UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

In re ENRON CORPORATION SECURITIES
LITIGATION

MARK NEWBY, et al., Individually and On Behalf
of All Others Similarly Situated,

Plaintiffs,

v.

ENRON CORP., et al.,

Defendants.

Civil Action No. H-01-3624
(Consolidated)

This Document Relates to:

WESTBORO PROPERTIES, LLC, et al.,

Plaintiffs,

v.

CREDIT SUISSE FIRST BOSTON, INC., et al.,

Defendants.

Civil Action No. H-03-1276
(Consolidated)

**MEMORANDUM OF LAW IN SUPPORT OF
DEUTSCHE BANK'S MOTION TO DISMISS PLAINTIFFS'
SECOND AMENDED COMPLAINT (INSTR. NO. 33)**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..................................................................................................... iii

INTRODUCTION AND SUMMARY ....................................................................................... 1

STANDARD OF REVIEW ........................................................................................................ 5

I.  PLAINTIFFS HAVE FAILED TO STATE A CLAIM UNDER SECTION 12(a)(2) and
    SECTION 15 OF THE 1933 SECURITES ACT. .............................................................. 6

    A.  Plaintiffs Fail to State a Claim Under Section 12(a)(2) of the Securities Act. ........... 6

        1.  Plaintiffs' Certificates Were Not Offered by Means of a Prospectus................. 7

        2.  Section 12(a)(2) Does Not Apply to Private Placements Such as the
            Certificate Sales. ............................................................................................. 11

    B.  Plaintiffs' Section 12(a)(2) and Section 15 Claims Relating to Their September
        1999 Certificate Purchases are Time-Barred. .......................................................... 13

    C.  Plaintiffs Fail to State a Claim Under Section 15 of the 1933 Act. .......................... 14

II.  PLAINTIFFS' CLAIMS UNDER THE TEXAS SECURITIES ACT MUST BE
     DISMISSED. ........................................................................................................................ 15

    A.  No Texas Entities Are Properly Alleged As The Targets of Plaintiffs' TSA
        Claims, Which Concern Sales and Securities Issued By A Delaware Trust And
        Alleged Participation In or Aiding of Osprey's Misrepresentations By New York
        Defendants. ................................................................................................................ 15

    B.  Plaintiffs' TSA Claims Would Be Barred by New York's Martin Act, Creating a
        Conflict of Laws......................................................................................................... 17

    C.  New York Law Applies To Plaintiffs' Claims of Misstatements in the Osprey
        Sales, Mandating Dismissal of Their TSA Claims. .................................................. 18

III.  PLAINTIFFS' COMMON LAW FRAUD CLAIM SHOULD BE DISMISSED. ............. 20

    A.  The Complaint Does Not Adequately Allege That Deutsche Bank Made Any
        Misstatements.............................................................................................................. 20

    B.  Plaintiffs Have Not Adequately Alleged Scienter. ................................................... 23

    C.  Plaintiffs Do Not Adequately Allege That They Reasonably Relied on Any
        Statement by Deutsche Bank. .................................................................................... 25

        1.  Plaintiffs Fail to Plead Actual Reliance with Particularity Under Rule 9(b).... 26

        2.  Plaintiffs Cannot Allege Reasonable Reliance on Any Statement by
            Deutsche Bank. ................................................................................................. 27

    D.  Defendants Had No Duty of Disclosure to Plaintiffs.................................................. 30

     E.     Plaintiffs Cannot Pursue "Holder" Fraud Claims Against Deutsche Bank. .............. 31

IV.    PLAINTIFFS' AIDING AND ABETTING FRAUD CLAIM IS INADEQUATELY PLED AND MUST BE DISMISSED. ................................................................. 33

     A.    Plaintiffs Have Not Alleged That Deutsche Bank Had Actual Knowledge of Enron's Alleged Fraud. ....................................................................... 34

         1.    Plaintiffs Fail to Allege That Deutsche Bank Had Actual Knowledge That the Structured Tax Transactions Were Fraudulent. ........................................... 34

         2.    Plaintiffs Fail to Allege That Deutsche Bank Had Actual Knowledge That the Osprey and Marlin Financings Were Fraudulent. ...................................... 36

         3.    Plaintiffs Fail to Allege That Deutsche Bank Had Actual Knowledge of Any Fraudulent Activity By The LJM2 Investment Partnership. ........................... 38

         4.    Plaintiffs Fail To Allege That Any Deutsche Bank Analyst Issued A Report or Recommendation Knowing That It Was In Service Of Some Fraud. .......... 39

     B.    Plaintiffs Have Not Alleged that Deutsche Bank Substantially Assisted in Any Alleged Fraud. .......................................................................... 40

         1.    Plaintiffs Do Not Allege That Deutsche Bank's Participation in the Tax Transactions Proximately Caused Their Injuries. ............................................. 40

         2.    Plaintiffs Do Not Allege That Deutsche Bank's Participation in the Osprey and Marlin Transactions Proximately Caused Their Injuries. ......................... 41

         3.    Plaintiffs Do Not Allege That Deutsche Bank's Investment in LJM2 Substantially Assisted LJM2's Fraud or Proximately Caused Plaintiffs' Injuries. ............................................................................................. 41

         4.    Plaintiffs Do Not Allege That Deutsche Bank's Analysts' Reports Proximately Caused Plaintiffs' Injuries. ........................................................ 42

V.    PLAINTIFFS FAIL TO ADEQUATELY PLEAD THEIR CIVIL CONSPIRACY CLAIMS. ............................................................................................ 43

CONCLUSION .................................................................................................... 45

# TABLE OF AUTHORITIES

## FEDERAL CASES

In re Alstom SA Sec. Litig., 406 F. Supp. 2d 402 (S.D.N.Y. 2005)...............................................14

Am. High-Income Trust v. Alliedsignal, 329 F. Supp. 2d 534 (S.D.N.Y. 2004) .........................10

In re Azurix Corp. Sec. Litig., 198 F. Supp. 2d 862 (S.D. Tex. 2002).........................................11

Banque Arabe et Internationale D'Investissement v. Maryland Nat'l Bank, 57 F.3d 146
    (2d Cir. 1995)............................................................................................................30, 31

Blackburn v. City of  Marshall, 42 F.3d 925 (5th Cir. 1995) .........................................................5

Castellano v. Young & Rubicam, Inc., 257 F.3d 171 (2d Cir. 2001) ...........................................17

Cates v. Creamer, 431 F.3d 456 (5th Cir. 2005)..........................................................................18

Collins v. Morgan Stanley Dean Witter, 224 F.3d 496 (5th Cir. 2000).........................................1

Cortec Indus., Inc. v. Sum Holding L.P., 949 F.2d 42 (2d Cir. 1991).............................................1

Cromer Fin. Ltd. v. Berger, 137 F. Supp. 2d 452 (S.D.N.Y. 2001).........................................33, 40

Doe v. Linam, 225 F. Supp. 2d 731 (S.D. Tex. 2002).....................................................................6

Double Alpha, Inc. v. Mako Partners L.P., No. 99 Civ 111541, 2000 WL 1036034
    (S.D.N.Y. Jul. 27, 2004) ...............................................................................................11

DynCorp v. GTE Corp., 215 F. Supp. 2d 308 (S.D.N.Y. 2002)....................................................29

El Pollo Loco, S.A. de C.V. v. El Pollo Loco, Inc., 344 F. Supp. 2d 986 (S.D. Tex. 2004) ...18, 19

Ellison v. America Image Motor Co., 36 F. Supp. 2d 628 (S.D.N.Y. 1999)..................................25

In re Enron Corp. Sec., Deriv. & "ERISA" Litig., 235 F. Supp. 2d 549
    (S.D. Tex. 2002).................................................................................................15, 24, 38

In re Enron Corp. Sec., Deriv. & "ERISA" Litig., 258 F. Supp. 2d 576 (S.D. Tex. 2003).....16, 17

In re Enron Corp. Sec., Deriv. & "ERISA" Litig., 284 F. Supp. 2d 511 (S.D. Tex. 2003)...........26

In re Enron Corp. Sec., Deriv. & "ERISA" Litig., 310 F. Supp. 2d 819
    (S.D. Tex. 2004)..........................................................................................1, 7, 12, 13

In re Enron Corp. Sec., Deriv. & "ERISA" Litig., 388 F. Supp. 2d 780 (S.D. Tex. 2005).......6, 33

iii

In re Enron Corp. Sec., Deriv. & "ERISA" Litig., 465 F. Supp. 2d 687 (S.D. Tex. 2006)...........14

In re Enron Corp. Sec., Deriv. & "ERISA" Litig., No. MDL-1446, Civ. A H-01-3624,
    2004 WL 405886 (S.D. Tex. Feb. 25, 2004) ............................................................14

In re Enron Corp. Sec., Deriv. & "ERISA" Litig., No. H-01-3624, 2005 WL 3704688
    (S.D. Tex. Dec. 5, 2005) ..............................................................................21, 28

In re Enron Corp. Sec., Deriv. & "ERISA" Litig., 2006 U.S. Dist. LEXIS 43146 (S.D.
    Tex. Jun. 5, 2006) ........................................................................................21

Faye L. Roth Revocable Trust v. UBS PaineWebber, Inc., 323 F. Supp. 2d 1279 (S.D.
    Fla. 2004) ...................................................................................................9

Filler v. Hanvit Bank, 339 F. Supp. 2d 553 (S.D.N.Y. 2004) (2d Cir. 2005)..................33, 34, 38

Frazier v. Turning Stone Casino, 254 F. Supp. 2d 295 (N.D.N.Y. 2003) .....................................43

In re General Mtrs. Corp. Anti-lock Brake Prods. Liab. Litig., 966 F. Supp. 1525
    (E.D. Mo. 1997) ...........................................................................................27

Gustafson v. Alloyd Co., 513 U.S. 561 (1995)....................................................6, 7, 10

Hernandez v. Ciba-Geigy Corp., No. Civ. A. B-00-82, 2000 WL 33187524
    (S.D. Tex. Oct. 17, 2000).................................................................................43

Hernandez v. Ciba-Geigy Corp. USA, 200 F.R.D. 285 (S.D. Tex. 2001)..............................26, 27

Hill York Corp. v. Am. Int'l Franchises, Inc., 448 F.2d 680 (5th Cir. 1971) ................................11

King v. Douglass, 973 F. Supp. 707 (S.D. Tex. 1996) .................................................18

Klaxon v. Stentor Elec. Mfg. Co., 313 U.S. 487 (1941)...............................................18

Kunzweiler v. Zero.net, Inc., No. 3:00-CV-2553-P, 2002 WL 1461732
    (N.D. Tex. Jul. 3, 2002) .................................................................................23

Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson, 501 U.S. 350 (1991)..........................13

Laser Mort. Mgmt., Inc. v. Asset Securitization Corp., No. 00 Civ. 8100 (NRB),
    2001 WL 1029407 (S.D.N.Y. Sept. 6, 2001)............................................................7, 8

Lewis v. Fresne, 252 F.3d 352 (5th Cir. 2001) ....................................................11, 14

In re Livent, Inc. Noteholders Sec. Litig., 151 F. Supp. 2d 371 (S.D.N.Y. 2001) ......................28

Lone Star Ladies Inv. Club v. Schlotzsky's, Inc., 238 F.3d 363 (5th Cir. 2001) ..........................14

McDaniel v. Bear Stearns & Co., 196 F. Supp. 2d 343 (S.D.N.Y. 2002) ....................................40

Pittman v. Grayson, 149 F.3d 111 (2d Cir. 1998)....................................................................43, 44

Ray Larsen Assocs., Inc. v. Nikko Am., Inc., No. 89 Civ. 2809 (BSJ), 1996 WL 442799
     (S.D.N.Y. Aug. 6, 1996) ...........................................................................................................31

Rich v. Maidstone Financial, Inc., No. 98 Civ. 2569 (DAB), 2002 WL 31867724
     (S.D.N.Y. Dec. 20, 2002)...........................................................................................................22

Ryan v. Hunton & Williams, No. 99-CV-5938 (JG), 2000 WL 1375265
     (E.D.N.Y. Sept. 20, 2000)...........................................................................................................39

SEC v. Ralston Purina Co., 346 U.S. 119 (1953) .........................................................................12

In re Sharp Int'l Corp., 403 F.3d 43 (2d Cir. 2005) .....................................................................42

Silvercreek Mgmt., Inc. v. Salomon Smith Barney, Inc. (In re Enron Corp. Sec., Deriv. &
     "ERISA" Litig.), No. Civ. A. H-02-3185, 2003 WL 23305555 (S.D. Tex. Dec. 11, 2003).....17

Southland Sec. Corp. v. INSpire Ins. Solutions, Inc., 365 F.3d 353
     (5th Cir. 2004)....................................................................................6, 23, 24, 25, 35, 39

Tigue Inv. Co. v. Chase Bank of Texas, No. Civ. A. 3:03 CV 2490 N, 2004 WL 3170789
     (N.D. Tex. Nov. 15, 2004) ..........................................................................................................25

United States ex. rel. Williams v. Bell Helicopter Textron, Inc., 417 F.3d 450
     (5th Cir. 2005)..........................................................................................................................20

VTech Holdings, Ltd. v. PricewaterhouseCoopers, LLP, 348 F. Supp. 2d 255
     (S.D.N.Y. 2004)..........................................................................................................................34

Waltree Ltd. v. ING Furman Selz LLC, 97 F. Supp. 2d 464 (S.D.N.Y. 2000) ..............................7

Williams v. Bank Leumi Trust Co. of New York, No. 96 Civ. 6695 (LMM), 1998 WL 397887
     (S.D.N.Y. Jul. 15, 1998) ............................................................................................................31

In re WorldCom, Inc. Sec. Litig., 294 F. Supp. 2d 431 (S.D.N.Y. 2003) ....................................10

In re WorldCom, Inc. Sec. Litig., 382 F. Supp. 2d 549 (S.D.N.Y. 2005) ..............................26, 32

Yung v. Lee, 432 F.3d 142 (2d Cir. 2005)..................................................................................7, 9

# STATE CASES

Anzerilla v. Am. Tobacco Co., No. Civ. 11754/96, 2000 WL 34016364
(N.Y. Sup. Ct. Oct. 27, 2000) ...................................................................33

Albion Alliance Mezzanine Fund, L.P. v. State Street Bank and Trust Co., 797 N.Y.S.2d 699
(N.Y. Sup. 2003)........................................................................................34

Burgundy Basin Inn, Inc. v. Watkins Glen Grand Prix Corp., 379 N.Y.S.2d 873
(N.Y. App. Div. 1976) ...............................................................................23

CPC Int'l, Inc. v. McKesson Corp., 70 N.Y.2d 268 (1987) ............................................17

Firestone Steel Prods. Co. v. Barajas, 927 S.W.2d 608 (Tex. 1996)..............................44

Frank v. Bear Stearns & Co., 11 S.W.3d 380 (Tex. App.—Houston [14th Dist.] 2000) .............15

Giant Group Ltd. v. Arthur Andersen LLP, 770 N.Y.S.2d 291 (N.Y. App. Div. 2003) ..............23

Greenberg Traurig of New York, P.C. v. Moody, 161 S.W.3d 56 (Tex. App.—Houston
[14th Dist.] 2004, no pet.)..........................................................................15, 17

Ins. Co. of N. Am. v. Morris, 981 S.W.2d 667 (Tex. 1998)....................................30, 43

Johnson & Higgins of Texas, Inc. v. Kenneco Energy, Inc., 962 S.W.2d 507 (Tex. 1998)....23, 25

Kaufman v. Cohen, 760 N.Y.S.2d 157 (N.Y. App. Div. 2003)....................................42

Lama Holding Co. v. Smith Barney, Inc., 646 N.Y.S.2d 76 (1996)..............................26

Lane v. McCallion, 561 N.Y.S.2d 273 (N.Y. App. Div. 1990)....................................26

Lenczycki v. Shearson Lehman Hutton, Inc., 656 N.Y.S.2d 609 (N.Y. App. Div. 1997)............34

Lesikar v. Rappeport, 33 S.W.3d 282 (Tex. App. -Texarkana 2000, pet. denied) ........................31

Lindsay v. Lockwood, 163 Misc. 2d 228 (N.Y. Sup. Ct. 1994) ...................................33

New York Univ. v. Cont'l Ins. Co., 87 N.Y.2d 308 (1995) ............................................23

Shirvanian v. DeFrates, No. 14-02-00447-CV, 2004 WL 35987
(Tex. App.—Houston [14th Dist.] Jan. 8, 2004) ......................................................32

Shirvanian v. DeFrates, 161 S.W.3d 102 (Tex. App.—Houston [14th Dist.] 2004)....................32

Small v. Lorillard Tobacco Co., Inc., 679 N.Y.S.2d 593 (N.Y. App. Div. 1998) ........................20

Snyder v. Puente De Brooklyn Realty Corp., 746 N.Y.S.2d 517 (N.Y. App. Div. 2002)............43

Stuart Silver Assocs. v. Baco Dev. Corp., 665 N.Y.S.2d 415 (N.Y. App. Div. 1997)................30

Weinstock v. Handler, 664 N.Y.S.2d 298 (N.Y. App. Div. 1997) ................................................30

## FEDERAL STATUTES

15 U.S.C. § 77*l*(a)(2) (2000) ...................................................................................................6, 7

15 U.S.C. § 77*c* (2000) ...............................................................................................................7

15 U.S.C. § 77*m* (2000) ...........................................................................................................13

28 U.S.C. § 1658(b) (2000) .......................................................................................................13

17 C.F.R. § 230.144(a) (2005) ...................................................................................................10

17 C.F.R. §§ 230.901-230.905 (2005) .......................................................................................10

Fed. R. Civ. Proc. 9(b) ..............................................................................................................6

## STATE STATUTES

N.Y. Gen. Bus. Law § 352 (McKinney's 2006) ..........................................................................17

Tex. Rev. Civ. Stat. § 581-33A(2) (Vernon Supp. 2002) ............................................................15

Tex. Rev. Civ. Stat. § 581-33A(2) (Vernon Supp. 2002) ............................................................17

## MISCELLANEOUS

Restatement (Second) of Conflict of Laws § 145 (1971) ...........................................................18

Restatement (Second) of Conflict of Laws § 148 (1971) ...........................................................18

Regulation D Revisions, Securities Act of 1933 Release No. 6683, 52 Fed. Reg. 3015, 3017 (Jan. 30, 1987) (available at 1987 WL 125172) ..................................................................12

Defendant Deutsche Bank Securities, Inc. ("Deutsche Bank")[1] respectfully submits this memorandum of law in support of its motion to dismiss the Second Amended Complaint (the "Complaint" or "Compl.") pursuant to Rules 12(b)(6) and 9(b) of the Federal Rules of Civil Procedure.

## INTRODUCTION AND SUMMARY

Plaintiff Westboro Properties LLC is an institutional investor based in Rochester, New York, and Plaintiff Stonehurst Capital Inc., also based in Rochester, New York, is the investment manager for Westboro. Westboro and other Stonehurst clients (that are not Plaintiffs here) invested equity in various Enron-related structures, including the Osprey Trust (a Delaware trust), through private placement transactions. In this action, Westboro sued Deutsche Bank and other financial institutions for losses in their Osprey Trust equity interests – i.e., in their Osprey Certificates.[2] Plaintiffs assert some claims that focus narrowly on the Osprey Certificates purchase transaction – claims under Sections 12(a)(2) and 15 of the Securities Act of 1933; claims for primary and secondary violations of the Texas Securities Act; and a common law

---

[1]   Deutsche Bank Securities, Inc. was formerly known as Deutsche Banc Alex.Brown Inc., which is named as a separate defendant in this action. This Court has already recognized that Deutsche Bank Alex.Brown Inc. ceased to be a legal entity following its name change on or about March 29, 2002. See In re Enron Corp. Sec., Deriv. & "ERISA" Litig., 310 F. Supp. 2d 819, 826 n.4 (S.D. Tex. 2004). The Complaint also names as a defendant "Deutsche Bank Alex.Brown Securities Inc.," which is not and has never been a separate legal entity.

[2]   While both Westboro and Stonehurst are named plaintiffs, the documents that effected the Osprey Certificates purchases show that Westboro is the owner, and that Stonehurst functions as its manager. (See Declaration of Ruth E. Harlow, dated February 28, 2007, filed concurrently with this Memorandum ("Harlow Decl."), Exh. 1 (September 1999 Osprey Trust Certificate Purchase Agreement) at Westboro signature page & Schedule I; Harlow Decl. Exh. 2 (July 2000 Osprey Trust Certificate Purchase Agreement) at Westboro signature page & Schedule I.) Stonehurst does not own any of the Certificates at issue and thus does not have any basis for its own, separate recovery of any award on the claims alleged.

The Certificate purchases are referred to throughout the Complaint (see, e.g., Compl. ¶¶ 23, 35, 40-41, 44), and those purchases underlie and are integral to all of the Complaint's causes of action. The Certificate Purchase Agreements thus may be relied upon in support of this motion under Rule 12(b)(6). See Collins v. Morgan Stanley Dean Witter, 224 F.3d 496, 498-99 (5th Cir. 2000); Cortec Indus., Inc. v. Sum Holding L.P., 949 F.2d 42, 46-48 (2d Cir. 1991) (affirming use of stock purchase agreement, warrant, and offering memorandum, submitted by defendant, in deciding Rule 12(b)(6) motion; defendant may produce documents that are integral to the complaint because plaintiff should not be allowed to escape the consequences of such documents simply by failing to attach them to the complaint).

1

fraud claim against Deutsche Bank.  Plaintiffs also assert broader claims that contend that Deutsche Bank and others allegedly aided and abetted or conspired with Enron in purported financial statement fraud.

For all the reasons discussed below, Plaintiffs' claims that they were deceived by Deutsche Bank in the Osprey Certificates purchase transaction cannot proceed.  The Complaint fails to plead facts that might establish that Section 12(a)(2) applies; to the contrary, that section does not apply, because the Certificates were sold in private transactions involving no prospectus.  Likewise, the Complaint fails to plead facts that establish the Texas Securities Act applies; the Certificates purchase took place in New York, the Plaintiffs and Deutsche Bank are based in and acted in New York, and no Texas entity was a party to that purchase transaction. Plaintiffs' common law fraud claim against Deutsche Bank also cannot proceed, because Plaintiffs have alleged no facts to support (i) that Deutsche Bank made any misstatements to Plaintiffs, (ii) that a Deutsche Bank actor had scienter in making some misstatement, or (iii) that Plaintiffs reasonably relied on a misstatement by Deutsche Bank.  Nor did Deutsche Bank have any duty to disclose to Plaintiffs.  Finally, Plaintiffs' common law aiding and abetting and conspiracy claims against Deutsche Bank fail to state a claim as well, because Plaintiffs have not alleged facts showing the knowledge and actions that would, through one of these secondary liability theories, link Deutsche Bank to an aspect of Enron's alleged financial statement fraud that harmed Plaintiffs.

Plaintiffs' Second Amended Complaint, filed with the benefit of full and complete discovery, contains 800-plus paragraphs of allegations.[3]  Given Plaintiffs' three opportunities to plead, their lengthy effort, and their continued failure to allege facts that might support any claim against Deutsche Bank, Plaintiffs' case should be dismissed in its entirety, with prejudice.

Before turning to the specifics of each asserted claim, however, it is important as background to point out that Plaintiffs try to obscure the circumstances and nature of their Certificates' purchases throughout the Complaint.  Plaintiffs repeatedly use the imprecise phrase "Osprey securities" to muddy their allegations – while also conceding (Compl. ¶¶ 40-44), as they must, that there were two distinct types of securities sold by Osprey:  (i) the Notes (which Plaintiffs did not purchase), sold through Rule 144A and Reg S offerings and formal offering memoranda, and (ii) the equity Certificates (which Plaintiffs did purchase), sold through face-to-face meetings and more individualized negotiations with a small group of institutional investors. For the Notes offering, Deutsche Bank and other financial institutions served as initial purchasers and then sold to investors; for the Certificates sales, Deutsche Bank and Donaldson, Lufkin & Jenrette (now Credit Suisse) were the alleged solicitors of sales, but the sales to investors occurred directly from the Osprey Trust.  (See Certificate Purchase Agreements, Harlow Decl. Exhs. 1 & 2.)

The Certificate purchasers were equity investors who, unlike the Note purchasers, had an active role in the closing of the Osprey financing and the operation of the Osprey Trust.

---

[3]     Plaintiffs filed their original complaint (the "Original Complaint") on April 17, 2003.  (Instr. No. 1.)  In addition to Deutsche Bank, the Original Complaint named as defendants Credit Suisse First Boston, Inc., Donaldson Lufkin & Jenrette Securities Corporation, The Bear Stearns Companies, Inc., Lehman Brothers Holdings, Inc., Citigroup, Inc. and UBS Warburg LLC (as well as a number of entities allegedly related to each of those defendants).  (Id.)  Plaintiffs filed their First Amended Complaint on July 25, 2003.  (Instr. No. 9.)  On August 17, 2006, Plaintiffs filed a motion to further amend their complaint, which the Court granted on January 22, 2007.  (Instr. Nos. 26, 32.)  Plaintiffs' Second Amended Complaint names Deutsche Bank and the Citigroup and UBS-related entities as the remaining defendants at the time of its filing.

Plaintiffs' claims of being deceived by Deutsche Bank in the Osprey Certificates purchases are particularly disingenuous, because the relevant transaction documents reveal that Plaintiffs themselves (a) had direct access to whatever documents they reasonably might have needed – the same access as Deutsche Bank – to satisfy themselves about the nature of the purchase and the Osprey and Whitewing structures;[4] (b) had independent, Certificate purchasers' counsel (Dewey Ballantine) that reviewed all of the many transaction documents (including, for example, the Indenture and the powers of the Indenture Trustee) for them in advance of their investment;[5] (c) as Certificate holders, were responsible for the operation of the Osprey Trust,[6] and (d) consented, in writing, after receiving information about the assets and an opportunity to ask questions, to the initial asset purchases of Sarlux, Trakya, and Promigas (and any subsequent investments over $40 million) by Whitewing[7] – purchases that they now imply they knew nothing about.

---

[4]     See Conditions Precedent to Purchase in Certificate Purchase Agreements, Harlow Decl. Exhs. 1 & 2 at Section 2.1 (incorporating Conditions Precedent in Section 3.1 of the Participation Agreement), Section 2.2(ii) ("Osprey Certificate holder has received such other documents, certificates or opinions as such Osprey Certificate holder may reasonably request") & Section 2.2(v) ("all Transaction Documents [as defined in the Participation Agreement, and including inter alia the Whitewing Management LLC Agreement, the Indenture, the Osprey Trust Agreement] shall be in form and substance reasonably satisfactory to each Osprey Certificateholder").  The Participation Agreement, Exh. 3 to Harlow Decl., specifies in Section 3.1(e) and (k) that other conditions precedent are an opinion satisfactory to the Certificateholders from "Dewey Ballantine LLP, special counsel to the Certificateholders (addressed to the Certificateholders only)" and that the "Initial Purchasers and the Certificateholders shall have received such other documents, certificates and opinions as any such Person or their counsel may reasonably request."

[5]     See supra note 4.

[6]     Osprey Trust Agreement, Exh. 4 to Harlow Decl., Section 7.01.  Plaintiffs' Complaint refers throughout to and depends upon the creation of the Osprey Trust, which sold and issued the Certificates to Westboro. (See, e.g., Compl. ¶¶ 23, 27, 39.)

[7]     Whitewing Management LLC Agreement, Exh. 5 to Harlow Decl., Section 6.06(b) & (c) (discussing consent requirement by an Osprey Majority (51% of Certificateholders) to allow the purchase of any asset with a price over $40 million and in other circumstances), Schedule 6.01(c) (describing information provided to Certificateholders before consent sought).  The Whitewing Management LLC Agreement is referred to in paragraph 109 of the Complaint, and is another core transaction document upon which Plaintiffs' claims depend.

        Plaintiff Stonehurst, through Douglas D. Stark, managed and executed the consents for 51% of the initial Certificateholders, and thus was a key party – the only necessary party – for securing the required Osprey

Plaintiffs' allegations fail to state a claim even without placing them in context and referring to the documents, properly considered on this motion, that Plaintiffs' themselves quote or rely upon in the Complaint. But Plaintiffs' current assertions that they were surprised about the non-arms-length Whitewing asset purchase process, Osprey Trust's dependence on Enron's financial condition, or the powers of the Osprey Indenture Trustee, for example, are belied by all the operative documents that they and their counsel reviewed at the time they invested in the Certificates. And to the extent that Plaintiffs are, in retrospect, dissatisfied with Whitewing's investments in Sarlux, Trakya, etc., they have themselves to blame – Plaintiffs specifically consented in writing to those individual investments.[8] Deutsche Bank certainly is not to blame, for it played no role whatsoever in any Enron/Whitewing asset transfer negotiations or deals, nor was it the source of information on those asset transactions for the Certificate holders, who had direct access to information through Osprey and Whitewing.[9]

## STANDARD OF REVIEW

A claim must be dismissed under Rule 12(b)(6) "if the complaint lacks an allegation regarding a required element necessary to obtain relief." <u>Blackburn</u> v. <u>City of</u>

---

Majority of consents. (<u>See</u> Certificate Purchase Agreement, Exh. 1 to Harlow Decl., at Osprey Associates/ Westboro signature pages & Schedule I.)

[8] The basic transaction documents submitted herewith show that various allegations in the Complaint – which was filed after complete discovery – do not have any factual foundation and instead are clearly false. For example, Plaintiffs claim in paragraph 23 that they purchased their Osprey Certificates "on a 'take it or leave it' basis and, other than Defendants' representations, ***no other information about the particulars of the transaction was available to the Plaintiffs***." (Compl ¶ 23 (emphasis added).) As noted above and reflected in the Conditions Precedent to the closing of their Certificate purchases, nothing could be farther from the truth. Similarly, Plaintiffs represent to the Court that all of the "Osprey investors," including the Certificate purchasers, "did not purchase their securities from the Osprey Trust" but instead purchased them from banks that were initial purchasers. (Compl. ¶ 60; <u>but cf</u>. Certificate Purchase Agreements, cited <u>supra</u> (showing that Certificate purchases occurred directly from Osprey Trust).) Plaintiffs are trying to create the false impression that they were dependent on the banks and had no direct access to information in making their investments, when in fact they purchased not from an "Osprey underwriting syndicate" but from Osprey itself and when in fact Plaintiffs had every opportunity to do any due diligence they thought appropriate. (<u>Cf</u>. Compl. ¶ 62.)

[9] <u>See</u> <u>supra</u> note 7.

Marshall, 42 F.3d 925, 931 (5th Cir. 1995) (quotation omitted).  Plaintiffs' claims grounded in allegations of fraud must additionally be pleaded with particularity under Federal Rule of Civil Procedure 9(b), see In re Enron Corp. Sec., Deriv. & "ERISA" Litig., 388 F. Supp. 2d 780, 785 (S.D. Tex. 2005), and the Court will not accept as true "conclusory allegations, unwarranted deductions or legal conclusions."  Southland Sec. Corp. v. INSpire Ins. Solutions, Inc., 365 F.3d 353, 361 (5th Cir. 2004).  In addition, "[a] motion to dismiss for failure to state a claim is the proper vehicle by which to assert a limitations defense where a plaintiff's complaint shows affirmatively that his claims are time-barred."  Doe v. Linam, 225 F. Supp. 2d 731, 734 (S.D. Tex. 2002).

Moreover, where it is clear that amendment would be futile because the deficiencies in the complaint cannot be cured, a complaint should be dismissed with prejudice. See Southland Sec. Corp., 365 F.3d at 385 (affirming district court's conclusion that plaintiffs "should not be afforded yet another opportunity to replead").  Such is the case here, as Plaintiffs are unable to allege sufficient facts to support their claims, despite having had two opportunities to amend their Complaint as well as the benefit of full discovery in this litigation.

## ARGUMENT

**I.    PLAINTIFFS HAVE FAILED TO STATE A CLAIM UNDER SECTION 12(a)(2) AND SECTION 15 OF THE 1933 SECURITIES ACT.**

### A.    Plaintiffs Fail to State a Claim Under Section 12(a)(2) of the Securities Act.

Section 12(a)(2) extends liability only to persons who directly sell a security "by means of a prospectus" that contains a misstatement or omission of material fact.  15 U.S.C. § 77*l*(a)(2).  In Gustafson v. Alloyd Co., 513 U.S. 561 (1995), the Supreme Court held that the term prospectus is limited to a document that "must include the 'information contained in the registration statement.'"  513 U.S. at 569.

As this Court has observed, under <u>Gustafson</u>, only public offerings fall within the ambit of Section 12(a)(2).  <u>See</u> <u>In re Enron Corp.</u>, 310 F. Supp. 2d at 860 (citing <u>Gustafson</u>, 513 U.S. at 584).  At the same time, both the text of Section 12 and <u>Gustafson</u> make clear that liability must also be based on the existence of a "prospectus," irrespective of whether the offering is in some ways public.  In other words, not every offering that could be characterized as "public" will be subject to Section 12(a)(2) – only those with offering documents that "must include" the information contained in a registration statement.  15 U.S.C. § 77*l*(a)(2); <u>Gustafson</u>, 513 U.S. at 569; <u>see also</u> <u>Yung</u> v. <u>Lee</u>, 432 F.3d 142, 149 (2d Cir. 2005) (holding that "Section 12(a)(2) liability cannot attach unless there is an 'obligation to distribute a prospectus'").[10] Here, however, careful parsing of these distinctions is unnecessary:  Plaintiffs' claims fail both because they can point to no "prospectus" applicable to their purchases ***and*** because they purchased their Certificates pursuant to a purely private sale.[11]

### 1.    Plaintiffs' Certificates Were Not Offered by Means of a Prospectus.

Plaintiffs' Section 12(a)(2) claims fail at the outset because they do not (and cannot) allege that they purchased their Certificates pursuant to a "prospectus."  <u>See</u> <u>Waltree Ltd.</u> v. <u>ING Furman Selz LLC</u>, 97 F. Supp. 2d 464, 470 (S.D.N.Y. 2000) (dismissing Section 12(a)(2) claim where plaintiff failed to "allege the existence of a 'prospectus'").  Indeed, as is customary

---

[10]    The <u>Gustafson</u> Court explained that there is only one category of documents not requiring registration – <u>i.e.</u>, documents relating to offerings exempted from registration by virtue of Section 3, 15 U.S.C. § 77c– that may still qualify as a "prospectus."  <u>See</u> 513 U.S. at 569 (noting that except "for the explicit and well defined exemptions for securities listed under § 3" the "mandate is unqualified: '[A] prospectus . . . shall contain the information contained in the registration statement") (alteration in original); <u>see also</u> <u>Yung</u> v. <u>Lee</u>, 432 F.3d at 148 n.3; <u>Laser Mort. Mgmt., Inc.</u> v. <u>Asset Securitization Corp.</u>, No. 00 Civ. 8100 (NRB), 2001 WL 1029407, at *8 n.9 (S.D.N.Y. Sept. 6, 2001).  There are no exemptions under Section 3 at issue here.

[11]    While Section 12(a)(2) also addresses offers made by means of an "oral communication," <u>Gustafson</u> held that this phrase "is restricted to oral communications that relate to a prospectus."  513 U.S. at 567-68 (noting agreement among Courts of Appeals on this point).  Because (among other reasons) Plaintiffs do not allege the existence of a prospectus, they cannot state a Section 12(a)(2) claim based on any oral misrepresentation.

for this type of private equity interest sale, there was no formal offering document of any kind. Plaintiffs describe their Certificate purchases as having occurred after face-to-face meetings and after they "received and relied on the information presented in the August 1999 and June 2000 Pamphlets" that were alleged summaries for potential investors in the Certificates.  (Compl. ¶¶ 47-48, 50.)  They also allege that they were given copies of the Offering Memorandum ("OM") for the Osprey I Note offering and, purportedly, a draft OM for another Note offering that occurred months after all of their Certificate purchases.  (Id. ¶¶ 50, 68.)[12]  These allegations fail to state a claim for a number of reasons.

First, while the Osprey **Notes** were offered by means of offering memoranda, it is apparent from the OMs themselves that Plaintiffs' **Certificates** were not.  The Osprey I OM states right on the cover (and in other places as well) that "[t]he Osprey Trust Certificates are not being offered hereby."  (See Osprey I OM, Harlow Decl. Exh. 6 at cover, 10.)[13]  Accordingly, even if Plaintiffs could establish that the Osprey I OM was a "prospectus" (which as shown below, they cannot), Plaintiffs cannot use that document to support any Section 12(a)(2) claim based on the Certificates.  See Laser Mort. Mgmt, 2001 WL 1029407, at *8 (dismissing Section 12(a)(2) claim where court held that "Private Certificates were not sold 'by means of a prospectus' because the offering documents" in question were "explicit" that such certificates were not being offered thereby).

Second, in purchasing the Certificates, Plaintiffs clearly understood and agreed that there was no "obligation to distribute a prospectus" in connection with the Certificates

---

[12]     There is, however, no evidence whatsoever that any draft of the "Osprey III" OM, a transaction that closed on October 5, 2000, existed at the time of the interim Certificates offering which Plaintiffs allege occurred in June 2000.  (Compl. ¶ 41.)  The Certificate Purchase Agreement for those purchases is dated as of July 10, 2000.  (See Harlow Decl. Exh. 2.)  The second Osprey OM for potential Note purchasers was created and first distributed in draft form in September 2000.

[13]     Plaintiffs allege various misrepresentations in the OM, and thus Deutsche Bank can provide this document to the Court on a Rule 12(b)(6) motion.  (See, e.g.,Compl. ¶¶ 67, 70, 95, 116.)

offering.  See Yung v. Lee, 432 F.3d at 149.  The Certificate Purchase Agreements that govern

Plaintiffs' purchases expressly state that the "Osprey Certificates will be offered and sold to the

Osprey Certificateholders without being registered under the Securities Act of 1933 . . . in

reliance on exemptions therefrom and may not be offered or sold except pursuant to an

exemption from the registration requirements of the Securities Act."  (See Certificate Purchase

Agreements, Harlow Decl. Exhs. 1 & 2 at 1, 4.)  They further state that the non-registration of

the Certificates was dependent, at least in part, on representations from Plaintiffs, including the

representation that Plaintiffs were purchasing Certificates for their own investment purposes

"and not with a view toward distribution" of the Certificates in a way that would require

registration.  (Id. at 4.)  The agreements also require that each Certificateholder expressly

represent that it is an "accredited investor" within the meaning of Rule 501(a)(1), (2), (3) or (7)

of Regulation D (id. at 2) – which provides for an exemption from registration under Section

4(2) of the Securities Act.[14]  See Faye L. Roth Revocable Trust v. UBS PaineWebber, Inc., 323

F. Supp. 2d 1279, 1294-96 (S.D. Fla. 2004) (holding that offerings under Regulation D to

"accredited investors" are not covered by Section 12(a)(2)).

       Third, even if it had applied to the Certificates, the Osprey I OM is itself not a

"prospectus," nor do Plaintiffs anywhere allege that it is a prospectus.  The OMs, too, are explicit

that there was no prospectus distribution requirement.  The Osprey I OM states on its cover that

the Osprey Notes were offered pursuant to Rule 144A and Regulation S – neither of which is

subject to the registration requirements of the 1933 Act – and that the Notes "HAVE NOT BEEN

AND WILL NOT BE REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF

1933."  (See Osprey I OM, Harlow Decl. Exh. 6 at cover.).  Transactions under Rule 144A,

---

[14]    The Osprey I OM also refers to the Osprey Certificates as being separately "offered for sale in the United States to institutional investors in reliance on Section 4(2) of the Securities Act."  (See Osprey I OM, Harlow Decl. Exh. 6 at 52.)

which is entitled "Private Resales of Securities to Institutions," are private transactions with

qualified institutional buyers that are not subject to the registrations requirements of the 1933

Act.  17 C.F.R. § 230.144(a).  Courts have held that such offerings cannot give rise to Section

12(a)(2) liability because no prospectus is required.  See In re WorldCom, Inc. Sec. Litig., 294 F.

Supp. 2d 431, 455-56 (S.D.N.Y. 2003) (dismissing Section 12(a)(2) claim, finding that "[t]he

terms of the [144A] Offering Memorandum compel the conclusion that the . . . Offering was a

private placement . . . no matter how the plaintiff might word the claim, the document involved

cannot be silkenized into a § 12(a)(2) 'prospectus.'") (citations omitted); Am. High-Income Trust

v. Alliedsignal, 329 F. Supp. 2d 534, 543 (S.D.N.Y. 2004) (holding that "offerings under Rule

144A are by definition non-public, and offering memoranda distributed in connection with such

offerings cannot give rise to Section 12(a)(2) liability").  Similarly, Regulation S offerings are

made pursuant to a safe harbor from the registration requirements of Section 5 of the 1933 Act.

17 C.F.R. §§ 230.901-230.905.  Such sales are not offered pursuant to a prospectus, and

therefore are not subject to Section 12(a)(2) liability.  Gustafson, 513 U.S. at 578.[15]

   It is clear from the lack of a "prospectus" for the Certificates that there can be no

Section 12(a)(2) liability.  To eliminate any doubt that Plaintiffs' claims should be dismissed,

Deutsche Bank also demonstrates that Plaintiffs' allegations show that Certificates were sold in

purely private transactions.

---

[15] Plaintiffs allege in conclusory fashion, with no accompanying factual allegations, that "[t]he offering documents for the [Rule 144A and Reg S] securities had disclosures which *appeared to contain* information comparable to that provided in registered securities offerings."  (See Compl. ¶¶ 808-09 (emphasis added).)  They also affirmatively state that "there was an absence of a registration statement covering the securities."  (Id. ¶ 811.)  Thus, even for the Notes OM, Plaintiffs concede that these documents were not actually a prospectus, but merely allegedly appeared to be similar.  The standard for a Section 12(a)(2) claim requires a real and mandatory prospectus.  See Yung v. Lee, 432 F.3d at 149; see also In re WorldCom, Inc. Sec. Litig., 294 F. Supp. 2d at 455-56 (dismissing 12(a)(2) claim where plaintiffs failed to allege that the offering memorandum for the securities was a "prospectus," and rejecting allegations that the offering memorandum contained "the type of information contained in a prospectus in a registered public offering" as "ineffective to convert it to a public offering").

## 2. Section 12(a)(2) Does Not Apply to Private Placements Such as the Certificate Sales.

Following <u>Gustafson</u>, courts have routinely held that Section 12(a)(2) does not apply to <u>any</u> form of private placement.  <u>See, e.g.</u>, <u>Lewis</u> v. <u>Fresne</u>, 252 F.3d 352, 357-58 (5th Cir. 2001) (affirming dismissal of Section 12(a)(2) claims because Section 12(a)(2) does not apply to a private placement); <u>In re Azurix Corp. Sec. Litig.</u>, 198 F. Supp. 2d 862, 893 (S.D. Tex. 2002) (noting that <u>Gustafson</u> makes clear that Section 12 claims "apply only to public offerings"); <u>Double Alpha, Inc.</u> v. <u>Mako Partners L.P.</u>, No. 99 Civ. 111541, 2000 WL 1036034, at *3 (S.D.N.Y. Jul. 27, 2004) (holding that Section 12(a)(2) liability "does not extend to private placements of securities for which a prospectus is not required").  It is beyond dispute that the Certificate sales were purely private transactions.

First, Plaintiffs do <u>not</u> allege that they purchased their Certificates pursuant to any public offering.  As they do to obscure the facts throughout their pleading, Plaintiffs vaguely refer to the offerings of all of the "Osprey securities" collectively – <u>i.e.</u>, the Notes and Certificates – as having been "syndicated, promoted and sold by Defendants *just like* public offerings to widely disseminated purchasers."  (Compl. ¶ 810 (emphasis added).)  Notwithstanding Plaintiffs' attempt to gloss over this critical issue, however, the Complaint lacks any factual allegations that might establish that the <u>Certificates</u> were offered to the public – because of course they were not.

Second, as discussed, there was no formal offering document for the Certificates.  Plaintiffs allege that they learned about the contours of the Osprey deal and the possibility of an equity investment through face-to-face meetings and other informal presentation materials.  (See Compl. ¶¶ 61, 47, 97.)  These are classic indicia of a "private" offering.  See <u>Hill York Corp.</u> v. <u>Am. Int'l Franchises, Inc.</u>, 448 F.2d 680, 687-89 (5th Cir. 1971).

Third, the size of the Certificate offering also compels the finding that this was a private sale.  The September 1999 Certificate offering had just five purchasers who requested ten Certificates; likewise, for the July 2000 offering, there were four purchasers who requested eight Certificates.  (See Harlow Decl. Exhs. 1 & 2 at Schedule I.)

Finally, Plaintiffs are sophisticated institutional investors who, under the Supreme Court's decision in SEC v. Ralston Purina Co., do not "need the protection of the [1933] [A]ct." 346 U.S. 119, 125 (1953).  As this Court has previously noted, "[a]n offering to those who are shown to be able to fend for themselves is a transaction 'not involving any public offering.'"  In re Enron Corp., 310 F. Supp. 2d at 861 (quoting Ralston Purina, 346 U.S. at 124-25).  Here, the Certificate Purchase Agreements that govern the Plaintiffs' purchases were expressly conditioned on Plaintiffs' warranty and representation that they were "accredited investors" within the meaning of Rule 501(a) of Regulation D.  (See Harlow Decl. Exhs. 1 & 2 at 3.)[16]

Moreover, Plaintiffs' obligation to accept and pay for their Certificates was expressly conditioned on their having received: (1) "such other documentation, certificates or opinions as [they] may reasonably request in connection with the consummation of the transactions contemplated" in the Certificate Purchase Agreement; and (2) the underlying Osprey and Whitewing transaction documents "in form and substance reasonably satisfactory to each Osprey Certificateholder."  (Id. at 2.)  In addition, those transaction documents reveal that a condition precedent for the entire Osprey financing was the Certificate purchasers' *own counsel*, Dewey Ballantine, providing an opinion letter that stated that all of the transaction documents

---

[16]     See Regulation D Revisions, Securities Act of 1933 Release No. 6683, 52 Fed. Reg. 3015, 3017 (Jan. 30, 1987) (available at 1987 WL 125172) (holding that "the concept of the 'accredited investor' . . . is intended to encompass those persons whose financial sophistication and ability to sustain the risk of loss of investment or ability to fend for themselves render the protections of the Securities Act's registration process unnecessary").

were to its satisfaction.  See supra note 4.  These investors are clearly those who can and did

"fend for themselves."  In re Enron Corp. Sec., 310 F. Supp. 2d at 861.[17]

**B.**   **Plaintiffs' Section 12(a)(2) and Section 15 Claims Relating to Their September 1999 Certificate Purchases are Time-Barred.**

Claims brought under Sections 12(a)(2) and 15 of the 1933 Act must be brought

within one year of the date of discovery of the general facts constituting the alleged violation and

by three years from the date the securities were purchased.  15 U.S.C. § 77*m*; Lampf, Pleva,

Lipkind, Prupis & Petigrow v. Gilbertson, 501 U.S. 350, 364 (1991).  Plaintiffs' Securities Act

claims based on Plaintiffs' September 1999 purchases thus separately fail because they are time-

barred under the three-year statute of repose.  The three-year period for those claims expired in

September 2002, nearly nine months prior to the filing of the Original Complaint on April 17,

2003.

This one-year/three-year statutory framework is not affected by Section 804 of the

Sarbanes-Oxley Act, which extended the limitations period in certain circumstances to the earlier

of two years from discovery or five years from purchase.  Pub. L. No. 107-204, § 804 (codified

at 28 U.S.C. § 1658(b)).  This Court has previously refused to apply the extended statute of

limitations to Section 12(a)(2) claims.  See In re Enron Corp. Sec., Deriv. & "ERISA" Litig., No.

---

[17]    This Court has previously noted that the Osprey I OM contains a number of provisions suggesting that the Notes offering was itself private.  See In re Enron Corp., 310 F. Supp. 2d at 863-64 (quoting from Osprey I OM and listing factors).  While the Court concluded that based on the Newby plaintiffs' allegations regarding the sales for the *Notes*, including allegations that the Notes were listed and publicly traded on the Luxembourg Stock Exchange, there may be an issue of fact with respect to whether the offering for the Notes was public that could be resolved through discovery, id. at 865-66, there is no such factual issue here, given the *absence* of a "prospectus," and – despite Plaintiffs' access to *full discovery* here – the absence of any factual allegations that the Certificate placement was public, any allegation of a large number of offerees or purchasers, or indeed any factual allegation whatsoever that might transform this patently private placement into a public offering.

MDL-1446, Civ. A H-01-3624, 2004 WL 405886, at *19 (S.D. Tex. Feb. 25, 2004).[18]  The Court recently affirmed this view in a December 8, 2006, noting that the extended statute of limitations period *only* applies to securities claims that require proof of fraudulent intent as an element of the cause of action.  See In re Enron Corp. Sec., Deriv. & "ERISA" Litig., 465 F. Supp. 2d 687, 712 (S.D. Tex. 2006).  While the Court's discussion dealt specifically with claims governed by Section 18 of the Exchange Act of 1934, the same reasoning is equally applicable to Section 12(a)(2).  Indeed, this Court cited with approval In re Alstom SA Sec. Litig., 406 F. Supp. 2d 402 (S.D.N.Y. 2005), which expressly held that Section 804, for the same reasons, did not apply to *any* claims under Section 11 and 12(a)(2) of the Securities Act or Section 18 of the Exchange Act of 1934.  In re Enron Corp., 465 F. Supp. 2d at 712; In re Alstom SA Sec. Litig., 406 F. Supp. 2d at 412-14.

### C.      Plaintiffs Fail to State a Claim Under Section 15 of the 1933 Act.

As shown above, Plaintiffs do not and cannot allege any primary violation of Section 12(a)(2) in connection with their private purchases of the Certificates.  As a derivative claim, the control person claim asserted under Section 15 must also be dismissed.  See Lewis, 252 F.3d at 357.

---

[18]      While the Court appears to have previously distinguished between fraud based and non-fraud based claims under Section 12(a)(2), see In re Enron Corp., 2004 WL 405886, at *19, the Court has not specifically ruled that the extended statute of limitations applied to any Section 12(a)(2) claims in the Newby litigation or elsewhere.  In any event, it appears that because Plaintiffs' Securities Act claims closely track the language of Section 12(a)(2), they intend to assert claims that are not "grounded in fraud."  (See Compl. ¶ 810; Lone Star Ladies Inv. Club v. Schlotzsky's, Inc., 238 F.3d 363, 369 (5th Cir. 2001) (holding that plaintiff's claims, which averred that defendant "made untrue statements of material facts and omitted to state material facts, in violation of" Section 12(a)(2) did "not sound in fraud").)

## II.  PLAINTIFFS' CLAIMS UNDER THE TEXAS SECURITIES ACT MUST BE DISMISSED.

The Texas Securities Act ("TSA") does not apply to Plaintiffs' Certificate purchases, which did not take place in Texas or otherwise involve selling entities in Texas. Plaintiffs contend that the Court should apply Texas law to its state law claims because, they claim, "the State of Texas has the closest and most significant relationship" with this action. (Compl. ¶ 742.)  Plaintiffs plead that, alternatively, New York law applies.  (Id. ¶ 743.) Plaintiffs' claims under the TSA present a clear conflict of laws between New York and Texas statutory law, as New York does not recognize a private right of action under its analog to the TSA.  See Greenberg Traurig of New York, P.C. v. Moody, 161 S.W.3d 56, 75-76 (Tex. App.— Houston [14th Dist.] 2004, no pet.).  As discussed below, the applicable choice of law analysis mandates that New York law should apply and Plaintiffs' TSA claims should be dismissed.

### A.  No Texas Entities Are Properly Alleged As The Targets of Plaintiffs' TSA Claims, Which Concern Sales and Securities Issued By A Delaware Trust And Alleged Participation In or Aiding of Osprey's Misrepresentations By New York Defendants.

While it may be true that the TSA can be invoked to protect investors outside Texas from securities law violations "emanating from Texas," see In re Enron Corp. Sec., Deriv. & "ERISA" Litig., 235 F. Supp. 2d 549, 691 (S.D. Tex. 2002), as shown below, Plaintiffs' TSA claims focus only on alleged securities law violations by non-Texas entities acting entirely outside of Texas.

To state a claim under either Article 581-33A(2) or Article 581-33F(2) Plaintiffs must allege facts showing a primary violation by a "seller" or "offeror" that is in privity with the plaintiff.  See Tex. Rev. Civ. Stat. art. 581-33A(2) (Vernon Supp. 2002) ("A person who *offers or sells* a security . . . by means of an untrue statement of a material fact or an omission . . . is liable to the person buying the security *from him*.") (emphasis added); see also Frank v. Bear

Stearns & Co., 11 S.W.3d 380, 383 (Tex. App.—Houston [14th Dist.] 2000) (this section "'is a **privity** provision'") (emphasis in original).  As with statutory sellers under Section 12(a)(2) of the Securities Act of 1933, the TSA's Article 581-33(A)(2) imposes liability only on those persons who actually pass title or who actively engage in solicitation of the securities purchased by a plaintiff.  See In re Enron Corp. Sec., Deriv. & "ERISA" Litig., 258 F. Supp. 2d 576, 603-04 (S.D. Tex. 2003).

Under the allegations in the Complaint, there are only two possible primary violators under the TSA – the Osprey Trust or the only remaining defendant bank, Deutsche Bank.  Enron, the only Texas-based entity that Plaintiffs have identified in the Complaint, cannot be a primary violator because it is not alleged to be either a "seller" or "offeror" of the Osprey Certificates in privity with Plaintiffs.  Rather, Plaintiffs vaguely and nonspecifically allege that "Enron was an issuer and offeror of *securities*" (Compl. ¶ 748 (emphasis added)), and do not make any factual allegations to support any contention that Enron was an offeror of the *Osprey Certificates* in privity with *Plaintiffs* (as opposed to other investors who, for example, who might have purchased *Enron* bonds from Enron).  It is clear from the documentation that the Osprey Trust, not Enron, sold the Certificates.  (See Compl. ¶ 23, 39; Certificate Purchase Agreements, Harlow Decl. Exhs. 1 & 2 at 1.)  Moreover, Plaintiffs also have not alleged that Enron took any part in the selling process within the meaning of Article 581-33(A).  Accordingly, there is no alleged statutory violation "emanating from Texas" that Plaintiffs can plausibly seek to address by means of the Texas Securities Act.  Plaintiffs' TSA claims should be dismissed because that statute simply does not apply to the extraterritorial deceptions alleged in support of Plaintiffs' TSA claims.

**B.     Plaintiffs' TSA Claims Would Be Barred by New York's Martin Act, Creating a Conflict of Laws.**

A formal conflict of laws analysis yields the same result.  New York's Blue Sky laws, which are analogous to the TSA, are known as the Martin Act.  N.Y. Gen. Bus. Law § 352, et seq.  The Martin Act governs fraud and deception in the purchase and sale of securities, including claims that do not require proof of intent to defraud.  See CPC Int'l, Inc. v. McKesson Corp., 70 N.Y.2d 268, 276 (1987); Castellano v. Young & Rubicam, Inc., 257 F.3d 171, 190 (2d Cir. 2001).  As this Court has recognized, however, the Martin Act "does not permit [a] private right of action for violations of its antifraud provisions."  Silvercreek Mgmt., Inc. v. Salomon Smith Barney, Inc. (In re Enron Corp. Sec., Deriv. & "ERISA" Litig.), No. Civ. A. H-02-3185, 2003 WL 23305555, at *4 & n.9 (S.D. Tex. Dec. 11, 2003) (citing CPC Int'l, 70 N.Y.2d at 276; Castellano, 257 F.3d at 190).  Therefore, private actions not involving proof of intent to defraud are precluded by the Martin Act.  See CPC Int'l, 70 N.Y.2d at 276; Castellano, 257 F.3d at 190; see also In re Enron Corp., 2003 WL 23305555, at *13 (holding that "a logical and persuasive rationale" existed for pre-empting causes of action that, "like the Martin Act itself, do not require proof of deceitful intent…").  Plaintiffs' claims under the Texas Securities Act do not require proof of fraudulent intent, see Tex. Rev. Civ. Stat. art. 581-33A(2) (Vernon Supp. 2002);[19] In re Enron Corp., 258 F. Supp. 2d at 607, and therefore would be barred by the Martin Act, creating a conflict of laws.  See Greenberg Traurig, 161 S.W.3d at 76 (dismissing TSA claims where New York law applied to plaintiffs' allegations and holding that "unlike the Texas Securities Act, New York's Martin Act provides for neither an express nor implied private claim").

---

[19]     While Plaintiffs' claims under Art. 581-33(F) do require proof of a type of scienter, such claims are secondary in nature and cannot be asserted in the absence of a primary violation.  See In re Enron Corp., 258 F. Supp. 2d at 607.

C.   **New York Law Applies To Plaintiffs' Claims of Misstatements in the Osprey Sales, Mandating Dismissal of Their TSA Claims.**

A federal court deciding choice of law questions must apply the choice of law rules of the state in which its sits.  Klaxon v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496 (1941); King v. Douglass, 973 F. Supp. 707, 723 (S.D. Tex. 1996).  For tort claims generally, Texas follows the "most significant relationship" test contained in Section 145 of the Restatement (Second) of Conflicts of Laws.[20]  See Cates v. Creamer, 431 F.3d 456, 463-64 (5th Cir. 2005). Where a party asserts fraud or misrepresentation claims, however, the more specific test in Restatement Section 148 dealing with "Fraud and Misrepresentation" applies.  El Pollo Loco, 344 F. Supp. 2d at 990.  As demonstrated below, both the specific test set forth in Section 148(1) and the general test of Section 145 mandate application of New York law to Plaintiffs' statutory securities fraud claim.  Section 148(1) provides in relevant part:

> When the plaintiff has suffered pecuniary harm on account of his reliance on the defendant's false representations ***and when plaintiff's action in reliance took place in the state where the false representations were made and received***, the local law of this state determines the rights and liabilities of the parties unless, with respect to the particular issue, some other state has a more significant relationship under the principles stated in § 6 to the occurrence and the parties, in which event the local law of the other state will be applied.

Restatement (Second) of Conflicts of Laws § 148(1)(1971) (emphasis added).

Plaintiffs' conclusory assertion that Texas law should apply is unavailing, given that the key elements of a Section 148(1) analysis – where the representations were made and received, and where Plaintiffs' alleged reliance and harm occurred in the Osprey Certificates transaction – point unambiguously to New York.  At all times relevant to this lawsuit, Deutsche

---

[20]   Restatement Section 145 creates the test, in the tort context, for applying the analysis of the factors listed under the general section of the Restatement on conflicts of laws, § 6.  See Restatement (Second) of Conflict of Laws § 145(2)(1971); see also El Pollo Loco, S.A. de C.V. v. El Pollo Loco, Inc., 344 F. Supp. 2d 986, 990 n.1 (S.D. Tex. 2004)

Bank and Plaintiffs were New York parties whose alleged relationship was centered in New York.  (Compl. ¶¶ 1, 2, 4-5, 61.)  The written materials Plaintiffs claim to have relied upon when deciding to purchase the Certificates were also allegedly distributed by Deutsche Bank at meetings between the parties, and the closing of the Osprey financing transactions occurred in New York.  (See Compl. ¶ 61; Participation Agreement, Harlow Decl. Exh. 3 at Section 2.1.) While the other potential "primary violator" under the TSA – i.e., the Osprey Trust – is a Delaware statutory business trust, all other relevant contacts point to New York.  Because Plaintiffs allege that they were defrauded in New York, and their alleged reliance took place in New York, Section 148 dictates that New York law should apply to Plaintiffs' claims.[21]

Application of Restatement Section 145 yields the same result, as that section focuses on where the plaintiff suffered injury, where the conduct causing the injury occurred, where the parties reside and/or are incorporated, and where the relationship between the parties was centered.  Restatement (Second) of Conflict of Laws § 145(2)(1971).  Because, as discussed, Plaintiffs allege that they were harmed while in New York, their purchases were allegedly solicited in and closed in New York, both Deutsche Bank and Plaintiffs' alleged principal places of business are in New York and all interaction and communication between the parties was centered in New York, Section 145, too, mandates the application of New York law.

---

[21]     Even if some of the misrepresentations here originated in Delaware or elsewhere before they were received and acted upon in New York, Restatement Section 148(2), which addresses reliance and misrepresentations occurring in different states, mandates that New York law should govern.  The determining factors under that section are the place where the Plaintiffs allegedly took action in reliance (New York), the place where Plaintiffs received the alleged misrepresentations (New York), the parties' alleged principal places of business (New York), and the place where Plaintiffs undertook their contractual obligations under their Certificate Purchase Agreements (New York).  See El Pollo Loco, 344 F. Supp. 2d at 990 & n.3.

III.    **PLAINTIFFS' COMMON LAW FRAUD CLAIM SHOULD BE DISMISSED.**

A claim of fraud cannot move beyond the pleading stage and must be dismissed as a matter of law unless every element is satisfactorily alleged.  To do so, Plaintiffs must make *detailed factual allegations* in support of every element:  representation of material fact, falsity, scienter, reasonable reliance, causation and damages.  Small v. Lorillard Tobacco Co., Inc., 679 N.Y.S. 2d 593, 604 (N.Y. App. Div. 1998), aff'd, 94 N.Y.2d 43 (1999).  As established below, Plaintiffs fail to adequately plead virtually every required element of their common law fraud claim.[22]  Rule 9(b) requires a plaintiff to specify the "who, what, when, where, and how of the alleged fraud."  United States ex. rel. Williams v. Bell Helicopter Textron, Inc., 417 F.3d 450, 453 (5th Cir. 2005) (citation and internal quotation marks omitted).  Moreover, to the extent Plaintiffs claim that they purchased their Certificates due to any omission of material fact by Deutsche Bank, this claim fails given the absence of any duty owed to Plaintiffs.

A.    **The Complaint Does Not Adequately Allege That Deutsche Bank Made Any Misstatements.**

Plaintiffs generally allege various misstatements in the offering memoranda (and incorporated Enron financial statements) for the Osprey Notes and other misrepresentations allegedly made by "Defendants" in meetings and presentation materials for the Certificates.  Although Plaintiffs' common law fraud claim against Deutsche Bank purports to be premised on these alleged misrepresentations, the claim fails at the outset because nowhere do Plaintiffs allege that *Deutsche Bank* made any of the statements.

---

[22]    As set forth above, New York law governs Plaintiffs' alleged claims of direct misrepresentation by Deutsche Bank, since any such misrepresentation was made, received and acted on in New York.  To eliminate any dispute that the direct fraud claim should be dismissed, however, Plaintiffs' failure to adequately plead such a claim is demonstrated under both New York and Texas law.  Those states' common law on fraud are substantially the same.

Plaintiffs do not allege that Deutsche Bank drafted, directed the drafting of, or played any role whatsoever in the compilation of Enron's financial statements.  Nor do Plaintiffs allege that Deutsche Bank was responsible for Enron's disclosures, incorporated in the OMs, in any way.  Plaintiffs also do not allege that Deutsche Bank drafted or created the Osprey Notes OMs.  They do not identify any particular statements that Deutsche Bank allegedly made to them in an OM.[23]  To the contrary, the Osprey I OM specifically identifies Enron as the author of the financial statements, and expressly states that the information contained therein (except for the plan of distribution of the Notes) or incorporated by reference came from the issuer (Osprey) and/or Enron.[24]  Cf. In re Enron Corp. Sec., Deriv. & "ERISA" Litig., 2006 U.S. Dist. LEXIS 43146 at *378, No. H-01-3624 (S.D. Tex. Jun. 5, 2006) ("Lead Plaintiff does not identify any alleged misleading statements other than Enron's incorporated financial statements in the offering memoranda, in particular any statements that were actually "created" by Deutsche Bank employees, nor has it shown that Deutsche Bank employees in any way participated in the preparation of the incorporated, allegedly misleading Enron financial statements"); see also In re Enron Corp. Sec., Deriv. & "ERISA" Litig., No. H-01-3624, 2005 WL 3704688, at *10-11 (S.D. Tex. Dec. 5, 2005) (dismissing Section 10(b) claims against Milbank Tweed on similar grounds).

Plaintiffs also claim that they received and reviewed certain "Pamphlets" in connection with the Osprey Certificate transactions, which allegedly also contained

---

[23]     As discussed, the Osprey I OM clearly states in multiple places (including the cover) that it does not apply to the Certificates.  (See Osprey I OM, Harlow Decl. Exh. 6 at cover, 10 ("The Osprey Trust Certificates are not being offered hereby").)  Accordingly, any alleged reliance by Plaintiffs on those materials would not be reasonable.  See Section III.C, infra.  Moreover, to the extent Plaintiffs claim to have been misled by any statements in the Osprey II OM (which relates to the financing that Plaintiffs refer to as "Osprey III") in making investment decisions, this claim is contrary to the timeline of events, because the Osprey III financing occurred in October 2000, months after Plaintiffs' last purchases were made in July 2000. (Compl. ¶¶ 40-43.)

[24]     See Osprey I OM, Harlow Decl. Exh. 6 at ii ("THE INFORMATION CONTAINED AND INCORPORATED BY REFERENCE IN THIS OFFERING MEMORANDUM HAS BEEN FURNISHED BY THE ISSUERS AND ENRON.  THE INITIAL PURCHASERS MAKE NO REPRESENTATION OR WARRANTY AS TO THE ACCURACY OR COMPLETENESS OF ANY SUCH INFORMATION.")

misstatements, but they likewise do not allege that any statements – let alone any false statements – in them were made by Deutsche Bank.  (See Compl. ¶¶ 47-48, 50, 68.)  Plaintiffs also do not allege that any Deutsche Bank employee said anything materially false in any meetings or presentations regarding the Osprey financing transactions.  Rather, in the 800-plus paragraphs of the Complaint, Plaintiffs refer twice to having been in a meeting about the Osprey financing with one person from Deutsche Bank, Seth Rubin.  (See Compl. ¶¶ 61, 97.)  Yet Plaintiffs wholly fail to allege that Mr. Rubin said anything, much less anything false or misleading, as they must do with specificity to state a claim.  (Id.)  Plaintiffs' common law fraud claim fails at the outset because no false statement made by Deutsche Bank is alleged.[25]

Instead, Plaintiffs rely upon generalized allegations as to all named "Defendants," as if they were a single entity rather than separate financial institutions and legal entities, and never attempt to specify who allegedly made which statements or representations.  (See Compl. ¶¶ 21 ("***Defendants*** told Plaintiffs that investments in the Osprey Trust would be secured by assets purchased from Enron through "arms-length" negotiations … ***Defendants*** also told Plaintiffs that additional safeguards decreased the risks associated with the investment"); 26 ("***Defendants*** also materially misrepresented the rights of the holders of these securities"); 108 ("***Defendants*** falsely represented the ability of the Osprey Indenture Trustee to cause the sale and liquidation of the Whitewing Assets upon the occurrence of certain trigger events.") (emphasis added).)  Such vague and generalized pleading does satisfy the misstatement element of fraud nor does it comply with Rule 9(b).  See Rich v. Maidstone Financial, Inc., No. 98 Civ.

---

[25]     It is unclear from the Complaint whether Plaintiffs also seek to assert a direct fraud claim against Deutsche Bank on the basis of certain alleged "buy" recommendations and reports allegedly issued by Deutsche Bank's analysts.  (See Compl. ¶¶ 584-87.)  If so, this effort also fails, as Plaintiffs do not even claim or allege any facts showing that these analyst reports ever came to them or otherwise were known to them prior to their purchases.  Moreover, Plaintiffs do not identify which of the few specific alleged statements in those reports were purportedly false.

2569 (DAB), 2002 WL 31867724, at *10 (S.D.N.Y. Dec. 20, 2002) ("A complaint may not simply 'clump [ ] defendants together in vague allegations' to meet the pleading requirements of Rule 9(b)."); Kunzweiler v. Zero.net, Inc., No. 3:00-CV-2553-P, 2002 WL 1461732, at *15, n.17 (N.D. Tex. Jul. 3, 2002) ("General allegations, which lump all defendants together failing to segregate the alleged wrongdoing of one from those of another, do not meet the requirements of Rule 9(b)."); see also Southland Sec. Corp., 365 F.3d at 365 (rejecting "group pleading" doctrine and dismissing Complaint for failure "to specify which of these documents is attributable to each individual defendant, let alone which portions or statements within these documents are assignable to each individual defendant").

   **B.    Plaintiffs Have Not Adequately Alleged Scienter.**

   Under both New York and Texas law, a knowing misrepresentation, i.e., scienter, must also be alleged to state a cause of action in fraud.  See New York Univ. v. Cont'l Ins. Co., 87 N.Y.2d 308, 318-19 (1995) (complaint should be dismissed where no inference of intent can be drawn from facts alleged); see also Johnson & Higgins of Texas, Inc. v. Kenneco Energy, Inc., 962 S.W.2d 507, 526-27 (Tex. 1998).  Likewise, New York and Texas courts permit a showing of scienter by means of recklessness *only* when the plaintiff alleges facts that the speaker made a statement as a definitive assertion *knowing* he was without knowledge as to the truth.  Burgundy Basin Inn, Inc. v. Watkins Glen Grand Prix Corp., 379 N.Y.S.2d 873, 880 (N.Y. App. Div. 1976); see also Johnson & Higgins of Texas, 962 S.W.2d at 727.  Regardless of the "form" of scienter claimed by a plaintiff, it must allege significant factual detail to support an inference of that scienter.  See Giant Group, Ltd. v. Arthur Andersen LLP, 770 N.Y.S.2d 291, 292 (N.Y. App. Div. 2003).  The Complaint offers no such facts in support of any direct fraud claim against Deutsche Bank.

As with the alleged misrepresentations, Plaintiffs attempt to allege scienter *en masse* without any attempt to particularize their allegations to specific Defendants.  (See, e.g., Compl. ¶¶ 51 ("Each **Defendant** had knowledge of Enron's true financial condition and knew that these financial statements were false and misleading"); 66 ("**Defendants** purposely or recklessly made material misrepresentations and omissions in the written materials provided to Plaintiffs and in the course of conducting investor information meetings with Plaintiffs") (emphasis added).)  These allegations manifestly do not suffice to establish scienter as to Deutsche Bank.  Rather than provide the required level of particularity, the statements consist of bare conclusions lacking any supporting facts regarding what alleged information any of the Defendants were aware of or how or when they came to learn this information.  See In re Enron Corp., 235 F. Supp. 2d at 564 n.3 (noting that "conclusory allegations or legal conclusions masquerading as factual conclusions do not defeat a motion to dismiss").

Even if Plaintiffs' sweeping allegations as to all named Defendants could be somehow attributed to Deutsche Bank (which they cannot), Plaintiffs fail to point to anyone in particular at Deutsche Bank who knowingly made a false statement.  This is again fatal to Plaintiffs' fraud claim, because when fraud is alleged against a corporate defendant, a plaintiff must allege that the individual corporate officer making the statement had the requisite level of knowledge and intent.  Southland Sec. Corp., 365 F.3d at 366 (recognizing the general common law rule that "where, as in fraud, an essentially subjective state of mind is an element of a cause of action…the required state of mind must actually exist in the individual making (or being a cause of the making of) the misrepresentation, and may not be simply imputed to the individual

on general principles of agency."); <u>see also</u> <u>Tigue Inv. Co.</u> v. <u>Chase Bank of Texas</u>, No. Civ. A

3:03 CV 2490 N, 2004 WL 3170789, at *2, n.3 (N.D. Tex. Nov. 15, 2004).[26]

Plaintiffs refer in passing to three individuals from Deutsche Bank in connection

with the Osprey transaction – Seth Rubin, Paul Cambridge and Mike Jakubik.  (<u>See</u> Compl. ¶¶

97, 101, 103.)  With regard to Mr. Jakubik, Plaintiffs themselves concede that he was a "member

of the Osprey team <u>while at Enron</u>" (<u>id.</u> ¶ 103 (emphasis added)); his employment with Deutsche

Bank in 2000 did not occur until long after Plaintiffs' purchases.  (<u>See</u> <u>id.</u> ¶ 104.)  With regard to

Messrs. Rubin and Cambridge, Plaintiffs offer no facts about what these individuals actually

knew that might support fraudulent intent.  And for all three, Plaintiffs fail to attribute <u>any</u>

statements – let alone any false statements – to them.[27]  The references to these individuals

utterly fail to establish Deutsche Bank's scienter.[28]

### C.    Plaintiffs Do Not Adequately Allege That They Reasonably Relied on Any Statement by Deutsche Bank.

Plaintiffs' common law fraud claim fails for yet another reason:  Plaintiffs have

not alleged with the specificity required by Rule 9(b) that they ***actually relied*** upon any

purported misrepresentation by Deutsche Bank.  Actual reliance is required for a common law

---

[26]     Plaintiffs' failure to allege particular facts showing scienter in some individual at Deutsche Bank is particularly telling in light of the fact that Plaintiffs filed their Second Amended Complaint after the Fifth Circuit issued its decision in <u>Southland Sec. Corp.</u>, and after this Court's repeated references to <u>Southland</u>'s clear guidance on the necessary showing for scienter in a corporate defendant.  365 F.3d at 366.

[27]     To the extent Plaintiffs premise their fraud claims against Deutsche Bank on allegations related to alleged "buy" recommendations or other statements made by Deutsche Bank analysts (which Plaintiffs never allege that they received), those claims also fail to allege scienter.  (<u>See</u> Compl. ¶¶ 583-87.)  Nowhere do Plaintiffs make the necessary allegation that any individual Deutsche Bank analyst or anyone overseeing the analyst reports made any statement with knowledge of its falsity and an intent to deceive or conscious recklessness regarding the truth.  (<u>See</u> <u>id.</u>)  Moreover, with respect to the "buy" recommendations – which are expressions of opinion, not fact – Plaintiffs make no allegations that those were not the Deutsche Bank analysts' truly held opinions.  <u>Johnson & Higgins of Texas</u>, 962 S.W.2d at 526-27.

[28]     Plaintiffs appear to attempt to allege scienter simply by pointing to the fact that Deutsche Bank earned fees in connection with certain transactions involving Enron.  (<u>See</u>, <u>e.g.</u>, Compl. ¶¶ 32, 415-17, 522, 533.) Courts have consistently held that such allegations are insufficient to allege scienter.  <u>See</u> <u>Ellison</u> v. <u>America Image Motor Co.</u>, 36 F. Supp. 2d 628, 640 (S.D.N.Y. 1999) ("The receipt of professional fees does not provide an adequate 'basis for drawing the necessary 'strong inference' of fraudulent intent.'").

fraud claim.  See In re Enron Corp. Sec., Deriv. & "ERISA" Litig., 284 F. Supp. 2d 511, 644

(S.D. Tex. 2003); see also In re WorldCom, Inc. Sec. Litig., 382 F. Supp. 2d 549, 559 (S.D.N.Y.

2005); Lama Holding Co. v. Smith Barney, Inc., 646 N.Y.S.2d 76, 80 (1996).  Moreover, even if

reliance were alleged, a fraud claim must nonetheless be dismissed where the alleged reliance is

unreasonable.  Lane v. McCallion, 561 N.Y.S. 2d 273, 275 (N.Y. App. Div. 1990).  As set forth

below, Plaintiffs do not and could not allege reasonable reliance on any statement by Deutsche

Bank.

> **1.    Plaintiffs Fail to Plead Actual Reliance with Particularity Under Rule 9(b).**

In order to plead actual reliance, the Complaint must specifically identify the

material misstatements allegedly relied upon and offer facts regarding the actual existence of

reliance.  See In re Enron Corp., 284 F. Supp. 2d at 644; Hernandez v. Ciba-Geigy Corp. USA,

200 F.R.D. 285, 293 (S.D. Tex. 2001) (dismissing complaint pursuant to Rule 9(b) where

plaintiffs failed to allege misstatements were read).  The Complaint fails to comply with this

standard and instead offers general conclusory allegations as to Plaintiffs' collective reliance on

"Enron's financial statements" and other unspecified representations by the named

"Defendants."  (See, e.g., Compl. ¶¶ 23, 35, 62, 521.) [29]  Not only do Plaintiffs fail to specify

which "Defendant" said what, and therefore fail to allege even a predicate for reliance on

individual statements, but Plaintiffs' allegations also make it impossible to determine any

particular statements that either one of them actually read or heard and then relied upon in

making their Certificate purchases.  Courts uniformly reject such vague and conclusory

---

[29]    Where Plaintiffs do mention each of the Defendants in the context of reliance, the allegations are equally
vague and conclusory – and merely repeat the same allegations for each Defendant.  (See Compl. ¶¶ 407
("Plaintiffs reasonably relied . . . upon representations of Citigroup as lead manager in the Osprey I offering
and on offering documents reviewed and approved by Citigroup."); 592 ("Plaintiffs reasonably relied . . .
upon representations of Deutsche as lead manager in the Osprey I offering and on offering documents
reviewed and approved by Deutsche.").)

allegations as insufficient.  See Hernandez, 200 F.R.D. at 293; see also In re General Mtrs. Corp. Anti-lock Brake Prods. Liab. Litig., 966 F. Supp. 1525, 1535 (E.D. Mo. 1997) (dismissing fraud claim pursuant to Rule 9(b) where complaint contained mere conclusory allegations of reliance), aff'd, 172 F.3d 623 (8th Cir. 1999).  The Court should do so here as well.

It obviously follows from Plaintiffs' inability to attribute a single specific misrepresentation to Deutsche Bank that they also cannot establish reliance on any such statements.  The only statements that Plaintiffs actually allege were made by Deutsche Bank are the "buy" recommendations and other statements allegedly included in certain analyst reports.  In fact, none of those reports address at all or make any recommendation (positive or negative) about the Osprey Certificates.  (See Compl. ¶¶ 583-85.)  But Plaintiffs do not allege any facts showing that they read or were even aware of these analyst reports, or that they relied on them in making their investment decisions regarding the Certificates.  See Hernandez, 200 F.R.D. at 293. Instead, Plaintiffs allege that they "reasonably relied that Citigroup, UBS and Deutsche would not purposely disseminate deceptive analyst reports to the investing public."  (Compl. ¶ 766.) This is not actual reliance on a particular misstatement under either New York or Texas law.

## 2.  Plaintiffs Cannot Allege Reasonable Reliance on Any Statement by Deutsche Bank.

Even assuming the Complaint could be read to allege reliance on statements attributable to Deutsche Bank, such reliance fails as a matter of law unless it was reasonable. Plaintiffs cannot claim reasonable reliance on the Osprey offering memoranda because those documents expressly and unambiguously state that they were not Certificate offering documents. (See Osprey I OM, Harlow Decl. Exh. 6 at cover, 10 ("The Osprey Trust Certificates are not being offered hereby.").)  Given the clear instructions limiting their use, the corresponding inability of Certificate purchasers to rely on them, and the Certificate purchasers' own direct

access to information, it would have been unreasonable as a matter of law for Plaintiffs to have

relied on those documents.  Cf. In re Livent, Inc. Noteholders Sec. Litig., 151 F. Supp. 2d 371,

439 (S.D.N.Y. 2001) ("To determine whether a plaintiff's reliance on an alleged misstatement

was reasonable, a court may, on a motion to dismiss, examine the text of the document at issue,

including any cautionary language.")

Second, even if Plaintiffs could reasonably rely on the offering memoranda for

the Notes, the very matters about which they claim they were misled – i.e., Enron's objectives in

connection with Osprey– were prominently and fully disclosed in those materials.  (See Osprey I

OM, Harlow Decl. Exh. 6 at 1 ("Enron periodically seeks to sell Designated Assets as a means to

create liquidity for its business . . . Whitewing will utilize a portion of the proceeds of Osprey's

investment to acquire Designated Assets.").)  Likewise, Plaintiffs also could not have reasonably

relied on any representations – if there were any – that anyone other than Enron would determine

the prices at which Whitewing could acquire assets from Enron (see Compl. ¶ 25), as the Osprey

I OM clearly disclosed that Enron would be on both sides of the bargaining table:

> Enron intends that each acquisition of Whitewing Assets will be at
> a price and on other terms determined by internal Enron
> negotiations conducted on an arms-length basis, and that holders of
> the Osprey Trust Certificates (the "Certificateholders") will have
> certain consent rights with respect to such acquisitions, ***but there
> can be no assurance that such prices and other terms will reflect
> those that would be agreed by unaffiliated third parties***.

(Osprey I OM, Harlow Decl. Exh. 6 at 13 (emphasis added).)

As this Court has recognized, investors like Plaintiffs "are sophisticated and

experienced and would recognize potential danger in such a warning."  See In re Enron Corp.,

2005 WL 3704688, at *11 ("The [Osprey OMs] warn that Enron by internal negotiations would

determine the price and conditions of Whitewing's acquisitions and that there would be no

guarantee that they would be as favorable as what might be offered by a third party.").  The

28

Osprey I OM also specifically warned of the inherent uncertainty regarding marketability of the

Whitewing assets.  (Osprey I OM, Harlow Decl. Exh. 6 at 13 (Section regarding "*Uncertainty of*

*Ability to Realize on Any Liquidation of the Whitewing Assets*" explaining that "[t]here may be

no established markets for the Whitewing Assets" and "there may be contractual or other

limitations relating to such sale.") (emphasis in original).).  Plaintiffs also cannot have

reasonably relied on the Notes OM regarding the timing of the initial Sarlux and Trakya asset

purchases (Compl. ¶¶ 94, 95, 107), because Plaintiffs themselves reviewed and consented to

these investments.[30]  See supra note 7.  Under these circumstances, where Plaintiffs were

admittedly put on notice of the very facts they claim were misrepresented, reasonable reliance is

absent.

Third, any alleged reliance by Plaintiffs is further undermined by the fact that

Plaintiffs took part in approving the terms of and all the transaction documents for the Osprey

financing.  Plaintiffs' purchases were expressly conditioned on their having received: (1) "such

other documentation, certificates or opinions as [they] may reasonably request in connection

with the consummation of the transactions contemplated"; and (2) transaction documents "in

form and substance reasonably satisfactory to each Osprey Certificateholder."  (See Certificate

Purchase Agreements, Harlow Decl. Exhs. 1 & 2 at 2.)  Plaintiffs were clearly in a position to

obtain any additional information that they required regarding the Osprey financing; they cannot

now reasonably claim that the information they received was inadequate.  See DynCorp v. GTE

Corp., 215 F. Supp. 2d 308, 322 (S.D.N.Y. 2002) ("Sophisticated parties to major transactions

---

[30]      The transaction documents governing Plaintiffs' purchases expressly granted Plaintiffs, as
Certificateholders, the power to review and consent to any asset purchases by Whitewing in excess of $40
million, and gave Plaintiffs the opportunity to obtain any necessary information regarding such proposed
asset sales prior to consenting or withholding consent.  (See, e.g., Whitewing Management LLC Agreement
Harlow Decl. Exh. 5 at § 6.06 (c)(i) (describing consent rights of Certificateholders for acquisitions of $40
million or greater), and Schedule 6.01(c) (describing information provided on proposed asset transfers).)

cannot avoid their disclaimers by complaining that they received less than all information, for they could have negotiated for fuller information or more complete warranties."); <u>Stuart Silver Assocs.</u> v. <u>Baco Dev. Corp.</u>, 245 A.D.2d 96, 98-99, 665 N.Y.S.2d 415 (N.Y. App. Div. 1997) (a party who fails to make use of available means "to discover the true nature of the transaction . . . cannot claim justifiable reliance on defendant's misrepresentations").  In short, Plaintiffs' common law fraud claim must be dismissed for failure to allege the required element of reliance.

**D.      Defendants Had No Duty of Disclosure to Plaintiffs.**

To the extent Plaintiffs are also attempting to premise their common law fraud claims on alleged material omissions by Deutsche Bank, such a theory fails as a matter of law. Where a plaintiff's fraud claim is for a fraudulent omission rather than a fraudulent misrepresentation, the "plaintiff must also prove that the defendant had a duty to disclose the material information."  <u>Banque Arabe et Internationale D'Investissement</u> v. <u>Maryland Nat'l Bank</u>, 57 F.3d 146, 153 (2d Cir. 1995).  Plaintiffs, however, only conclusorily allege that each of the named Defendants owed a "duty to disclose Enron's true financial condition pursuant to both Texas and New York law."  (Compl. ¶ 764.)

This assertion is baseless.  Under both New York law and Texas law, such a duty may be imposed only where there is a fiduciary relationship or other confidential or contractual relationship between the parties.  <u>See</u> <u>Weinstock</u> v. <u>Handler</u>, 664 N.Y.S.2d 298, 298-99 (N.Y. App. Div. 1997) (duty to disclose requires an existing contractual or fiduciary relationship"); <u>see also</u> <u>Ins. Co. of N. Am.</u> v. <u>Morris</u>, 981 S.W.2d 667, 674 (Tex. 1998) ("Generally, no duty of

disclosure arises without evidence of a confidential or fiduciary relationship.").[31]  Plaintiffs have

not alleged facts showing the requisite fiduciary relationship, relationship of confidence or other

contractual relationship that would give rise to a duty of disclosure in this case.[32]  Accordingly,

Plaintiffs' attempt to impose a duty of disclosure on Deutsche Bank fails and any omissions-

based claims must be dismissed.

### E.  Plaintiffs Cannot Pursue "Holder" Fraud Claims Against Deutsche Bank.

Moreover, to the extent Plaintiffs are attempting to assert fraud claims against

Deutsche Bank based on their decision to "hold" their Certificates (rather than selling them)

(Compl. ¶¶ 24, 592), such claims cannot succeed.  First, they suffer from the same fatal pleading

defects as the other purported fraud claims against Deutsche Bank – namely, Plaintiffs fail to

plead facts showing any statements Deutsche Bank made to them with scienter on which they

relied.

---

[31]     In fact, the one Texas case Plaintiffs cite in their Complaint in support of their bare assertion of a duty, Lesikar v. Rappeport, 33 S.W.3d 282 (Tex. App. –Texarkana 2000, pet. denied), (Compl. ¶ 761), involved a fiduciary relationship.  33 S.W.3d at 295-96.  Moreover, to the extent Plaintiffs are attempting to claim that a duty exists under New York law based on any alleged "superior knowledge" of Deutsche Bank's analysts (or anyone else at Deutsche Bank) (Compl. ¶¶ 762, 764), such attempt fails as a matter of law, as there is no contract or other business transaction alleged between Plaintiffs and Deutsche Bank.  See Williams v. Bank Leumi Trust Co. of New York, No. 96 Civ. 6695 (LMM), 1998 WL 397887, at *8 (S.D.N.Y. July 15, 1998) (dismissing fraud claim based on nondisclosure where plaintiff failed to show that plaintiff and defendant "stood on opposite sides of the same transaction"); Ray Larsen Assocs., Inc. v. Nikko Am., Inc., No. 89 Civ. 2809 (BSJ), 1996 WL 442799, at *5 (S.D.N.Y. Aug. 6, 1996) (holding that "a duty to disclose due to one party's superior knowledge . . . ordinarily arises only in the context of a business negotiation where the parties are entering a contract").  Plaintiffs fail to allege any of the other essential elements of a claim of nondisclosure based on superior knowledge.  They have not alleged any facts regarding what specific "superior knowledge" anyone at Deutsche Bank allegedly had, that any such information was not readily available to Plaintiffs (whose Certificate Purchase Agreements and other transaction documents entitled them to obtain any necessary information), or that anyone at Deutsche Bank *knew* that Plaintiffs were acting in reliance on mistaken knowledge.  See Banque Arabe et Internationale D'Investissement, 57 F.3d at 155-56.  Moreover, Plaintiffs do not even allege that anyone at Deutsche Bank had superior knowledge of any facts that made their *Certificates* purchases unfair, but instead allege merely that "Citigroup, Deutsche and UBS plainly had knowledge of essential facts about Enron that made *transactions involving Enron securities* inherently unfair."  (Compl. ¶ 764 (emphasis added).)

[32]     As is clear from the agreements governing Plaintiffs' Certificate purchases, there can be no allegation regarding any contractual relationship or transaction between Deutsche Bank and the Plaintiffs, who purchased their Certificates directly from the Osprey Trust.  (See Harlow Decl. Exhs. 1 & 2.)

In addition, holder claims are not established under New York or Texas common law, and if they were, even further pleading that is absent here would be required.  As for New York Common law, it is not clear whether and to what extent holder claims are even recognized.  See In re WorldCom, Inc. Sec. Litig, 382 F. Supp. 2d at 559 (recognizing that such claims are disfavored generally, and that the New York Court of Appeals has not "authoritatively articulated" whether and/or to what extent such claims can be stated under New York law).  What is clear, however, is that if such a claim does exist, to state a holder claim, a plaintiff must meet a more rigorous reliance threshold and allege that it relied on a ***personal, direct communication*** aimed at averting a sale.  Id.; see also Shirvanian v. DeFrates, No. 14-02-00447-CV, 2004 WL 35987, (Tex. App.—Houston [14th Dist.] Jan. 8, 2004) ("Shirvanian I") (opinion withdrawn and replaced by Shirvanian v. DeFrates, 161 S.W.3d 102 (Tex. App.—Houston [14th Dist.] 2004)).[33]  It is insufficient to claim merely that analyst reports influenced a bystander to hold, as Plaintiffs may be trying to do – though they never allege that they received or relied upon any Deutsche Bank analyst statement.  Plaintiffs do not point to any personal, direct communications with Deutsche Bank that they allegedly relied on after their purchases, nor do they allege that – or when – they would have otherwise sold.  Plaintiffs' holder claims, to the extent they are attempting to allege any, fail along with their other fraud claims.

---

[33]    Plaintiffs also cannot maintain "holder" claims under Texas law.  The only Texas court to have explicitly analyzed whether "holder" claims could be pursued under Texas common law held that such claims could only be brought where a plaintiff alleged not only a personal, face-to face or telephonic communication with the defendant ***but also*** an existing and definite plan to sell that would have occurred in the absence of the false communication designed to prevent their sale.  See Shirvanian v. DeFrates, 2004 WL 35987, No. 14-02-00447-CV (Tex. App.—Houston [14th Dist.] Jan. 8, 2004) ("Shirvanian I") (opinion withdrawn and replaced by Shirvanian v. DeFrates, 161 S.W.3d 102 (Tex. App.—Houston [14th Dist.] 2004)).  Plaintiffs do not allege any of these elements.  Moreover, Shirvanian I was withdrawn.

IV.   **PLAINTIFFS' AIDING AND ABETTING FRAUD CLAIM IS INADEQUATELY PLED AND MUST BE DISMISSED.**

In addition to their meritless primary fraud claim, Plaintiffs attempt to allege that Deutsche Bank aided and abetted Enron in alleged "financial statement fraud." To state a claim for aiding and abetting fraud under New York law, a plaintiff must plead facts showing: (1) the existence of a fraud; (2) defendant's actual knowledge of the fraud; and (3) that the defendant provided substantial assistance to advance the fraud's commission. Anzerilla v. Am. Tobacco Co., No. 11754/96, 2000 WL 34016364, at *3 (N.Y. Sup. Ct. Oct. 27, 2000); Lindsay v. Lockwood, 163 Misc.2d 228, 233 (N.Y. Sup. Ct. 1994). To allege substantial assistance, the plaintiff must offer facts not only showing that the defendant significantly aided the primary wrongdoer's fraud, but also that defendant's actions proximately caused the plaintiff's injuries. Cromer Fin. Ltd. v. Berger, 137 F. Supp. 2d 452, 470 (S.D.N.Y. 2001). Claims of aiding and abetting common law fraud are also subject to Rule 9(b)'s heightened pleading requirements. Filler v. Hanvit Bank, 339 F. Supp. 2d 553, 557 (S.D.N.Y. 2004), aff'd, 156 Fed. Appx. 413 (2d Cir. 2005). As shown below, Plaintiffs both fail to plead the required elements of aiding and abetting liability and fail to present their allegations with the degree of specificity mandated by Rule 9(b).[34] Plaintiffs' aiding and abetting claim, for example, is based on speculation about what Deutsche Bank "must have known" at the time these transactions were structured, and bare, inadequate conclusions that Plaintiffs were harmed by Deutsche Bank's actions.

---

[34]   In addition, if the Court decides that Texas law would apply to this broad aiding common law fraud claim that – unlike those previously discussed – centers on Enron, Plaintiffs have no aiding and abetting claim because Plaintiffs explicitly forego asserting any aiding and abetting claim under Texas law. (Compl. ¶ 751, 798.) It is unclear whether such claims would even be recognized under Texas law. See In re Enron Corp., 388 F. Supp. 2d at 785. Here, the only alleged common law aiding claim is under New York law.

A.    **Plaintiffs Have Not Alleged That Deutsche Bank Had Actual Knowledge of Enron's Alleged Fraud.**

To state an aiding and abetting claim, a plaintiff must allege facts that the defendant had ***actual knowledge*** of the underlying fraud.  Albion Alliance Mezzanine Fund, L.P. v. State Street Bank and Trust Co., 797 N.Y.S.2d 699, 706 (N.Y. Sup. 2003); see also Lenczycki v. Shearson Lehman Hutton, Inc., 656 N.Y.S.2d 609, 610 (N.Y. App. Div. 1997) (aiding and abetting claim dismissed "in the absence of evidence that [defendants] knew of [the primary wrongdoer's] intention" to perpetrate the wrong).  Allegations of constructive knowledge or recklessness are insufficient to allege the requisite state of mind of actual and concrete knowledge of the underlying fraud.  See Filler, 339 F. Supp. 2d at 557 ("Constructive knowledge of the primary fraud . . . is not sufficient to support an aiding and abetting claim.").  Also insufficient are allegations that a defendant "should have known" about the fraud.  See VTech Holdings, Ltd. v. PricewaterhouseCoopers, LLP, 348 F. Supp. 2d 255, 269 (S.D.N.Y. 2004).

Plaintiffs allege that "Deutsche completed numerous transactions with Enron and/or on behalf of Enron that had no legitimate purpose" and that "Deutsche knew that the purpose and effect of these transactions was to allow Enron to doctor its books."  (Compl. ¶¶ 434-35.)  These conclusory statements are obviously insufficient to plead actual knowledge.  Moreover, as set forth in detail below, of the nearly 200 paragraphs the Complaint devotes to the Enron transactions it targets, none contains a single factual allegation that an individual at Deutsche Bank involved in the transaction knew that Enron was using the transaction to defraud investors.  (See Compl. ¶¶ 457-581, 675-739.)

1.    **Plaintiffs Fail to Allege That Deutsche Bank Had Actual Knowledge That the Structured Tax Transactions Were Fraudulent.**

Plaintiffs simply conclude that Deutsche Bank structured certain "Tax Transactions" to "help[] Enron achieve its fraudulent accounting objectives."  (Compl. ¶ 457.)

Despite having full access to discovery in this case, and the opportunity to twice amend their Complaint, Plaintiffs do not allege any *facts* to show, however, that anyone involved in the transactions at Deutsche Bank knew that they would be used for a fraudulent purpose.  See Southland Sec. Corp., 365 F.3d at 366.  Plaintiffs instead offer conclusory allegations that Deutsche Bank "knew" that its tax and other structured transactions with Enron had "no legitimate purpose" and would be used to commit fraud.  (Compl. ¶ 434-35, 464.)  They also offer assorted third-party commentary and hindsight observations – mostly from the court-appointed Bankruptcy Examiner and the press – regarding what the Tax Transactions allegedly "allowed Enron" to do.  (See, e.g., Compl. ¶¶ 467 (describing Batson opinion that the "Tax Transactions enabled Enron to . . . erroneously record approximately $158 million of income"); 481 (quoting 2003 USA Today article).)  While the Complaint contains dozens of similar allegations regarding the Tax Transactions, not one of them can be read to plead facts that establish that anyone at Deutsche Bank knew at the time of entering into the transactions how Enron would disclose the transactions, that they were improper, or that Enron was entering into those transactions to commit fraud.  Absent such an allegation, the aiding and abetting claim must be dismissed for failure to plead actual knowledge of the underlying purported fraud.

Moreover, it should be emphasized that Plaintiffs' allegations about a primary financial accounting purpose do not support the required scienter.  Plaintiffs repeatedly quote excerpts from documents attributed to Deutsche Bank representatives and offer various other allegations to support the unremarkable proposition that Deutsche Bank knew that Enron expected to realize financial accounting benefits from the Tax Transactions.  (See, e.g., Compl. ¶¶ 488, 491.)  Knowledge of an intention to realize accounting income benefits says nothing about knowledge that those benefits were improper, much less knowledge of fraud, and the

Complaint utterly fails to allege that Deutsche Bank knew that Enron entered into the Tax Transactions to defraud investors.[35]

### 2. Plaintiffs Fail to Allege That Deutsche Bank Had Actual Knowledge That the Osprey and Marlin Financings Were Fraudulent.

Plaintiffs also allege that Osprey and Marlin allowed Enron to manipulate its financial statements by removing "poorly performing assets" and debt from its consolidated balance sheet.  (See Compl. ¶¶ 132, 136, 563, 569, 576.)  As with the Tax Transactions, Plaintiffs conclusorily assert that Deutsche Bank (and others) "knew" about Enron's "goals" for these transactions (see Compl. ¶¶ 144, 576), but they fail to allege that anyone at Deutsche Bank knew that the Osprey or Marlin transactions would be used by Enron to commit fraud.[36]  Indeed, Plaintiffs do not allege that Deutsche Bank knew anything materially different from what the investing public knew about Enron's objectives for these transactions.

With respect to Osprey, Plaintiffs repeatedly point to the statement from Paul Cambridge of Deutsche Bank that "The Osprey transaction was a highly tailored structured

---

[35]    Plaintiffs also selectively quote from opinion letters from various reputable national law firms in connection with the Teresa, Cochise and Steele Tax Transactions.  (See Compl. ¶¶ 490 (discussing July 29, 1997 tax opinion from King & Spalding LLP regarding the Teresa transaction); 507 (discussing December 16, 1997 tax opinion of Akin, Gump, Strauss, Hauer & Feld LLP regarding the Steele transaction); 529 (discussing March 21, 2001 tax opinion of McKee Nelson Ernst & Young regarding the Cochise transaction).)  What Plaintiffs fail to mention is that these same firms, in the same letters, offered opinions that the Tax Transactions discussed therein should survive a challenge by the Internal Revenue Service – one of the highest levels of a supportive tax opinion letter available.  If anything, those letters refute, rather than support, Plaintiffs' conclusory allegations of obvious illegitimacy and scienter surrounding the transactions.  (See July 29, 1997 Teresa Tax Opinion, Harlow Decl. Exh. 7; December 16, 1997 Steele Tax Opinion, Harlow Decl. Exh. 8; March 21, 2001 Cochise Tax Opinion, Harlow Decl. Exh. 9.)

[36]    If the Complaint alleges anything specific, it is that these financings and structures were not shams in that they actually purchased assets and entered into other transactions.  (See, e.g., Compl. ¶¶ 78, 93.)  As this Court has found:

> The [Osprey and Marlin] trusts were not shams and did not depend on any fictions because, according to the complaint, they were functioning entities with substance that purchased assets and issued notes that were purchased only by sophisticated financial institutions.  Any sham or deception was in the way that they were allegedly used by Enron to conceal debt and manufacture revenue.

February 8, 2007 Opinion and Order (Newby Instr. No. 5391) at 18.

finance, designed to meet certain balance sheet and income statement goals of Enron" (id. ¶¶ 97,

143) – which this Court has previously recognized does not show that Deutsche Bank knew of

any allegedly improper objectives for the Osprey transactions.  See February 8, 2007 Opinion

and Order (Newby Instr. No. 5391) at 18 (stating that the same statement by Mr. Cambridge

"does not support Lead Plaintiff's leap to the conclusion that Deutsche Bank structured it to

manipulate Enron's financial statements and deceive investors.  Structured finance transactions

are not *per se* illegal or improper").  In any event, Enron's "goal" of using the Osprey

transactions to raise off-balance sheet financing and to move assets from its balance sheet was

openly disclosed in the offering memoranda for the Notes and in the all the descriptions of the

Osprey financing (i.e., the same documents Plaintiffs claim misled them).[37]  (See Osprey I OM,

Harlow Decl. Exh. 6 at 1.)

        Likewise, Plaintiffs allege no facts showing Deutsche Bank's knowledge of any

fraudulent purpose for the Marlin transactions.  Plaintiffs offer only the plainly insufficient and

off-hand conclusion that Deutsche Bank, "knowing that Enron's off-balance sheet treatment had

been improper from the start," worked on Marlin II (which was a year after Plaintiffs' last

purchases).  (Compl. ¶ 577.)  Plaintiffs' failure to adequately allege actual knowledge at

Deutsche Bank of any fraudulent purpose for the Osprey and Marlin transactions negates them as

a possible basis for their aiding and abetting claim.

---

[37]    Moreover, Plaintiffs' assertion that the true nature of the Whitewing asset transfers was hidden from them is all the more implausible in light of the fact that Plaintiffs, as holders of Osprey Certificates, oversaw the asset acquisitions by having the power to review and obligation to consent on significant acquisitions.  (See Osprey I OM, Harlow Decl. Exh. 6 at 13; Whitewing Management LLC Agreement, Harlow Decl. Exh. 5 at § 6.06 (c)(i) (describing consent rights of Certificateholders for acquisitions of $40 million or greater).)  Deutsche Bank, on the other hand, was involved only in the initial Osprey financings and not in any of the specific asset transfers to Whitewing.

### 3. Plaintiffs Fail to Allege That Deutsche Bank Had Actual Knowledge of Any Fraudulent Activity By The LJM2 Investment Partnership.

LJM2 was an investment partnership in which various types of investors (including corporations, investment banks, insurance companies, and others) purchased passive limited partner interests.  Deutsche Bank, through a Deutsche Bank investment partnership, was one such investor.  (Compl. ¶ 732.)  Plaintiffs, however, do not allege a single fact to show that anyone at Deutsche Bank knew that LJM2 would be used for any fraudulent purpose.  Instead, Plaintiffs return to a series of conclusory allegations that Deutsche Bank "should have known" about Enron's fraudulent objectives.  (See, e.g., id. ¶¶ 702 (alleging that because "Citigroup and Deutsche" received Enron's financial statements and "reports and statements from LJM2" they "therefore knew that LJM2 was being used by Enron to doctor its books"); 717 (alleging that because "each Defendant routinely reviewed and analyzed Enron's financial statements" they "knew that LJM2 was being used to manipulate Enron's financial statements and to defraud investors.").)

Plaintiffs' conclusory allegations about what Deutsche Bank should or might have concluded from reading financial statements are not the equivalent of pleading facts showing actual knowledge.  See Filler v. Hanvit Bank, 339 F. Supp. 2d at 558 (allegations that defendants should have understood the impact on the primary wrongdoer's financial statements do not suffice to show actual knowledge of intent to defraud investors); see also In re Enron, 235 F. Supp. 2d at 564 n.3 (noting that "conclusory allegations or legal conclusions masquerading as factual conclusions do not defeat a motion to dismiss").  Plaintiffs also point to Andrew Fastow's conflict of interest, but knowledge of such a conflict is not knowledge of fraud.  Plaintiffs allege *no* facts as to: specific information in the "reports" or financial statements Deutsche Bank allegedly received from or about LJM2 (and what in those statements would give rise to

knowledge of any LJM2 fraud); who at Deutsche Bank supposedly knew this information; how or when such information was learned; and what that person's connection was to Deutsche Bank's December 1999 passive investment, which occurred before LJM2 entered into any transactions. They have no factual allegations that might support scienter with regard to LJM2.

> ### 4. Plaintiffs Fail To Allege That Any Deutsche Bank Analyst Issued A Report or Recommendation Knowing That It Was In Service Of Some Fraud.

Plaintiffs appear to assert that Deutsche Bank assisted Enron's fraud by issuing analyst reports containing "buy" recommendations and other statements. (See Compl. ¶¶ 582-88.) This claim is baseless. As discussed in Section III.A, supra, no statements in the reports are even specified as materially false or misleading, nor are there allegations that any of the recommendations were made with respect to the Osprey Certificates (they were not). Plaintiffs also do not allege that any particular Deutsche Bank analyst's recommendations were based on anything other than truly held opinions, or that any analyst otherwise knew that any report statements were false (if they were indeed false). Moreover, there are no allegations that any of the Deutsche Bank analysts actually knew of the underlying fraud – i.e., Enron's alleged manipulation of its financial statements – that Plaintiffs claim as a basis for aiding and abetting liability.[38]

---

[38] Plaintiffs' allegations that Deutsche Bank wanted to reduce its financial "exposure" to Enron out of alleged "concern" about Enron's financial statements also raise no inference of actual knowledge of fraud on the part of Deutsche Bank or its individual analysts. (Compl. ¶¶ 442-53.) As a threshold matter, those allegations could at most be read to infer that Deutsche Bank suspected fraud or suspected worsening Enron credit, which is not actual knowledge of fraud. See Ryan v. Hunton & Williams, No. 99-CV-5938 (JG), 2000 WL 1375265, at *8-9 (E.D.N.Y. Sept. 20, 2000) (allegations that defendants suspected fraud are insufficient). Moreover, Plaintiffs do not allege, as they must, that any individual Deutsche Bank analyst was aware of any such alleged concerns or desire to reduce Deutsche Bank's exposure. See Southland Sec. Corp., 365 F.3d at 366. And just as fatally, Plaintiffs' allegations about "concern" focus on 2001, the year *after* their last Certificates purchase.

**B.      Plaintiffs Have Not Alleged that Deutsche Bank Substantially Assisted in Any Alleged Fraud.**

To allege substantial assistance, which is further required to state an aiding and abetting claim, Plaintiffs must allege facts establishing not only that the defendant rendered assistance that was both "substantial and knowing," but also that the defendant's actions "proximately caused" the harm on which the primary liability is predicated.  McDaniel v. Bear Stearns & Co., 196 F. Supp. 2d 343, 352 (S.D.N.Y. 2002).  To allege "proximate cause," Plaintiffs cannot rely on "but for" causation:  they must allege facts – with sufficient particularity under Rule 9(b) – that Deutsche Bank's conduct directly and proximately caused their injuries.  Cromer Fin., 137 F. Supp. 2d at 470.  Plaintiffs' aiding and abetting claims fail on those grounds as well.

**1.      Plaintiffs Do Not Allege That Deutsche Bank's Participation in the Tax Transactions Proximately Caused Their Injuries.**

Plaintiffs claim that they suffered losses as a result of their Osprey Certificates becoming worthless.  (Compl. ¶ 36.)  Plaintiffs make no effort to allege how the Tax Transactions, and more specifically Deutsche Bank's role in them, caused their injuries.  See Cromer Fin., 137 F. Supp. 2d at 472 (motion to dismiss granted where plaintiffs failed to show that plaintiffs' injuries were the direct result of defendant's role in the alleged fraud).  At most, Plaintiffs allege that Enron may have used some of those transactions to inflate its "accounting income."  (See Compl. ¶¶ 497, 505.)  Plaintiffs fail to allege any causal connection between inflated Enron "accounting" income and their injuries – i.e., their equity securities in Osprey Trust becoming worthless.  There is and can be no allegation that the Tax Transactions materially affected Enron's cash flow, its levels of hidden debt, or credit ratios – all of which are more likely causes of Enron's ultimate downfall into bankruptcy – or that the Tax Transactions had any effect on Whitewing or Osprey directly.

40

### 2. Plaintiffs Do Not Allege That Deutsche Bank's Participation in the Osprey and Marlin Transactions Proximately Caused Their Injuries.

Deutsche Bank's involvement in the Osprey and Marlin financing transactions also cannot give rise to proximate causation, and Plaintiffs do not in any way attempt to allege as much. Even if Deutsche Bank had some role in Plaintiffs' initial investment, that is only a but for condition for the later alleged losses and does not relate to what proximately caused them. Moreover, to the extent Plaintiffs claim to have been harmed by way of asset transfers at inflated values from Enron to Whitewing, they do not allege – nor can they allege – that Deutsche Bank had anything to do with Enron's alleged subsequent abuse of the Osprey/Whitewing structure. Indeed, if any parties were uniquely situated to control the Whitewing asset transfers, it was Plaintiffs, the only parties whose express consent was required before any significant purchases were made. (See Osprey I OM, Harlow Decl. Exh. 6 at 13; Whitewing Management LLC Agreement, Harlow Decl. Exh. 5 at § 6.06 (c)(i) (describing consent rights of Certificateholders for acquisitions of $40 million or greater).) Plaintiffs controlled 51% of the Osprey voting rights. By contrast, Deutsche Bank is alleged to and did participate only in the Osprey *financing* transaction, not in any aspect of the ongoing operations of Whitewing or in any asset transfers. (Compl. ¶¶ 61, 97.) Likewise, Plaintiffs do not allege that the Marlin transactions – let alone Deutsche Bank's participation in them – played any role in their Osprey losses.

### 3. Plaintiffs Do Not Allege That Deutsche Bank's Investment in LJM2 Substantially Assisted LJM2's Fraud or Proximately Caused Plaintiffs' Injuries.

The sole factual allegation as to Deutsche Bank with respect to the LJM2 transaction in the Complaint is the fact that Deutsche Bank was merely a passive investor – having committed $10 million out of approximately $400 million total investments to this private equity limited partnership. (Compl. ¶ 734.) This kind of insubstantial investment (representing

only 2.5% of the total) in an over-subscribed investment vehicle was not, as a matter of law, substantial assistance to LJM2, much less to any particular alleged fraud involving LJM2.  There are no other allegations of any Deutsche Bank role in LJM2's operations or in LJM2's transactions with Enron – and Deutsche Bank had none.  Plaintiffs also fail to plead facts that could establish any link whatsoever (much less proximate cause) between Deutsche Bank's passive $10 million limited partner investment in LJM2 and Plaintiffs' losses in Osprey.

<strong>4.      Plaintiffs Do Not Allege That Deutsche Bank's Analysts' Reports Proximately Caused Plaintiffs' Injuries.</strong>

Plaintiffs assert generally that Deutsche Bank assisted in concealing Enron's fraud by issuing positive analyst reports and by never issuing a downgrade or warning.  (See Compl. ¶¶ 582-88.)  While this attempts to allege that Deutsche Bank may have failed to sound an alarm, it does not allege that Deutsche Bank's actions proximately caused Plaintiffs' Osprey losses.  Not preventing losses is materially distinct from causing them.  Deutsche Bank had no contractual or fiduciary relationship with these Plaintiffs and no duty to disclose.  In re Sharp Int'l Corp., 403 F.3d 43, 52 (2d Cir. 2005); Kaufman v. Cohen, 760 N.Y.S.2d 157, 170 (N.Y. App. Div. 2003).  Indeed, there is no allegation anywhere in the Complaint that Plaintiffs ever saw or read a Deutsche Bank analyst report.  Plaintiffs do not explain how analyst reports on Enron equity and/or debt securities that do not speak to, much less recommend, Osprey Certificates could conceivably have been a proximate cause of Plaintiffs' alleged losses on the Osprey Certificates.  Enron's, Osprey's and Plaintiffs' own actions, not anything related to a Deutsche Bank analyst, caused Plaintiffs' harm.

For the reasons set forth above, Plaintiffs fail to adequately plead substantial assistance – as well as the other predicate elements – and their aiding and abetting claims against Deutsche Bank should be dismissed.

42

## V.    PLAINTIFFS FAIL TO ADEQUATELY PLEAD THEIR CIVIL CONSPIRACY CLAIMS.

To state a claim for civil conspiracy to commit fraud, Plaintiffs must allege facts that demonstrate a **_knowing agreement_** by each alleged co-conspirator to commit fraud.[39]  See Snyder v. Puente De Brooklyn Realty Corp., 746 N.Y.S.2d 517, 521-22 (N.Y. App. Div. 2002), appeal denied, 99 N.Y.2d 506 (N.Y. 2003) (plaintiff must allege facts supporting "'an inference that defendants knowingly agreed to cooperate in a fraudulent scheme, or shared a perfidious purpose'"); see also Frazier v. Turning Stone Casino, 254 F. Supp. 2d 295, 313 (N.D.N.Y. 2003). As with Plaintiffs' other fraud-based claims, conspiracy to defraud must be pled with particularity under Rule 9(b).  See Hernandez v. Ciba-Geigy Corp., No. Civ. A. B-00-82, 2000 WL 33187524, at *5 (S.D. Tex. Oct. 17, 2000).

Plaintiffs' conspiracy claims must be dismissed for the same reason their aiding and abetting claims must be dismissed, i.e. they have failed to plead with any degree of specificity that Deutsche Bank knowingly colluded with Enron to defraud investors.  See Section IV.A, supra.  Plaintiffs' claims also fail because they do not allege any facts to support the predicate fact of any "agreement" between Deutsche Bank and Enron to commit fraud, which is an additional required element of their conspiracy claim.  See Snyder, 746 N.Y.S.2d at 521-22. Plaintiffs have merely alleged that Deutsche Bank participated in certain tax, investment, or structured finance transactions that Enron may have used to defraud investors.  When, as here,

---

[39]    In addition to their civil conspiracy claims, Plaintiffs also purport to assert claims under a "concerted action" theory under New York law.  To the extent there are differences between conspiracy and concerted action claims, such differences are irrelevant for purposes of this motion, as Plaintiffs have failed to establish an indispensable element of both claims – a knowing agreement to injure investors.  See Pittman v. Grayson, 149 F.3d 111, 122-23 (2d Cir. 1998).  Moreover, concerted action claims require the additional allegation that **_each defendant_** committed a tortious act in furtherance of the overall wrongful conduct, see id. at 122, but, as shown above, Plaintiffs fail to allege that Deutsche Bank committed any such tortious act. The elements of a civil conspiracy claim are also virtually identical under Texas and New York law.  In particular, both Texas and New York law require a knowing agreement to participate in an unlawful act. Ins. Co. of N. Am. v. Morris, 981 S.W.2d 667, 674 (Tex. 1998).

"scienter is lacking, the mere fact that a defendant's otherwise lawful activities may have assisted another in pursuit of guileful objectives is not a sufficient basis for a finding that he or she conspired to defraud."  Id.; Pittman, 149 F.3d at 122-23 (to be liable for civil conspiracy "the defendant must know the wrongful nature of the primary actor's conduct"); see also Firestone Steel Prods. Co. v. Barajas, 927 S.W.2d 608, 614 (Tex. 1996) (holding that "[f]or a civil conspiracy to arise, the parties must be aware of the harm or the wrongful conduct at the beginning of the combination or agreement" and that "[o]ne cannot agree, expressly or tacitly, to commit a wrong about which he has no knowledge").  Plaintiffs fail to allege any facts that might show Deutsche Bank's knowledge of any fraudulent purpose or any agreement by Deutsche Bank to defraud investors, and their conspiracy claim must likewise be dismissed.

## **CONCLUSION**

For the reasons set forth above, Defendant Deutsche Bank respectfully requests that the Court dismiss Plaintiffs' Second Amended Complaint in its entirety, with prejudice.

Dated: February 28, 2007
       Houston, Texas

Respectfully submitted,

BERG & ANDROPHY

By:    /s/ Joel M. Androphy
       Joel M. Androphy
       State Bar No. 01254700
       Federal ID No. 1410
       3704 Travis
       Houston, Texas  77002-9550
       (713) 529-5622 (Telephone)
       (713) 529-3785 (Facsimile)

OF COUNSEL:

Lawrence Byrne
Lance Croffoot-Suede
Ruth E. Harlow
Joseph B. Schmit
LINKLATERS
1345 Avenue of the Americas
New York, New York  10105
(212) 903-9000 (Telephone)
(212) 903-9100 (Facsimile)

ATTORNEYS FOR DEUTSCHE BANK
SECURITIES INC.