IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In Re Enron Corporation Securities, Derivative & "ERISA" Litigation | § § § § | MDL-1446 |
| MARK NEWBY, et al., | § § | |
| Plaintiffs | § § | |
| VS. | § § | CIVIL ACTION NO. H-01-3624 CONSOLIDATED CASES |
| ENRON CORPORATION, et al., | § § | |
| Defendants | § | |
| WESTBORO PROPERTIES, LLC, et al., | § § | |
| Plaintiffs, | § § | |
| VS. | § § | CIVIL ACTION NO. H-03-1276 |
| CREDIT SUISSE FIRST BOSTON, INC., et al., | § § § | |
| Defendants. | § | |

## OPINION AND ORDER OF DISMISSAL

The above referenced action, H-03-1276, alleges that a

Defendant Deutsche Bank Securities, Inc. ("Deutsche Bank" or "the

bank")[1] fraudulently induced Plaintiffs Westboro Properties LLC

---

[1] Deutsche Bank points out that Deutsche Bank Securities, Inc. was formerly known as Deutsche Banc Alex.Brown Inc., which is named as a separate defendant in this lawsuit. This Court earlier recognized that Deutsche Banc Alex.Brown Inc. ceased as a legal entity after its name was changed on or about March 29, 2002. *In re Enron Corp. Sec., Deriv. & "ERISA" Litig,*, 310 F. Supp. 2d 819, 826 n.4 (S.D. Tex. 2004). The complaint also sues as a defendant "Deutsche Bank Alex.Brown Securities, Inc.," which is not and has never been a separate legal entity. #40 at 1 n.1.
The Second Amended Complaint (#33) states, "Defendant Deutsche Bank Securities, Inc. notified Plaintiffs while litigation was pending that it is the successor in interest to the . . . Deutsche Banc entities and all Deutsche Banc entities are herein collectively referred to as 'Deutsche Banc' 'Deutsche Bank' or

and Stonehurst Capital, Inc. in 1999 and 2000 to purchase beneficial ownership interests ("Osprey Certificates") in the Osprey Trust, a special purpose entity ("SPE") allegedly secured by worthless or nearly worthless assets purchased from Enron Corporation purportedly through "arms-length" transactions and dumped into Osprey, as part of a larger conspiracy with Enron to manipulate Enron's financial statements and defraud investors. Pending before the Court in H-03-1276 is Deutsche Bank's motion to dismiss (instrument #39) Plaintiffs' Second Amended Complaint (#33), pursuant to Federal Rules of Civil Procedure 12(b)(6) and 9(b). All other Defendants have settled with Plaintiffs.

Initially Plaintiffs argue that Texas law applies here, because (1) Texas has the most significant relationship with Defendants allegedly wrongful conduct and is the reason why these cases were referred to the Southern District of Texas; (2) an out-of-state plaintiff may sue under the Texas Securities Act ("TSA") if the complained-of conduct took place in Texas; and (3) Texas has a strong public policy interest in enforcing its securities laws. Given that Enron Corp, was based in Houston, Texas and was inextricably intertwined in each of the transactions at issue here, where many of the important documents were drafted and decisions made, the nucleus of the litigation is in this district.

---

'Deutsche.'"  #33 at ¶ 5; see also ¶¶ 409-10 ("Herein, the term 'Deutsche' includes all of Deutsche Securities' predecessors in interest, including Bankers Trust."). Furthermore Deutsche Bank and Bankers Trust ("BT") merged in June 1999 after both banks had developed relationships with Enron and its executives.

Plaintiffs seek equitable and/or monetary relief for violations of Sections 581-33A and 581-33F of the TSA, Tex. Rev. Civ. Stat. Ann. § 581-1 *et seq.*; common-law aiding and abetting, fraud, and civil conspiracy; and Sections 12(a)(2) and 15 of the Securities Act of 1933, 15 U.S.C. §§ 77l(a)(2) and 77o. Plaintiffs also request attorneys' fees and exemplary damages. They claim they are entitled to unlimited exemplary damages under the Texas Civil Practice & Remedies Code § 41.008(c) because each Defendant violated and/or conspired with Enron to violate Texas Penal Code §§ 32.43 (commercial bribery) and/or 32.47 (fraudulent concealment of a writing).

Alternatively, Plaintiffs assert their claims under New York common law.

After careful review of the parties' submissions and the applicable law, for the reasons stated below the Court concludes that Plaintiffs have failed to state a claim against Deutsche Bank under Federal Rules of Civil Procedure 9(b) and 12(b) and that this action should accordingly be dismissed.

### Standards of Review

When a district court reviews a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), it must construe the complaint in favor of the plaintiff and take all well-pleaded facts as true. *Kane Enterprises v. MacGregor (US), Inc.*, 322 F.3d 371, 374 (5th Cir. 2003), *citing Campbell v. Wells Fargo Bank*, 781 F.2d 440, 442 (5th Cir. 1986).

"While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, . . . a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do . . . ." *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1964-65 (2007)(citations omitted). "Factual allegations must be enough to raise a right to relief above the speculative level." *Id.* at 1965, *citing* 5 C. Wright & A. Miller, *Federal Practice and Procedure* § 1216, pp. 235-236 (3d ed. 2004)("[T]he pleading must contain something more . . . than . . . a statement of facts that merely creates a suspicion [of] a legally cognizable right of action"). "*Twombly* jettisoned the minimum notice pleading requirement of *Conley v. Gibson*, 355 U.S. 41 . . . (1957)["a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief"], and instead required that a complaint allege enough facts to state a claim that is plausible on its face." *St. Germain v. Howard*,556 F.3d 261, 263 n.2 (5th Cir. 2009), *citing In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007)("To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must plead 'enough facts to state a claim to relief that is plausible on its face.'"), *citing Twombly*, 127 S. Ct. at 1974). "'A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the

defendant is liable for the misconduct alleged.'" *Montoya v. FedEx Ground Package System, Inc.*, ___ F.3d ___, No. Civ. A. L-08-39, 2010 WL 3081504, * 3 (5th Cir. Aug. 9, 2010), *quoting Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1940 (2009). Dismissal is appropriate when the plaintiff fails to allege "'enough facts to state a claim to relief that is plausible on its face'" and therefore fails to "'raise a right to relief above the speculative level.'" *Montoya*, 2010 WL 3081504 at * 3, *quoting Twombly*, 550 U.S. at 555, 570.

In *Ashcroft v. Iqbal*, 129 S. Ct. at 1940, the Supreme Court, applying the *Twombly* plausibility standard to a *Bivens* claim of unconstitutional discrimination and a defense of qualified immunity for government official, observed that two principles inform the *Twombly* opinion: (1) "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." . . . Rule 8 "does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions."; and (2) "only a complaint that states a plausible claim for relief survives a motion to dismiss," a determination involving "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."

Furthermore, the plaintiff must plead specific facts, not merely conclusory allegations, to avoid dismissal. *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498 (5th Cir. 2000) "Dismissal is proper if the complaint lacks an allegation regarding a required element necessary to obtain relief . . . ."

*Rios v. City of Del Rio, Texas*, 444 F.3d 417, 421 (5th Cir. 2006), *cert. denied*, 549 U.S. 825 (2006).

In addition to the complaint, the court may review documents attached to the complaint and documents attached to the motion to dismiss to which the complaint refers and which are central to the plaintiff's claim(s). *Collins*, 224 F.3d at 498-99. If an exhibit attached to the complaint contradicts an allegation in the complaint the exhibit controls. *United States ex rel. Riley v. St. Luke's Episcopal Hosp.*, 355 F.3d 370, 377 (5th Cir. 2004).

The court may also take notice of matters of public record when considering a Rule 12(b)(6) motion. *Davis v. Bayless*, 70 F.3d 367, 372 n.3 (5th Cir. 1995); *Cinel v. Connick*, 15 F.3d 1338, 1343 n.6 (5th Cir. 1994).

Fraud claims must also satisfy the heightened pleading standard set out in Federal Rule of Civil Procedure 9(b): "In allegations alleging fraud . . ., a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." A dismissal for failure to plead with particularity as required by this rule is treated the same as a Rule 12(b)(6) dismissal for failure to state a claim. *Lovelace v. Software Spectrum, Inc.*, 78 F.3d 1015, 1017 (5th Cir. 1996). The Fifth Circuit interprets Rule 9(b) to require "specificity as to the statements (or omissions) considered to be fraudulent, the speaker, when and why the statements were made, and an explanation

of why they were fraudulent." *Plotkin v. IP Axess, Inc.,* 407 F.3d 690, 696 (5th Cir. 2005).    *In accord Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 290 (2d Cir. 2006).

The pleading standards of *Twombly* and Rule 9(b) apply to pleading a state law claim of conspiracy to commit fraud.  *U.S. ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 193 (5th Cir. 2009)("a plaintiff alleging a conspiracy to commit fraud must 'plead with particularity the conspiracy as well as the overt acts . . . taken in furtherance of the conspiracy'"), *quoting FC Inv. Group LLC v. IFX Markets, Ltd.*, 529 F.3d 1087, 1097 (D.C. Cir. 2008).   *In accord Lerner v. Fleet Bank, N.A.*, 459 F.3d at 290-92.

If Plaintiffs fail to state a claim for fraud underlying their civil conspiracy claim, the civil conspiracy claim must be dismissed, too.  *Allstate Ins. Co. v. Receivable Finance, Inc.,* 501 F.3d 398, 414 (5th Cir. 2007); *American Tobacco Co., Inc. v. Grinnell*, 951 S.W. 2d 420, 438 (Tex. 1997)("Allegations of conspiracy are not actionable absent an underlying [tort]"); *Krames v. Bohannon Holman LLC*, No. 3:06-CV-2370-0, 2009 WL 762205, *10 (N.D. Tex. Mar. 24, 2009).  *In accord Kottler v. Deutsche Bank AG*, 607 F. Supp. 2d 447, 461 (S.D.N.Y. 2009)

Dismissal under Federal Rule of Civil Procedure 12(b)(6) is "appropriate when a defendant attacks the complaint because it fails to state a legally cognizable claim."  *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001), *cert. denied sub nom. Cloud v. United States*, 536 U.S. 960 (2002), *cited for that proposition in Baisden v. I'm Ready Productions*, No. Civ. A. H-08-

0451, 2008 WL 2118170, *2 (S.D. Tex. Tex. May 16, 2008). *See also ASARCO LLC v. Americas Min. Corp.*, 382 B.R. 49, 57 (S.D. Tex. 2007)("Dismissal "'can be based either on a lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory.'" [citation omitted]), *reconsidered in other part*, 396 B.R. 278 (S.D. Tex. 2008); *Esposito v. New York*, 355 Fed. Appx. 511, 512-13 (2d Cir. 2009).

### Relevant Law

A court decides a conflicts-of-law question only when a case is connected with more than one state and the laws of these states differ on one or more points in issue. *Greenberg Traurig of New York, PC v. Moody*, 161 S.W. 3d 56, 69-70 (Tex. App.-- Houston [14th Dist.] 2004, no pet.). Federal courts apply the forum state's conflict-of-laws rules to determine what law governs state-law claims. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941); *Bailey v. Shell Western E&P, Inc.*, 609 F.3d 710, 722 (5th Cir. 2010). Determining which state's law governs is a question of law for the court to decide. *Torrington Co. v. Stutzman*, 46 S.W. 3d 8229, 848 (Tex. 2000).

Where the parties have not agreed by contract which law should apply, Texas courts apply the law of the state with the most significant relationship to the particular substantive issue. *Duncan v. Cessna Aircraft Co.*, 665 S.W. 2d 414, 421 (Tex. 1984)(the court considers "the qualitative nature of the particular contacts with a state" and the "state policies underlying the particular substantive issues"). Texas has adopted

- 8 -

the *Restatement (Second) of Conflict of Laws* § 6 (1971)'s "most significant relationship test to decide choice of law issues. *Hughes Wood Prods., Inc. v. Wagner*, 18 S.W. 3d 202, 205 (Tex. 2000). Section 6(2) sets out general factors for consideration in determining the applicable law:

> (a)   the  needs  of  the  interstate  and international systems,
> (b) the relevant policies of the forum,
> (c) the relevant policies of other interested states  and  the  relative  interests  of  those states in the determination of the particular issue,
> (d) the protection of justified expectations,
> (e)   the   basic   policies   underlying   the particular field of law,
> (f) certainty, predictability and uniformity of the result, and
> (g) ease in the determination and application of the law to be applied.

The courts consider "the qualitative nature of the particular contacts" with a state and the "state policies underlying the particular substantive issues." *Duncan v. Cessna Aircraft Co.*, 665 S.W. 2d 414, 421 (Tex. 1984).

For claims based on fraud and misrepresentation, to determine which state's law applies, in Texas the court considers the specific factors in the *Restatement (Second) of Conflict of Laws* § 148. *Highland Crusader Offshore Partners, LP v. Motient Corp.*, 281 S.W. 3d 237, 249-50 (Tex. App.--Dallas 2009). Section 148 provides,

> (1) When the plaintiff has suffered pecuniary harm  on  account  of  his  reliance  on  the defendant's  false  representations  and  when the plaintiff's action in reliance took place in the state where the false representations were made and received, the local law of this

state determines the rights and liabilities of the parties unless, with respect to the particular issue, some other state has a more significant relationship under the principles stated in § 6 to the occurrence and the parties, in which even the local law of the other state will be applied.

(2) When the plaintiff's action in reliance took place in whole or in part in a state other than that where the false representations were made, the forum will consider such of the following contacts, among others, as may be present in the particular case in determining the state which, with respect to the particular issue, has the most significant relationship to the occurrence and the parties:

> (a) the place, or places, where the plaintiff acted in reliance upon the defendant's representations,
> (b) the place where the plaintiff received the representations,
> (c) the place where the defendant made the representations,
> (d) the domicil, residence, nationality, place of incorporation and place of business of the parties,
> (e) the place where a tangible thing which is the subject of the transaction between the parties was situated at the time, and
> (f) the place where the plaintiff is to render performance under a contract which he has been induced to enter by the false representations of the defendant.

If any two of the contacts apart from the defendant's domicil, state of incorporation, or place of business, are located wholly in a single state, that state will usually be the state of applicable law with respect to most issues. *Grant Thornton LLP v. Suntrust Bank*, 133 S.W. 3d 342, 358 (Tex. App.--Dallas 2004, pet. denied), *citing Restatement (Second) of Conflict of Laws* §

148, cmt. j.   In a conflict-of-laws analysis for a fraud-based claim, the principal focus is on where the conduct occurred. *Greenberg Traurig*, 161 S.W. 3d at 72.

> For tort claims in general, Section 145 applies:
>
> (1) The rights and liabilities of the parties with respect to an issue in tort are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties under the principles stated in § 6.
>
> (2) Contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include:
> > (a) the place where the injury occurred,
> > (b) the place where the conduct causing the injury occurred,
> > (c) the domicil, residence, nationality, place of incorporation and place of business of the parties, and
> > (d) the place where the relationship, if any, between the parties is centered.
>
> These contacts are to be evaluated according to their relative importance with respect to the particular issue.

Because there is no difference in the substantive law relating to fraud and civil conspiracy to defraud under New York and Texas law, this Court does not need to conduct a conflict-of-law analysis as to those causes of action. *Greenberg Traurig*, 161 S.W. 3d at 70.

New York's Blue Sky Laws, commonly known as the Martin Act, prohibit numerous fraudulent practices in the distribution, exchange, sale and purchase of securities. *Greenberg Traurig*, 161

S.W. 3d at 76.  Unlike the TSA, the Texas Blue Sky Law, however, investors have neither an express nor an implied private right for securities fraud under the Martin Act.  *Id., citing Pahmer v. Greenberg*, 926 F. Supp. 287, 302 (E.D.N.Y. 1996), *aff'd sub nom. Shapiro v. Cantor*, 123 F. 3d  717 (2d Cir. 1997); *CPC Int'l, Inc. v. McKesson Corp.*, 70 N.Y.2d 268, 519 N.Y.S.2d 804, 806-07, 514 N.E.2d 116, 118 (1987).  Thus there is a conflict between the Blue Sky laws of New York and of Texas.

### Complaint's Factual Allegations About Deutsche Bank

Deutsche Bank provided substantial commercial and investment banking services, commercial loans, and advisory services to Enron.  The Second Amended Complaint (#33) focuses on Deutsche Bank's material involvement in two different matters constituting part of Enron's alleged scheme to manipulate its balance sheet, falsify financial reports filed with the Securities and Exchange Commission ("SEC"), and defraud investors:  (1) promoting to Plaintiffs and other investors the sale of beneficial ownership interests, i.e., Osprey Certificates, in a SPE known as the Osprey Trust, which purportedly allowed Enron to rid itself of unwanted assets, hide debt, and inflate its reported income and (2) a series of tax transactions, used to "cook" Enron's books.

*Osprey Certificates*

There were three sales of equity and debt participation in the Osprey Trust, which was comprised of Whitewing Associates LP, established in December 1997 as a limited liability entity owned by Enron, and Whitewing Management LLC.  "Osprey I" occurred

- 12 -

in September 1999 and included the sale of $1.4 billion in 8.31%
"Senior Secured Notes" due on January 15, 2003 and $100,000,000
in certificates of beneficial ownership ("Osprey Trust
Certificates" or "Osprey Certificates") to institutional
investors.  A second equity sale ("Osprey II") closed in June 2000
and was composed of $70,000,000 of Osprey Trust Certificates.  The
last offering, "Osprey III," took place in September 2000 and
consisted of $750,000,000 in 7.797% "Senior Secured Notes," also
due on January 15, 2003, and $50,000,000 of Osprey Trust
Certificates.  Plaintiffs purchased $9,000,000 of Certificates in
Osprey I and $5,000,000 in Osprey II.  #33 at ¶¶ 40-44.

        The proceeds from the sale of Osprey securities were to
be used to purchase an ownership interest in a limited partnership
known as Whitewing.  Enron held a major ownership interest in
Whitewing through two Enron affiliates, Egret I LLC and Peregrine
I LLC, and in effect controlled the whole structure.  Defendant
financial institutions collectively promoted the sales of the
Osprey Notes and Certificates through "presentation-to-investors"
pamphlets, formal Offering Memoranda ("OMs") for the Osprey I and
III Notes, and face-to-face meetings.  With regard to their
purchase of the Certificates, Plaintiffs received and reviewed the
August 1999 and June 2000 pamphlets that allegedly contained
materially misleading statements or omitted material information
known to Defendants.  For example, these materials misrepresented
that Whitewing was to acquire assets at fair market value through
arm's length transactions between Whitewing and Enron.  Those who

- 13 -

prepared the materials also knowingly made material omissions about transfer restrictions on particular assets that Defendants and Enron were planning to sell to the Osprey structure and the actual value of the collateral in the form of the assets that backed the investment. The assets in Whitewing, acquired by wrongful transfers from Enron on terms materially unfair to Whitewing, constituted the security for the Osprey Trust investors. The OMs for Osprey I and III Notes incorporated Enron's purportedly false and misleading SEC filings for those years,[2] on which Plaintiffs claim they relied. Plaintiffs also met with representatives of the underwriting syndicate Defendant financial institutions acting jointly and severally, including Seth Rubin of Deutsche Bank, and relied upon the institutions' duty as underwriters in a private offering to conduct a thorough due diligence investigation and upon their statements regarding the sale and purchase of the Osprey offerings.

The complaint asserts that, motivated by large fees and commissions, Deutsche Bank acted as a joint bookrunning manager, i.e., as one of the underwriters controlling the offering, and

---

[2] The Osprey I OM expressly incorporated by reference Enron's 10-K for the year ending December 31, 1998 and its 10-Q and 8-K reports filed in 1999. #33, ¶ 153. The Osprey II OM expressly incorporated by reference Enron's 10-K report for the year ending December 31, 1999 and 10-Q and 8-K repots filed in 2000. *Id*. ¶ 154. The Court notes the discrepancy, which it assumes is a typographical error, between ¶ 52 and ¶ 154, the first referring to Osprey III, the second, Osprey II, since both cite the same Enron reports.

Deutsche Bank "actively sold"[3] Osprey Certificates.  #33 at ¶ 97.
It also alleges that Plaintiffs' representative, Doug Stark,
recalls the involvement of Deutsche Bank's Seth Rubin in the
presentation of material for Osprey I, and that Rubin failed to
tell Stark the truth about the assets to be purchased by Osprey
and that Citigroup was using Osprey to offload $40 million of its
own risks to Enron.[4]  Deutsche Bank allegedly also concealed the
opinion of another Deutsche Bank employee, Paul Cambridge, stated
in an email of November 2000:  "The Osprey transaction was a
highly tailored structured finance designed to meet certain
balance sheet and income statement goals of Enron."[5]  #33, ¶ 97.
Mike Jakubik had worked as part of Enron's Osprey team before
joining Deutsche Bank's Houston office as its Enron-relationship
person and was one of those responsible for conceiving and
marketing Osprey I to potential investors. *Id.* at ¶¶ 101, 103.
Jakubik knew that the Osprey offerings were intended to "create
a vehicle for dumping [Enron's] problem assets to avoid dramatic
write-downs and receiv[e] cash well in excess of the fair market
value of these assets," while the Osprey Trust was "a mechanism

---

[3] The complaint provides no details to explain its use of this
phrase.

[4] The Court observes that Plaintiffs fail to plead any facts
demonstrating that Rubin knew anything about the nature of the
assets to be purchased by Osprey or that Citigroup was trying to
offload onto Osprey $40 million of its risky exposure to Enron.

[5] This Court agrees with Deutsche Bank that this statement is
neutral and by itself does not demonstrate wrongdoing, nor does it
sustain a fraud cause of action.

for funding these overpriced acquisitions with Plaintiffs' funds."
*Id.* at ¶ 102.[6]  He knew there were no arm's length negotiations
between Enron and Whitewing because the executives representing
each side were Enron employees with incentive to promote Enron's
interests and that Whitewing would pay inflated prices for the
assets.  *Id.* at ¶ 103.  Nor did Deutsche Bank reveal that the
entire Osprey/Whitewing structure was controlled by Enron.  *Id.*
at ¶ 141.[7]  *Id.* #33 at ¶ 141.  The complaint without any specific
facts charges that Jakubik also helped Deutsche Bank structure and
promote the Osprey III offering of Notes and Certificates.  *Id.*
at ¶ 104.  Plaintiffs argue that these allegations support their
claim that Deutsche Bank was a primary violator of the TSA.

Defendants also falsely assured the prospective
investors that upon the occurrence of a "trigger event," including

---

[6] Plaintiffs also fail to allege facts showing how Jakubik
knew this information.  They do not state when he worked at Enron
and when at Deutsche Bank.  Deutsche Bank in its response asserts,
without any disagreement expressed by Plaintiffs, that Jakubik was
at Enron in August 1991 and did not join Deutsche Bank until August
2000, after both of Plaintiffs' purchases of Osprey Certificates.

[7] This Court observes that Plaintiffs' conclusory statement
that Enron controlled the whole Osprey/Whitewing structure is
contradicted by express statements in the Purchase Agreements about
the investors' powers.  If an exhibit attached to the complaint
contradicts an allegation in the complaint, the exhibit controls.
*United States ex rel. Riley v. St. Luke's Episcopal Hosp.*, 355 F.3d
370, 377 (5th Cir. 2004).  Plaintiffs have not alleged any facts
with particularity demonstrating Enron's "complete" control of
Osprey/Whitewing or the investors' complete lack of control.  For
that reason Plaintiffs also fail to show that Osprey/Whitewing, the
named seller of the securities, was a sham, so that Enron was in
actuality the offeror or seller for purposes of Plaintiffs' claims
under the TSA and § 12(a)(2).

any downgrade in Enron's credit rating or a significant drop in
Enron's stock price, the investors would supposedly be protected
by the Osprey Indenture Trustee's power to sell and liquidate the
assets.   Furthermore the Osprey structure was ultimately backed
through the Condor Share Trust only by Enron stock and an Enron
guaranty, so an understanding of Enron's actual financial
condition was critical to the Osprey Trust investors.

        Plaintiffs purchased their Osprey Certificates believing
that the Whitewing/Osprey assets[8] fully supported the structure's

---

        [8] The complaint names some of these "depressed" assets,
fraudulently purchased by Whitewing from Enron at excessive prices
when Enron's attempt to sell them elsewhere failed.  They included
Sarlux SRL ("Sarlux"), a gasification and power plant in Sardinia,
Italy, Trakya Elektrik Uretim ve Ticaret A.S. ("Trakya"), a power
plant in Turkey, and Promigas, in which Deutsche Bank played a
role.  #33 at ¶¶ 77–96.  The complaint claims that there were
severe contractual transfer restrictions on Enron's Sarlux interest
and that there were inherent difficulties with marketing the
economic, non-voting interest that Whitewing purchased.  An Enron
affiliate, Dutch Holdings B.V., held a 45% interest in Sarlux, with
the remaining majority interest held by SARAS, S.p.A., an Italian
energy company.   Apparently before selling 99.99% of Enron's
interest in these assets to Osprey on September 30, 1999, during
the spring and fall of 1999 Citigroup and Enron had tried to sell
Sarlux and other assets including the Trakya plant through project
Margaux in 1999, but failed because "the joint owners would not
permit disclosure of material facts."   They not only concealed
their failed attempt to sell the assets, but they deliberately
omitted telling Plaintiffs that (1) they unloaded the assets on
Osprey for a concealed, predetermined price, (2) there were no
tangible assets purchased by Osprey, (3) that a shareholders'
agreement between SARAS and Dutch Holdings precluded Enron from
transferring its interest in Sarlux to third parties without the
approval of shareholders, including SARAS, and (4) that Enron's
interest in Sarlux was subject to a "call option" held by SARAS
which was triggered if Enron ever disposed of its economic interest
in Sarlux.   The call option allowed SARAS to purchase Enron's
Sarlux shares within 60 days of Enron's transfer of that interest
to a non-affiliate for a price equal to 90% of Enron's book value
or invested capital in the Sarlux shares; at the time Whitewing
acquired the interest in Sarlux for $350 million, the "call option"

value and unaware that transfer restrictions and liquidity
restraints made most of the assets in Whitewing unmarketable.  The
complaint summarizes, "In reality, Defendants formed Osprey to
fund Whitewing's acquisitions of exorbitantly priced Enron assets
so Enron could continue to report falsely inflated financial
results and conceal from disclosure the asset impairment,
excessive liabilities, and increasing losses that Enron was
incurring from its unsuccessful businesses." #33, ¶ 75.

The complaint charges that Defendants caused the Osprey
I OM to be false and materially misleading by describing the
investments as a blind pool even though the Sarlux and Trakya

---

price was exercisable for less than $60 million, the real value of
the purchase.  The Sarlux transaction was completed only six days
after the funding of Osprey I.  The Osprey I OM omitted such
material facts as that the terms of the transaction were pre-
determined and not by fair bidding, the call option severely
restricted Sarlux's potential value, and the planned terms of the
sale were unfair to Whitewing and a fraud on the Osprey investors.
#33, ¶¶ 78-88.  After Enron declared bankruptcy, SARAS learned that
Enron had transferred its economic interest in Sarlux to Whitewing,
so SARAS exercised the call option.  *Id.* at 89.

The treatment of Trakya' assets followed the same
pattern.  On October 29, 1999 Enron transferred its economic
interest in approximately 22% of Trakya to the same Whitewing
indirect subsidiary and intermediary it used in the Sarlux
transaction for $100 million, four times the value assigned to the
asset on Enron's books.  Its terms were also pre-planned and thus
not subject to the "bidding" process that was represented in the
Osprey I OM.  As in Sarlux, the Trakya transaction involved severe,
undisclosed transfer restrictions not reflected in the price paid
by Whitewing, and unanimous shareholder and lender consent was
required for any transfer by Enron of its interests, making the
investment unreasonable for Plaintiffs.  After Whitewing purchased
Enron's economic interest in Trakya at such an inflated price,
Osprey Trust investors were injured when Enron failed to secure the
proper shareholder and lender consents.  #33, ¶¶ 90-95.

In Promigas, which had a market value of $106 million on
Enron's books, Enron sold its interest to Osprey for $137.5
million.  #33, ¶ 96.

- 18 -

transactions had already been identified for the purchase and by failing to disclose the purchases in reasonable detail, including the financial terms of the sale and the severe transfer restrictions.  The Osprey III offering largely copied Osprey I in expanding the fraud already perpetrated on purchasers of Osprey I securities, and again characterized by material transfer restrictions with great impact on the value of the interest purchased and by the grossly inflated overpayment for the Sarlux and Trakya assets, which were not disclosed in the Osprey III OM.

*Tax Transactions*

Tax opinions from independent tax advisors and Enron Bankruptcy Examiner Neal Batson identify the "business purpose" of the tax transactions as the generation of "accounting income" and "balance sheet management" for Enron, especially at the end of accounting periods and particularly the year-end financial reports.  #33 at ¶¶ 436-39.

In addition to two major structured finance transactions named Osprey and Marlin (discussed *infra*), which raised billions of dollars for Enron and enabled it to remove non-performing or poorly performing assets from its consolidated balance sheet, the complaint identifies and discusses six tax transactions developed and promoted by Deutsche Bank:  four, known as the "BT/Deutsche Tax Transactions," for Enron to hide its financial condition, were dubbed Teresa, Steele, Cochise, and Tomas; and two "tax accommodation" transactions, to provide tax benefits to Deutsche Bank, were called Renegade and Valhalla.  All of these purportedly

gave Deutsche Bank knowledge of Enron's financial condition and accounting fraud.

The complaint reports that according to Enron Bankruptcy Examiner Neal Batson, the BT/Deutsche Tax Transactions enabled Enron wrongfully to record approximately $158 million of income from two REMIC Carryover Basis Transactions,[9] $143.7 million of which Enron improperly recorded as pre-tax income, as well as erroneously to record a $229 million increase in after-tax net income by reporting Teresa in a manner out of compliance with generally accepted accounting principles ("GAAP"). #33, ¶ 467. After the first BT/Deutsche Tax Transaction, Teresa, was presented to Enron by Deutsche Bank in 1996 and closed the next year, the design and implementation of tax transactions became Deutsche's most significant area of involvement with Enron and ultimately became a conspiracy. #33, ¶¶ 468, 472. Deutsche Bank received over $40 million in fees for its work on the four BT/Deutsche Tax Transactions. #33, ¶ 470. These transactions, as noted by Neal Batson, had nothing to do with tax savings and failed to comply

---

[9] "REMIC" is a real estate mortgage investment conduit, i.e., an entity owning a collateralized pool of real estate mortgages and related securities that satisfy certain technical requirements in the Internal Revenue Code. Batson's Third Interim Report states that each transaction involved the acquisition of REMIC Residual Interests and a limited amount of "Facilitating Assets," which had low economic returns and allowed Enron to portray the potential benefit of speculative future tax deductions for Phantom Losses as pre-tax income for financial accounting purposes. #33, ¶ 504. See subsequent discussion.

with GAAP;[10] they were designed to enable Enron to manipulate and falsify its SEC-filed financial statements by generating current accounting income through creation of speculative future tax credits, but no reserves were set aside in the event that the promised benefits were never realized.  #33, ¶¶ 473-77; see also ¶¶ 487-91.  With the help of Enron's R. Davis Maxey, head of the Corporate Tax Planning Group, which dealt with transactions designed to aid in the manipulation of Enron's financial reports, Deutsche Bank was able to turn Enron's tax department into a "profit center," as described in a February 14, 2003 *USA Today* story, "Enron Unit Turned Tax Shelters into Profit." #33, ¶¶ 478-81.  Moreover, Enron and Deutsche Bank disregarded critical third-party opinions regarding the tax transactions, including advice from Arthur Andersen, various law firms hired by Enron and Deutsche Bank, and tax attorney Bill McKee.  #33, ¶¶ 483-85.[11]

---

[10] The Fifth Circuit has concluded that "the mere publication of inaccurate accounting figures, or a failure to follow GAAP, without more, does not establish scienter.  The party must know that it is publishing materially false information, or the party must be severely reckless publishing such information." *SEC v. Seghers*, 298 Fed. Appx. 319, 331 (5th Cir. 2008), *citing Lovelace v. Spectrum*, 78 F.3d 1015, 1020 (5th Cir. 1996). "In short, GAAP violations are neither necessary nor sufficient to prove securities fraud.  It is possible to violate GAAP, yet not commit fraud, and it is possible to commit fraud without violating GAAP." *Id.*

[11] The complaint asserts that during his deposition, McKee stated that putting financial income on Enron's books was the "principal objective" and that because he was only a "tax lawyer," no matter what he found or suspected, it was not his job to report or make any recommendations for others to investigate.  #33, ¶ 484-85.

In Teresa, for example, a "tax basis step-up" transaction described by Batson as among the "most egregious" of the structures for manipulating financial accounting rules, Enron quantified an increase in the value of Enron's Houston corporate headquarters building as a future tax benefit, recorded that quantified benefit as current accounting income over an artificially short period of time, and passed Enron's interest in the building to a partnership, with later distribution of the property to an Enron affiliate that had achieved an increased basis in its partnership interest. Enron expected the increased tax basis in the partnership eventually to be reflected as an increase in the basis of the corporate headquarters building and expected depreciation deductions over 39.5 years, as summarized in a March 14, 1997 memorandum by Deutsche Bank's Thomas Finley, Christine Levinson and John Tsai and as described in Batson's Second Interim Report, Appendix J, Annex 4.[12]  #33, ¶¶ 492-95.  The tax benefit would not be available until some undetermined time in the future, when the headquarters was distributed to Enron and Enron would take advantage of the increased depreciation deductions.  Thus the point of Teresa was to generate financial accounting income by improperly recording deferred tax assets in

---

[12] Batson's team determined that the accounting for Teresa did not accord with GAAP because (1) Enron's ability to realize the specified future tax benefits was far from certain; (2) the recording of tax benefits was premature because benefits would not be realized until the basis step-up was reflected in the basis of Enron's corporate headquarters; and (3) even if the recording of the benefits were not premature, Enron should have provided a valuation allowance or tax cushion.  #33, ¶ 498.

advance of future tax deductions, even before the resulting increased basis could attach to a depreciable asset. #33, ¶ 496. The complaint asserts that, based on Teresa, Enron improperly created $229 million of after-tax "income" in its SEC-filed financial statements. #33, ¶ 497. Although originally Deutsche Bank was to receive a fee of approximately $8 million for Teresa, that amount was later reduced to $6.625 million after Enron agreed to participate in Project Renegade, which functioned to benefit the Deutsche Bank. #33, ¶ 499.

Earning a fee of $10 million in the next tax transaction, Deutsche Bank designed Steele, the first of two REMIC Carryover Basis Transactions ("the REMIC Transactions"), to appear to be a legitimate tax avoidance structure that acquired and managed a portfolio real estate and other financial assets with an enhanced earning profile, but which actually was intended to generate false "accounting income" to doctor Enron's financial reports rather than tax savings. #33, ¶¶ 522, 513-14, 505, 507-08. The REMIC transactions' purpose was inappropriate inflation of reported financial accounting, pre-tax income of expenses by associating those expenses with investments in some "Facilitating Assets," which were low-yielding and included substantial transaction costs. #33, ¶ 505. Steele generated this false income by amortizing a large portion of the deferred tax credits associated with the acquisition of the REMIC Residual Interests into pre-tax accounting income over the life of the Facilitating

Assets, which in Steele were five-year corporate bonds.[13]  #33, ¶
515. From 1997-2001, Enron's consolidated statements improperly
reported $144 million of pre-tax income involving the Facilitating
Assets. *Id.* Arthur Andersen prepared for Deutsche Bank a report
on Steele, dated August 6, 1998, that warned of potential problems
with the structure and that it might not survive scrutiny by the
IRS.  #33, ¶ 509.  Some employees at Deutsche Bank were
uncomfortable with the transaction.  For example, Peggy Capomaggie
in a September 10, 1997 internal email to Thomas Finley and other
Deutsche Bank bankers, questioned whether Enron's acquisition of
assets from the bank was a properly constituted "business
combination," a requirement to comply with the IRS Code, and
whether other accounting alternatives should be discussed, but she
was overruled.  #33, ¶¶ 517-18.

Cochise, a variation on Steele, was similarly reported
in a manner not in compliance with GAAP or relevant IRS
regulations.  It, too, was based on speculative tax deductions,
intended to generate accelerated pre-tax accounting income without
appearing to do so, and was set up to allow the sale or
monetization of REMIC Residual Interests.  Deutsche Bank sold
Cochise to Enron on a representation that it could generate $75
million in pre-tax accounting income and $79 million in accounting

_____

[13] The complaint states that Enron and Deutsche Bank knew that
under GAAP  a rational, systematic method had to be used for the
amortization period and that the deferred tax assets could only be
attributed to REMIC Residual Interests with an estimated life of
twenty-seven years.  #33, ¶ 519; see also Batson, ¶ 520.  They
violated this restriction.

earnings from the future benefit of future tax deductions.  #33, ¶ 524-25, 527-28, 531.  Batson's Second Interim Report, Appendix J, Annex 2, describes the true purpose of Cochise and the numerous SPEs and intra-SPE transactions used to conceal it.  #33, ¶ 526. Instead of corporate bonds, Cochise's Facilitating Assets were interests in two airplanes purchased from a Deutsche affiliate, treated as a "business combination."  #33, ¶ 530.  The financial accounting basis of the interests could then be reduced to zero, and the basis reduction used to offset the deferred tax asset that the acquisition of the REMIC Residual Interests generated.  #33, ¶530.  Deutsche Bank knew Enron planned to recognize the gain on the sale as the full fair value of the airplanes and to amortize the deferred credit over five years even though the deferred tax assets were attributable solely to REMIC Residual Interests with a much longer life.  #33, ¶ 531.  Deutsche Bank was paid about $15 million for its work on Cochise.  #33, ¶ 533.

Deutsche Bank designed and closed the Tomas Transaction in 1998 to avoid Enron's having to report its acquisition of Portland General Holdings, Inc. and unwound the structure as planned in 2000.  #33, ¶¶ 535-36.  The bank's PowerPoint presentation described Tomas' benefits as "generat[ing] tax basis in a portfolio of 'burnt out' leveraged lease assets, which Portland General originally acquired, and provid[ing] a mechanism for liquidating the portfolio at a substantial gain," once again making the sale of the low-tax-basis assets appear to be an accounting income gain.  #33, ¶¶ 536, 538.  Ultimately Tomas

- 25 -

enabled Enron to record permanent tax benefits as pre-tax gains on Enron's financial statements. Enron gave assets to the Tomas structure that Enron wanted to sell and which had a low basis for both accounting and tax purposes. #33, ¶ 539. The Tomas structure enabled Enron to swap low-tax-basis stock of an affiliate that held cash equal to the sales value of the low-basis assets, which then could be liquidated without Enron having to recognize tax gain. #33, ¶ 539.

To satisfy certain IRS regulations, documentation of part of the Tomas transaction indicated that Oneida, an Enron controlled SPE, would engage in a leasing business, but it had failed to do any leasing by June 2000. To make it appear that Oneida was operating a business concern, Deutsche Bank and Enron transferred the Cochise Facilitating Asset airplanes to Oneida in the summer of 2000. #33, ¶ 540. To ensure that Enron could recognize accounting gains quickly, Enron and Deutsche Bank had an unwritten agreement that the structure would be unwound in two years and a day. Under relevant tax rules, certain favorable presumptions arise when a contributing partner received a liquidating distribution more than two years after its contribution, but they do not apply where there is an understanding that liquidation has been planned at the commencement of the transaction. #33, ¶ 541. Nevertheless, although Deutsche Bank and Enron intended Tomas to be unwound in two years and one day, Enron gave it a tax treatment that was risky and uncertain and improperly recorded the full tax benefit

from the avoidance of the built-in gain at the end of the two years. #33, ¶ 542. It booked the entire proceeds of $36.5 million from the sale of the airplanes as net income, which was made possible only by the wrongful purchase accounting adjustments that reduced Enron's book value in the aircraft to zero, in turn contrary to GAAP because the purchase of the airplanes was not related to the acquisition of the REMIC Residual Interests in Cochise. #33, ¶¶ 544, 548. Moreover, Deutsche Bank knew that Oneida paid an excessive price for the airplanes, as evidenced by a third-party appraisal that Deutsche Bank commissioned and received from BK Associates, Inc. on Jun 12, 2000. #33, ¶ 543. In total, the accounting for Tomas, which did not comply with GAAP, allowed Enron to recognize gains of $25.6 million in 1998 and $18 million in 2000. #33, ¶¶ 545-56. Enron's R. Davis Maxey told Neal Batson that Enron held the Cochise airplanes for a time simply to create the impression that they had not been purchased for resale, even though the opposite was true. #33, ¶ 547. Deutsche Bank knew the truth because it had devised the structure to permit such. Plaintiffs claim they did not know about Deutsche Bank's aiding Enron by artificially creating accounting income and that the result affected Enron's financial statements. Plaintiffs maintain such information would have been an important consideration in their decision whether to purchase the Osprey Certificates. #33, ¶ 549.

The complex tax accommodation transactions, Renegade and Valhalla, which employed various Enron- and Deutsche-controlled

- 27 -

affiliates to conceal the real aims of Enron and Deutsche Bank, were designed to provide tax benefits to Deutsche Bank, and they demonstrate the conspiracy between the two. #33, ¶ 550, 556. For Renegade, in December 1998 Enron borrowed $18 million from BT/Deutsche Bank at a discounted rate, compensated by Deutsche Bank in the reduction of its fee for Teresa from $8 million to approximately $6.625 million. In Valhalla, a May 2000 transaction, with Enron's help Deutsche Bank created deductible interest and nontaxable income by exploiting differences between United States and German tax law. #33, ¶ 553. Enron shared a portion of Deutsche Bank's windfall through an interest rate differential between the interest rate on a Deutsche/Enron Note and the interest rate on the "Participation Rights" under an Enron-Deutsche agreement. #33, ¶ 554. With Valhalla Enron gained a five-year net borrowing while generating approximately $17-20 million of annual pre-tax earnings and cash flow, while Deutsche Bank gained approximately $40 million of annual tax benefits. #33, ¶ 555. The Valhalla Transaction is described in Batson's Second Interim Report, Appendix J, and in his Third Interim Report, Appendix G. The complaint asserts that Deutsche Bank's home office in Germany questioned as contrary to a German statute and against money laundering law the propriety of a part of Valhalla in which Deutsche Bank's Frankfurt office lent $2 billion to an indirect German subsidiary of Enron called Rheingold. #33, ¶¶ 558-60.

With Deutsche Bank's aid, Enron created the Marlin Transaction, structured as a "share trust," to move Enron's unsuccessful water business (Azurix and its subsidiaries, including its purchase of Wessex Water Plc and its associated debt), off Enron's balance sheet.  #33, ¶¶ 561-65.  Mike Jakubik of Deutsche Bank told Batson that treating the Marlin transaction as off-balance sheet financing would avoid the rating agencies' categorizing the structure as debt, which would have an adverse impact on Enron's credit rating, and preclude having to issue more Enron stock,.  #33, ¶ 566; ¶ 576 (email from Deutsche Bank's George Tyson to Paul Cambridge confirming that Deutsche Bank knew that Enron's primary goal was keeping all of the Azurix and Marlin debt off-balance sheet and that Enron was concerned about the ratings impact of refinancing Marlin).  Deutsche Bank was a joint bookrunning manager with Credit Suisse First Boston ("CSFB") (then operating as Donaldson, Lufkin & Jenrette, "DLJ") for both the Marlin I transaction and the Marlin II transaction, the latter being used to refinance the Marlin I.  #33, ¶ 567-68.  Marlin I was comprised of approximately $1.024 billion in Marlin 7.09% Senior Secured Notes due December 2001 (the debt component) and $125 million of certificates (the equity component).  #33, ¶ 568. Based on the alleged "independence" of Marlin from Enron, the share trust, with its poorly performing assets and debt of almost $2 billion, was not reported on Enron's consolidated financial reports.  #33, ¶ 569.  In actuality, however, it was totally controlled by Enron.  #33, ¶ 570.  Furthermore Enron contributed

204,800 shares of its preferred stock (convertible into 17.2 million shares of Enron common stock) to the Marlin Preferred Share Trust and undertook the Share Trust obligations, with recourse to Enron.  #33, ¶ 571.  Given Enron's control and assumption of risk through its stock contribution and assumption of share trust liabilities, the deconsolidation of Marlin in Enron's financial statements violated GAAP.  #33, ¶ 572. Furthermore, as joint bookrunning manager for Marlin I and designer of the Marlin structure, the complaint asserts that Deutsche Bank was responsible for performing due diligence and disclosing relevant facts that investors would consider material. #33, ¶ 573.  Because Marlin was privately placed, Marlin investors and the capital markets depended on the underwriters' disclosures. *Id.*  Deutsche Bank decided to conceal Enron's control of the structure and the ultimate recourse to Enron.  #33, ¶ 574.  As Deutsche Bank involvement continued from Marlin I to Marlin II, in a July 8, 1998 memorandum to Mike Jakubik and other Deutsche Bank bankers, Calli Hayes listed a number of problems with the Marlin structure and commented, "My biggest problem with the transaction as proposed is the exit strategy--there isn't one, at least not a solid one."  #33, ¶ 578.

During the period that it was involved in the various tax transactions, with specific dates identified and examples provided, Deutsche Bank continued publicly to provide only upbeat evaluations and recommendations of Enron and Enron-related

affiliates, concealing its precarious and risky financial condition. #33, ¶¶ 582-90.

*LJM2*

Moreover the complaint generally claims that Deutsche Bank, conspiring with other Defendant financial institutions, helped fund LJM2 and knew that it, with its sham transactions and falsified independence from Enron, was used by Enron to manipulate its balance sheet. #33, ¶¶ 675-703, 723-29. Deutsche Bank's BT invested $10 million in LJM2. #33, ¶ 734. The complaint summarily describes cooperation agreements and guilty pleas of various Enron-related officials to document the deceptions employed to use LJM2 and the Raptors to avoid undesirable results from Enron's accounting treatments. The complaint asserts generally that Deutsche Bank and Citigroup "participated and invested in a clandestine special purpose entity which was controlled by Fastow and Enron to facilitate the phony sales of overvalued Enron assets" and "conspired with Enron and Fastow to aid Enron's fraud by means of transactions that deceptively moved worthless or underperforming assets, as well as debt, off Enron's balance sheet. #33, ¶ 729. The result of the conspiracy was that the price of Enron stock was artificially inflated, Enron was able to borrow at a low interest rate that did not reveal the risk of such loans, and Plaintiffs "were unable to ascertain Enron's true financial condition." *Id.* Deutsche Bank failed to disclose what it knew about LJM2 and Enron's financial reports. #33, ¶¶ 735-40.

*Deutsche Bank's Motive*

The complaint claims that Deutsche Bank joined in the conspiracy to defraud in order to maintain its Tier I banking status with Enron and to pocket the high fees.[14]  In short, it was motivated by greed.  #33, ¶ 730.

*Knowledge of Enron's Actual Financial Condition*

Deutsche Bank purportedly knew about Enron's deteriorating financial status because of the wide range of services it provided to Enron (lending, security offerings, structured financing, and advisory services, especially those related to tax), because of the transactions it participated in with Enron and Enron-related entities, and because the bankers met regularly and personally with top Enron officials, especially banker Paul Cambridge with Andrew Fastow and Ben Glissan, and Enron board member Herbert Winokur, as did senior Deutsche Bank manager Yves Balman with Enron's Jeffrey Skilling.

The complaint further charges that starting in 1999, Deutsche Bank began reducing its exposure to Enron.  Deutsche Bank's William Archer, in an internal email to Hugo Banziger, described attachments to the email as a "paper trail" of its "growing discomfort" with Enron credit.  #33, ¶ 442; see also ¶¶ 448-52 (internal emails from Cambridge, Archer, and Calli Hayes reflecting concern about exposure to Enron).  The attachments were

---

[14]  The complaint states that between 1997 and Enron's bankruptcy filing, Deutsche received approximately $11 million in fees associated with lending and non-tax structured financings; approximately $18 million in fees associated with public and private securities offerings; and approximately $43 million in fees associated with the BT/Deutsche Tax Transactions.  #33, ¶¶ 415-17.

a document dated April 25, 2000, two documents dated December 1, 2000, a document dated December 1, 2001, a document dated May 7, 2001, a document dated October 9, 2001, and an undated document. Deutsche Bank never revealed, indeed deliberately concealed, its knowledge of Enron's financial condition and the risks for investing in Enron from Plaintiffs and the general investing public. Deutsche Bank's Paul Cambridge and Calli Hayes testified before Bankruptcy Examiner Neal Batson's team that by early 2000 Deutsche Bank was concerned about Enron's reported financial condition in statements filed with the SEC. #33, ¶444. Cambridge emailed Deutsche Banker William Archer on September 10, 2001 that there was a "general inclination" by Deutsche Bank's Chief Credit Officer for North America to "disbelieve [Enron] no matter what the source". #33, ¶ 446. The same credit officer was concerned that Skilling's resignation in August 2001 was "the tip of an iceberg of a lot of potential bad news coming up." #33, ¶ 447. On May 7, 2001, as shown by the Minutes of Deutsche Bank's Underwriting Committee, Deutsche Bank purchased $25 million of credit default protection in the derivative market and wanted to buy more, but found the cost prohibitive. The October 9, 2001 Amended Minutes of the same Committee reveal that Enron had considerable off-balance sheet liability and that its transactions lacked transparency about its hedging activities.

*Conspiracy Claim*

The complaint asserts that from at least 1997 Deutsche Bank aided Enron in its fraudulent accounting goals by designing, financing and/or implementing the above named substantial tax-related transactions, in addition to Osprey and Marlin, and it participated in the fraud-enabling LJM2 partnership. Plaintiffs, in purchasing the Osprey Certificates, relied on Enron's financial statements, which they insist that Deutsche Bank helped to make false and misleading.

### Deutsche Bank's Motion to Dismiss

Noting that the Second Amended Complaint is Plaintiffs' third bite of the apple[15] and was filed after discovery was completed, Deutsche Bank moves to dismiss with prejudice all causes of action against it.

### Section 12(a)(2) Claims

### *No Prospectus*

According to the complaint, Plaintiffs purchased Osprey Certificates after face-to-face sales meetings and after "receiv[ing] and rel[ying] on the information presented in the August 1999 and June 2000 Pamphlets" that were summaries for potential investors.[16]   #33 at ¶¶ 47-48, 50.   Plaintiffs, who

---

[15] Plaintiffs respond by pointing out that this motion is Deutsche Bank's first challenge to the sufficiency of Plaintiffs' pleading; Plaintiffs' first amendment was technical, made a few months after the case was filed in 2003 and before the *Newby* fact discovery period began.

[16] Deutsche Bank states these are classic indicia of a "private" offering.  *See Hill York Corp. v. Am. Int'l Franchises, Inc.*, 448 F.2d 680, 687-89 (5th Cir. 1971), *abrogated on other grounds, Pinter v. Dahl*, 486 U.S. 622, 649-51 (1988), *as recognized*

purchased only Osprey Certificates, did not purchase the Notes, which were sold through Rule 144A and Reg S offerings and formal offering memoranda.

Section 12(a)(2) liability expressly reaches only persons who directly sell a security "by means of a prospectus" that contains a misstatement or omission of material fact.   15 U.S.C. § 77l(a)(2).   The term "prospectus" is restricted to a document that "must include the 'information contained in a registration statement.'"   *Gustafson v. Alloyd Co.*, 513 U.S. 561, 569 (1995).[17]   Thus only public offerings with documents including information in a registration statement are subject to Section 12(a)(2) liability.   *Id.*[18]; *Yung v. Lee*, 431 F.3d 142, 149 (2d Cir. 2005)("Section 12(a)(2) liability cannot attach unless there is

_____

in *In re Enron Corp. Sec., Derivative & "ERISA" Litig.*, 540 F. Supp. 2d 759, 784 n.28 (S.D. Tex. 2007).   Criteria relevant to determining the factual issue of whether an offering is public include (1) the number of offerees and their relationship to each other and to the issuer; (2) the number of units offered (the smaller the number, the more likely it is a private offering); (3) the size of the offering (the smaller, the more likely it will be considered private); (4) the manner of the offering (a private offering is more likely when the offering is made directly to the offerees rather than through the facilities of public distribution such as investment bankers or the securities exchanges; and (5) whether the particular class of investors affected need the protection of the 1933 Act and its registration requirements.   *Id.*

[17]   This Court notes that "[f]or all relevant purposes, the prospectus and registration statements contain identical representations."   *Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 859 (5th Cir. 2003).

[18]   Deutsche Bank observes that while Section 12(a)(2) also addresses offers made by "oral communication," that phrase "is restricted to oral communications that relate to a prospectus." *Gustafson*, 513 U.S. at 567-68.   As pointed out, there was no prospectus involved here.

an 'obligation to distribute a prospectus.'"). Plaintiffs' §
12(a)(2) claims fail because there was no prospectus applicable
to their Osprey Certificate purchases and because they purchased
their Certificates pursuant to a purely private sale, insists
Deutsche Bank.[19]

Furthermore, argues Deutsche Bank, in purchasing their
Osprey Certificates, Plaintiffs understood and agreed that there
was no "obligation to distribute a prospectus" in connection with
the Certificates because the Purchase Agreements governing these
purchases expressly state, "Osprey Certificates will be offered
and sold to the Osprey Certificateholders without being registered
under the Securities Act of 1933 . . . in reliance on exemptions
therefrom and may not be offered or sold except pursuant to an
exemption from the registration requirements of the Securities
Act."  #41, Certificate Purchase Agreements, Harlow Decl., Exs.
1 & 2 at 1, 4.  The Agreements further state that non-registration
was dependent in part on representations from Plaintiffs,
including that Plaintiffs were purchasing Certificates for their
own investment purposes "and not with a view toward distribution
of the Certificates in a way that would require registration."

---

[19] The Osprey Certificates, unlike the Osprey Notes, were not
offered by means of offering memoranda.  Deutsche Bank cites to
Ruth E. Harlow's Declaration, #41, showing that the Certificate
Purchase Agreement for those purchases is dated July 10, 2000,
while the second Osprey Offering Memorandum ("OM") was created and
first distributed in draft form in September 2000.  (Because
Plaintiffs allege various misrepresentations in the OM, Deutsche
Bank maintains that it can provide the document on a Rule 12(b)(6)
memorandum.  The Court agrees.)

*Id.* at 4.   These Agreements additionally required each Certificate-holder to represent that it was an "accredited investor" within the meaning of Rule 501(a)(1), (2), (3) or (7) of Regulation D (*id.* at 2)--which provides for an exemption from registration under Section 4(2) of the Securities Act. *See, e.g.*, *Faye L. Roth Revocable Trust v. UBS Paine Webber, Inc.*, 323 F. Supp. 2d 1279, 1294-96 (S.D. Fla. 2004)(holding that offerings under Regulation D to "accredited investors" are not covered by Section 12(a)(2)). *See* discussion below.

　　Moreover, even if the Osprey I OM had applied to the Certificates, it is not a "prospectus."  The OMs explicitly state there was no prospectus distribution requirement.  The Osprey I OM's cover recites that the Osprey Notes were offered pursuant to Rule 144A and Regulation S, neither of which is subject to the registration requirements of the Securities Act of 1933, and that the Notes "HAVE NOT BEEN AND WILL NOT BE REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933."  #41, Harlow Decl., Ex. 6 (Osprey I OM).  Transactions under Rule 144A ("Private Resales of Securities to Institutions") are private transactions with qualified institutional buyers that are not subject to the 1933 Act's registration requirements. 17 C.F.R. § 230.144(a). Because no prospectus is required, such offerings cannot give rise to Section 12(a)(2) liability. *See, e.g., In re WorldCom, Inc. Sec. Litig.*, 294 F. Supp. 2d 431, 455-56 (S.D.N.Y. 2003)(dismissing Section 12(a)(2) claim because "[t]he terms of the [144A] Offering Memorandum compel the conclusion that the . . . Offering was a

private placement . . . no matter how the plaintiff might word the claim, the document involved cannot be silkenized [*sic*] into a § 12(a)(2) 'prospectus.'" [citations omitted]); *Am. High-Income Trust v. Alliedsignal*, 329 F. Supp. 2d 534, 543 (S.D.N.Y. 2004)(holding that "offerings under Rule 144A are by definition non-public, and offering memoranda distributed in connection with such offerings cannot give rise to Section 12(a)(2) liability"). Registration S offerings are similarly made pursuant to a safe harbor from the registration requirements of Section 5 of the 1933 Act.  17 C.F.R. §§ 230.901-230.905.  Moreover such sales are not offered pursuant to a prospectus and are not subject to Section 12(a)(2) liability. *Gustafson*, 513 U.S. at 578.

In sum, in the absence of a prospectus for the Osprey Certificates, there can be no Section 12(a)(2) liability.

**Private Placement**

Plaintiffs § 12(a)(2) claims should also be dismissed because the allegations in the complaint reveal that the Certificates were sold in purely private transactions.  In the wake of *Gustafson*, courts have routinely held that Section 12(a)(2) does not apply to any form of private placement. *See, e.g., Lewis v. Fresne*, 252 F.3d 352, 357-58 (5th Cir. 2001); *In re Azurix Corp. Sec. Litig.*, 198 F. Supp. 2d 862, 893 (S.D. Tex. 2002); *Double Alpha, Inc. v. Mako Partners LP*, No. 99 Civ. 111541, 2000 WL 1036034, *3 (S.D.N.Y. July 27, 2004).  Plaintiffs have not made any factual allegations that would establish that the

Certificates[20] were offered to the public, and there were no formal offering documents for them.  In addition the small size of the Certificate offerings indicates they were private sales:  the September 1999 had five purchasers requesting ten Certificates, while the July 2000 offering had four purchasers requesting eight certificates.  #41, Harlow Decl., Exs. 1 & 2 at Schedule I.

Deutsche Bank further argues that Plaintiffs are sophisticated institutional investors who, in the words of the United States Supreme Court, do not "need the protection of the [1933] Act." *SEC v. Ralston Purina Co.*, 346 U.S. 119, 125 (1953). The relevant Certificate Purchase Agreements are conditioned on Plaintiffs' warranty and representation that they were "accredited investors"[21] within the meaning of Rule 501(a) of Regulation D. #41, Harlow Decl. Exs. 1 & 2 at 3.

In addition Plaintiffs' obligation to accept and pay for their Certificates was expressly conditioned upon their having received (1) "such other documentation, certificates or opinions

---

[20] Deutsche Bank asserts that Plaintiffs obscure the facts by referring to offerings of Osprey securities (both Notes and Certificates) collectively.  There are no factual allegations that the Certificates, which alone were purchased by Plaintiffs, were offered to the public.

[21] *See* Regulation D Revisions, Securities Act of 1933 Release No. 6683, 52 Fed. Reg. 3015, 3017 (Jan. 30, 1987)(available at 1987 WL 125172)(the concept of the accredited investor "is intended to encompass those persons whose financial sophistication and ability to sustain the risk of loss of investment or ability to fend for themselves render the protections of the Security Act's registration process unnecessary.").  For more information about accredited investors, see Stuart R. Cohen, 1 Sec. Counseling for Small & Emerging Companies § 6:17 ("Accredited Investors")(2009).

as [they] may reasonably request in connection with the
consummation of the transactions contemplated" in the Certificate
Purchase Agreement; and (2) the underlying Osprey and Whitewing
transaction documents were "in form and substance reasonably
satisfactory to each Osprey Certificate holder." *Id.* at 2.
Moreover, those transaction documents reveal that a condition
precedent for the entire Osprey financing was an opinion letter
stating that all the transaction documents were provided to its
satisfaction by the Certificate purchasers' own attorney, Dewey
Ballantine.[22]

### Time-Barred Claims

Deutsche Bank argues that Plaintiffs' claims based on
Plaintiffs' September 1999 purchases under Sections 12(a)(2) and
15 are time-barred because they were not brought within one year
of the date of discovery of the general facts constituting the
alleged violations and within three years from the date the
securities (statute of repose) were purchased, which expired

---

[22] This Court concludes that if Plaintiffs plead sufficient
facts to show that they were knowingly and intentionally defrauded
by Deutsche Bank and Enron with their superior knowledge, these
conditions in the Purchase Agreement would not bar Plaintiffs'
fraud claims at this stage of the litigation. "[W]here a contract
is induced by fraud, there is in reality no contract, because there
is no 'real assent' to the agreement." *Edward Thompson Co. v.
Sawyers*, 111 Tex. 374, 874 (Tex. 1921), *quoted by Schlumberger
Technology Corp. v. Swanson*, 959 S.W. 2d 171, 178 (Tex. 1997), and
by *Authorlee v. Tuboscope Vetco Intern., Inc.*, 274 S.W. 3d 111, 129
(Tex. App.--Houston [1st Dist.] 2008, pet. denied).  Therefore "the
defrauded party is not bound by any of the contractual provisions,
'including those relating to presentation or guaranties which
induced its execution." *Id.* at 874-75; *Authorlee*, 274 S.W. 3d at
130.

nearly nine months prior to the filing of the Original Complaint on April 17, 2003.[23].   15 U.S.C. § 77m; *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*, 501 U.S. 350, 364 (1991).

### Control Person Claim under Section 15 of the Securities Act of 1933

Moreover because Plaintiffs cannot assert a primary violation of Section 12(a)(2) in connection with their private purchases of the Certificates, the derivative controlling person claim asserted under Section 15, 15 U.S.C. § 77o, fails as a matter of law.   *Lewis*, 252 F.3d at 357 n.3.

### TSA Claims

Deutsche Bank maintains that Plaintiffs' claims for primary and secondary violations of the TSA fail because the purchase of the Certificates occurred in New York, both Plaintiffs and Deutsche Bank are based in and acted in New York, and there was no Texas entity that was a party to the purchase transaction.[24] *See In re Enron Corp. Sec., Deriv. & "ERISA" Litig.*, 235 F. Supp.

---

[23] The extension of the one-year/three-year framework to two years from discovery/five years from purchase by the Sarbanes-Oxley Act, Pub. L. No. 107-204, § 804 (codified at 28 U.S.C. § 1658(b)), does not apply to Section 12(a)(2) claims. *In re Enron Corp. Sec., Deriv. & "ERISA" Litig.*, No. MDL 1446, Civ. A. H-01-3624, 2004 WL 405886, at *19 (S.D. Tex. Feb. 25, 2004); *In re Enron Corp. Sec., Deriv. & "ERISA" Litig.*, 465 F. Supp. 2d 687, 712 (S.D. Tex. 2006)(extended statute of limitations applies only to securities claims that require proof of fraudulent intent).

[24] Deutsche Bank identifies Westboro as an institutional investor and Stonehurst Capital as Westboro's investment manager, both based in Rochester, New York. #40 at 1. Deutsche Bank represents that only Westboro owns the Certificates, as reflected in the documents, and thus Stonehurst has no basis for its own separate recovery of an award on the claims here.

2d 549, 691-92 (S.D. Tex. 2002)(TSA can be invoked to protect investors outside Texas from securities law violations "emanating from Texas").

To state a claim under Article 581-33A(2) or Article 581-33F(2), a plaintiff must allege facts showing a primary violation by a "seller" or "offeror" that is in privity with the plaintiff.  Tex. Rev. Civ. Stat. art. 581-33A(2)("A person who offers or sells a security . . . by means of an untrue statement of a material fact or an omission . . . is liable to the person buying the security from him.").  Like Section 12(a)(2) of the Securities Act of 1933, the TSA's Article 581-33A(2) imposes liability only on persons who actually pass title or who actively engage in solicitation of the securities purchased by a plaintiff.  *In re Enron Corp. Sec., Deriv. & "ERISA" Litig.*, 258 F. Supp. 2d 576, 603-04 (S.D. Tex. 2003).  Under the facts pleaded by Plaintiffs, the only possible primary violators of the TSA are Osprey Trust or Deutsche Bank.  Enron is the only Texas-based entity named in the complaint, but it is not alleged to be either a sellor or an offeror of Osprey Certificates in privity with Plaintiffs.  The documents reflect that Osprey Trust sold the Certificates to Plaintiffs.  Therefore, argues Deutsche Bank, there is no alleged statutory violation "emanating from Texas."

Plaintiffs have alternatively pleaded that New York law applies here.  New York's Blue Sky Laws, known as the Martin Act, N.Y. Gen. Bus. Law § 352 *et seq.*, are analogous to Texas's TSA. Deutsche Bank argues that Plaintiffs' TSA claims would be barred

by New York's Martin Act, creating a conflict of laws, because, as noted *supra*, the Martin Act does not permit [a] private right of action for violations of its antifraud provisions. *Silvercreek Management, Inc. v. Salomon Smith Barney, Inc.* (In re Enron Corp. Sec., Deriv. & "ERISA" Litig.,), No. Civ. A. H-02-3185, 2003 WL 23305555, at *4 & n.9 (S.D. Tex. Dec. 11, 2003), *citing CPC Int'l, Inc. v. McKesson Corp.*, 70 N.Y. 2d 268, 276 (1987), and *Castellano v. Young & Rubicam, Inc.*, 257 F.3d 171, 190 (2d Cir. 2001). *See also Greenberg Traurig*, 161 S.W.3d at 75-76 (dismissing TSA claims where New York law applied to Plaintiffs' allegations and holding that "unlike the Texas Securities Act, New York's Martin Act provides for neither an express nor implied private claim," but instead gives the state Attorney General broad regulatory and remedial powers to prevent securities fraud). The Martin Act governs fraud and deception in the purchase and sale of securities, including claims that do not require proof of intent to defraud, and thus private actions not involving proof of intent to defraud are barred by the Martin Act. *CPC Int'l,* 70 N.Y. 2d at 276; *Castellano*, 257 F.3d at 190. Plaintiffs' private claims under Article 581-33A(2) of the TSA would be barred by the Martin Act, creating a conflict of laws.

Under *Restatement (Second) of Conflict of Laws* § 148(1) for claims of fraud and misrepresentation,

> When the plaintiff has suffered pecuniary harm on account of his reliance on the defendant's false representation and when **plaintiff's action in reliance took place in the state where the false representations**

> ***were made and received***, the local law of this
> state determines the rights and liabilities
> of the parties unless, with respect to the
> particular issue, some other state has a more
> significant relationship under the principles
> stated in § 6 to the occurrence and the
> parties, in which event the local law of the
> other state will be applied. [emphasis added
> by the Court]

Here, insists Deutsche Bank, the representations at issue were made and received, and Plaintiffs' alleged reliance and harm from the purchase of Osprey Certificates occurred, in New York, so under Section 148, New York law should apply to Plaintiffs' claims.[25]  The same result would be reached under Section 145 for tort claims if one looked to where Plaintiffs suffered the injury, where the conduct causing the injury occurred, and where the parties reside and/or are incorporated, and where the relationship between the parties was centered.  At all relevant times Deutsche Bank and Plaintiffs were New York parties and their alleged relationship was centered in New York.  Complaint ¶¶ 1, 2, 4-5, 61.  The documents Plaintiffs claim to have relied on in deciding to purchase their Certificates were allegedly distributed by Deutsche Bank at meetings between the parties and the closing of the Osprey financing transactions occurred in New York.  Complaint ¶ 61; #41, Participation Agreement, Harlow Decl. Ex. 3 at Section 2.1.  Although the other alleged primary violator under the TSA,

---

[25]  In response Plaintiffs point to Deutsche Bank's contradictory assertion that they relied on fraudulent information provided by Enron, which is in Texas.  #40 at 21-22.

- 44 -

the Osprey Trust, is a Delaware statutory business Trust, all other relevant contacts are in New York.

**Common Law Claims**

*Fraud*

Next, argues Deutsche Bank, the common law fraud claim fails because Plaintiffs have not alleged facts to support essential elements, i.e., (1) that Deutsche Bank made any misstatements to Plaintiffs, (2) that a Deutsche Bank actor had scienter in making a misstatement, or (3) that Plaintiffs reasonably relied on a misstatement by Deutsche Bank or that Deutsche Bank had any duty to disclose to Plaintiffs. Fed. R. Civ. P. 9(b) requires Plaintiffs to specify the "who, what, when, where, and how of the alleged fraud." *United States ex rel. Williams v. Bell Helicopter Textron, Inc.*, 417 F.3d 450, 453 (5th Cir. 2005)(citation and internal quotation marks omitted).[26]

To the extent that Plaintiffs allege that they purchased their Certificates based on material omissions by Deutsche Bank, Deutsche Bank insists the claim fails because it owed no duty to disclose to Plaintiffs.

More specifically, although Plaintiffs assert that they relied on various misstatements in the OMs and incorporated Enron

---

[26] This Court observes that the Second Circuit is in agreement. *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007)(Rule 9(b) requires that a complaint alleging securities fraud "based on misstatements must (1) specify statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent. Allegations that are conclusory or unsupported by factual assertions are insufficient.").

financial statements, for the Osprey Notes and other misrepresentations, the claim fails because nowhere do Plaintiffs allege that Deutsche Bank made any of the statements, drafted or directed the drafting of, or played any role in the preparation of, Enron's financial statements, or was responsible for Enron's disclosures that were incorporated into the OMs. Plaintiffs do not identify any specific statements made to them by Deutsche Bank; rather the Osprey I OM expressly states that the information in it was furnished by Enron or the issuer (Osprey). Cf. *In re Enron Corp. Sec., Deriv. & "ERISA" Litig.*, 529 F. Supp. 2d 644, 774 (S.D. Tex. 2006)("Lead Plaintiff does not identify any alleged misleading statements other than Enron's incorporated financial statements in the offering memoranda, in particular any statements that were actually 'created' by Deutsche Bank employees, nor has it shown that Deutsche Bank employees in any way participated in the preparation of the incorporated, allegedly misleading Enron financial statements."). As for the pamphlets that Plaintiffs assert they reviewed in connection with their purchase of the Osprey Certificates, no statements, not to mention misstatements, are identified in them that were made by Deutsche Bank. Indeed, in the entire complaint, Plaintiffs only twice stated they had a meeting about Osprey with one person from Deutsche Bank, Seth Rubin, and they do not allege that he said anything. Plaintiffs do not comply with Rule 9(b) when they assert "Defendants" generally stated or misrepresented certain things, since several different financial institutions and legal entities were involved.

Common law fraud in both New York and Texas requires a showing of scienter, a knowing misrepresentation. *New York Univ. v. Cont'l Ins. Co.*, 87 N.Y. 2d 308, 318-19 (1995); *Johnson & Higgins of Texas, Inc. v. Kenneco Energy, Inc.*, 962 S.W. 2d 507, 526-27 (Tex. 1998). Both permit a showing of scienter by recklessness only when the plaintiff alleges facts showing that the speaker made a statement as a definitive assertion knowing he was without knowledge as to the truth. *Johnson & Higgins*, 962 S.W. 2d at 727; *Burgundy Basin Inn, Inc. v. Watkins Glen Grand Prix Corp.*, 379 N.Y.S. 2d 873, 880 (N.Y. App. Div. 1976). Regardless the Plaintiff must provide significant factual detail to support an inference of scienter. *Flaherty & Crumrine Preferred Income Fund, Inc. v. TXU Corp.*, 565 F.3d 200, 213 (5th Cir. 2009)(While not subject to the heightened "strong inference" of scienter standard of the federal securities laws, to adequately plead fraud for Texas common law fraud under Rule 9(b) in federal court "a plaintiff must set forth specific facts to support an inference of fraud by either showing a defendant's motive to commit securities fraud (but motives universal to corporations and their officers do not suffice)[27] or identify special circumstances that indicate conscious misrepresentation or behavior on the part of the defendant), *cert. denied*, 130 S. Ct. 199 (2009); *Giant*

---

[27] In *Flaherty & Crumrine*,564 F.3d at 213, the Fifth Circuit found insufficient to establish an inference of fraud alleged motive of delay in order to benefit, motive to bring offerings to fruition and to enhance the value of the securities at issue, and motive to inflate stock price and the value of defendants' investments.

*Group, Ltd. v. Arthur Andersen, LLP,* 770 N.Y.S. 2d 291, 292 (N.Y.
App. Div. 2003).[28]  Deutsche Bank contends that the complaint here
fails to offer particular facts to support any direct fraud claim
against it, but only conclusorily asserts scienter against
Defendants generally.[29]  No Deutsche Bank employee is individually

_____

[28]    This Court notes that under New York law, the pleading
requirements for intent, or scienter, for common law fraud are
similar to those for scienter under the federal  securities law:
the plaintiff must allege facts indicating that the defendant had
the "intent to deceive, manipulate or defraud." *Matsumura v.
Benihana Nat'l Corp.*, 542 F. Supp. 2d 245, 251 (S.D.N.Y. 2008).
The Second Circuit similarly requires the plaintiff to establish
the requisite intent of scienter by alleging facts that (1) show
the defendants had both motive and opportunity to commit fraud, or
(2) that constitute strong circumstantial evidence of conscious
misbehavior or recklessness. *Lerner v. Fleet Bank, N.A.*, 459 F.3d
273, 290-91 (2d Cir. 2006).  For motive or improper intent
plaintiff must plead facts that give rise to an inference that is
"more than merely plausible or reasonable--it must be cogent and at
least as compelling as any opposing inference of nonfraudulent
intent." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S.
308, 314 (2007); *Abu Dhabi Commercial Bank v. Morgan Stanley & Co.,
Inc.*, 651 F. Supp. 2d 155, 171 (S.D.N.Y. 2009). To plead motive
adequately, Plaintiffs should identify concrete benefits that could
be realized by one or more of the alleged false statements and
wrongful disclosures, while adequate pleading of opportunity would
involve the means and likely prospect of obtaining those concrete
benefits by those means. *Abu Dhabi*, 651 F. Supp. 2d at 171, *citing
Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1130 (2d Cir.
1994).  While under Rule 9(b) scienter may be averred generally,
nevertheless the plaintiff must allege facts that give rise to a
strong inference of fraudulent intent. *Shield v. Citytrust
Bancorp, Inc.*, 25 F.3d at 1128.  *See also O'Brien v. National
Property Analysts Partners*, 936 F.2d 674, 676 (2d Cir.
1991)(scienter in fraud allegations may be pleaded by "inference"
if supported by sufficient "factual basis").   Furthermore,
"[m]otives that are generally possessed by most corporate directors
and officers do not suffice; instead, plaintiffs must assert a
concrete and personal benefit to the individual defendants
resulting from the fraud." *Kalmit v. Eichler*, 264 F.3d 131, 139
(2d Cir. 2001).

[29] Although Deutsche Bank argues that amendment would be
futile, Deutsche Bank's objection to the pleadings that Plaintiffs
refer to conduct of "Defendants" generally rather than of Deutsche

- 48 -

identified as a statement maker with the requisite level of knowledge and intent. *See Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.*, 365 F.3d 355, 365-66 (5th Cir. 2004)(required state of mind must actually exist in the individual making or being a cause of the making of the misrepresentation and may not be simply imputed to the individual on agency principles).   No facts are alleged demonstrating scienter against the three individuals from Deutsche Bank mentioned in the complaint (Seth Rubin, Paul Cambridge and Mike Jakubik).

No statements in any Deutsche Bank analyst reports are specified as materially false or misleading, nor do Plaintiffs show that any analyst recommendations were knowingly false when made or that any of its analysts actually knew of the underlying fraud, maintains Deutsche Bank.

Nor, maintains Deutsche Bank, do Plaintiffs adequately plead reasonable, actual reliance, an essential element of common law fraud, on any statement by Deutsche Bank.  They merely allege generally that Plaintiffs collectively relied on Enron's financial statements and other unspecified representations.  Since they have not attributed a single specific misrepresentation to Deutsche Bank, they clearly cannot establish reliance on any such statement.  The only statements by Deutsche Bank that Plaintiffs do allege are "buy" recommendations and other statements purportedly included in certain analyst reports, but those reports

_____

Bank specifically can be rectified by amendment, insist Plaintiffs.

do not make any recommendations about the Osprey Certificates, nor do Plaintiffs allege that they read or that they were even aware of these recommendations; instead they asserted that they "reasonably relied that [*sic*] Citigroup, UBS and Deutsche would not purposely disseminate deceptive analyst reports to the investing public." Complaint ¶ 583-85, 766.   Furthermore Plaintiffs cannot claim reasonable reliance on the Osprey OMs because the documents expressly and unambiguously state that they were not Certificate offering documents. #41, Osprey I OM, Harlow Decl. Ex. 6 at cover, 10 ("The Osprey Trust Certificates are not being offered hereby.").  Moreover, Deutsche Bank asserts that the matters about which Plaintiffs claim to have been misled are prominently and fully disclosed, that Enron would determine which assets and what prices Whitewing would acquire from Enron.  As noted, their purchases were expressly conditioned upon their receiving documentation and information that they might reasonably request and the power to review and consent to some asset sales, so they could have obtained additional information they wanted about Osprey financing and asset sales.

In addition, under both New York and Texas common law, where the fraud claim is one of omission, the plaintiff must show that the defendant had a duty to disclose material information because of a fiduciary or other confidential relationship or contractual relationship between the parties. *Weinstock v. Handler*, 664 N.Y.S. 2d 298, 298-99 (N.Y. App. Div. 1997); *Ins. Co. of N. Am. v. Morris*, 981 S.W. 2d 667, 674 (Tex. 1998).  Deutsche

Bank argues that Plaintiffs have failed to allege facts that would give rise to a duty to disclose by Deutsche Bank under the circumstances here.

Last, Plaintiffs' fraud claims cannot be based on their decision to hold rather than to sell their Certificates. There is no adequate pleading of scienter in the making of alleged misrepresentations. Even if "holder" claims were established under New York and Texas common law, Plaintiffs must allege, but have not, that they relied on a personal, direct communication aimed to stop a sale. *In re WorldCom, Inc. Sec. Litig.*, 382 F. Supp. 2d 549, 559 (S.D.N.Y. 2005)(recognizing that holder claims are disfavored generally and requiring situations of direct communication); *Shirvanian v. DeFrates*, No. 14-02-00447-CV, 2004 WL 35987 (Tex. App.--Houston [14th Dist.] Jan. 8, 2004)("*Shirvanian I*")(the only Texas court to have analyzed whether "holder" claims can be asserted under Texas law)(for holder claims must allege not only a personal, face-to-face communication with the defendant, but also an existing and definite plan to sell that would have occurred in the absence of the false communication designed to preclude their sale), *withdrawn and replaced*, 161 S.W. 3d 102 (Tex. App.--Houston [14th Dist.] 2004)("*Shirvanian II*").[30]

---

[30] This Court notes that the Texas Supreme Court has recently discussed the issue of the viability of "holder claims," which allege that the defendant wrongfully induced the plaintiff to continue holding stock and seek damages for its diminished value. *Grant Thornton LLP v. Prospect High Income Fund*, ___ S.W. 3d ___, No. 06-0975, 2010 WL 2636124, *11-14 (Tex. July 2, 2010). While expressly not deciding "whether a holder claim involving more specific and direct communications is actionable under Texas law"

***Aiding and Abetting Fraud Under New York Law***

Common law aiding and abetting of a fraud under New York law, to which Rule 9(b)'s heightened pleading standards apply,[31] requires pleading facts showing (1) the existence of a fraud; (2) defendant's actual knowledge of the fraud; and (3) that defendant provided substantial assistance to advance the fraud's commission. *Anzerilla v. Am. Tobacco Co.*, No. 11754/96, 2000 WL 34016364, *3 (N.Y. Sup. Ct. Oct. 27, 2000); *Lindsay v. Lockwood*, 163 Misc. 2d 228, 233 (N.Y. Sup. Ct. 1994).

To show substantial assistance under New York law, a plaintiff must plead facts showing not only that the defendant significantly aided the primary wrongdoer's, here Enron's, fraud,

---

because the claim before it did not meet these standards, the Texas Supreme Court "merely decline[d] to permit such a claim in the absence of any direct communication." *Id.* at *14. As noted, New York has recognized a claim for common law fraud where investors are induced to retain securities in justifiable reliance on a defendant's misrepresentations when there was direct communication between the plaintiffs and defendants. *In re WorldCom, Inc. Sec. Litig.*, 382 F. Supp. 2d 549, 559-60 (S.D.N.Y. 2005), *citing Continental Ins. Co. v. Mercadante*, 222 A.D. 181, 225 N.Y.S. 488, 489 (1st Dept. 1927), and *Primavera Familienstifung v. Askin*, 130 F. Supp. 2d 450, 494 (S.D.N.Y. 2001)(collecting cases). Plaintiffs here have not alleged any direct communications between themselves and Deutsche Bank about purchasing the Osprey certificates, so any holder claims would not be recognized under New York or Texas law.

[31] *Filler v. Hanvit Bank*, 339 F. Supp. 2d 553, 557 (S.D.N.Y. 2004), *aff'd*, 156 Fed. Appx. 413 (2d Cir. 2005).

but also that the aiding defendant's actions proximately caused the plaintiff's injuries. *Cromer Fin. Ltd. v. Berger*, 137 F. Supp. 2d 452, 470 (S.D.N.Y. 2001). Plaintiffs cannot rely on "but for" causation; aider and abettor liability mandates that the injury be a direct or reasonably foreseeable result of the defendant's conduct. *Id.* Deutsche Bank charges that Plaintiffs failed to plead with the degree of specificity required by Rule 9(b) and failed to plead the required elements of aiding and abetting fraud. Instead they speculate about what Deutsche Bank "must have known" when the transactions were structured and proffer bare conclusions that Plaintiffs were harmed by Deutsche Bank's conduct.

Furthermore Plaintiffs fail to allege that Deutsche Bank had actual knowledge of Enron's alleged fraud for their aiding and abetting claim. *Albion Alliance Mezzanine Fund, LP v. State Street Bank and Trust Co.*, 797 N.Y.S. 2d 699, 706-07 (N.Y. Sup. 2003), *aff'd*, 2 A.D. 3d 162 (N.Y.A.D. 1 Dept. Dec. 4, 2001). Allegations of constructive knowledge or recklessness in not knowing are insufficient to allege the required state of mind of actual and concrete knowledge of the underlying fraud. *Filler*, 339 F. Supp. 2d at 557. An allegation that a defendant "should have known" about the fraud is also insufficient. *VTech Holdings, Ltd. v. PricewaterhouseCoopers, L.L.P.*, 348 F. Supp. 2d 255, 269 (S.D.N.Y. 2004).

Plaintiffs conclude that Deutsche Bank structured certain tax transactions to "help[] Enron achieve its fraudulent

- 53 -

accounting objectives." Complaint ¶ 457. Deutsche Bank argues that Plaintiffs fail to allege facts showing that it knew that its tax and other structured transactions with Enron had "no legitimate purpose" and would be used to commit fraud. *Id.* at ¶¶ 434-35, 464. Plaintiffs present third-party commentary and hindsight observations, especially from Neal Batson, that the transactions allowed Enron to record erroneously millions of dollars of income, but they do not plead facts that establish that anyone at Deutsche Bank knew at the time of entering into the transactions how Enron would disclose them, that they were improper, or that Enron was entering into them to commit fraud. Absent such details, the aiding and abetting claim must be dismissed for failure to plead actual knowledge of the underlying fraud. Allegations of an intention to realize accounting income benefits do not translate into knowledge of improper benefits, no less knowledge of fraud. The complaint fails to allege facts showing that Deutsche Bank knew Enron entered into the tax transactions to defraud investors.

Nor have Plaintiffs alleged facts showing that Deutsche Bank had actual knowledge that the Osprey and Marlin financings were fraudulent or that anyone at Deutsche Bank knew these transactions would be used by Enron to commit fraud. Nor have they asserted any facts demonstrating that Deutsche Bank had any actual knowledge of fraudulent activity by the LJM2 Partnership or that anyone at Deutsche Bank knew that LJM2 would be used for any fraudulent purpose.

While Plaintiffs assert that they suffered losses when their Osprey certificates became worthless, they do not allege how the tax transactions, and specifically Deutsche Bank's role in them, proximately caused their injuries,[32] but only state that Enron may have used some of those transactions to inflate its accounting income. *Cromer Fin.*, 137 F. Supp. 2d at 472 (granting motion to dismiss where plaintiffs fail to show that their injuries were the direct result of the defendant's role in the alleged fraud). Nor do they allege that Deutsche Bank's involvement in the Osprey and Marlin transactions proximately caused their injuries. Plaintiffs claim they were injured by asset transfers at inflated values from Enron to Whitewing, but they do not and cannot allege that Deutsche Bank, which participated only in the Osprey financing transaction, had anything to do with Enron's subsequent abuse of the Osprey/Whitewing structure. Deutsche Bank notes that Plaintiffs, alone, were uniquely situated to control those asset transfers since they were the only parties whose express consent was required for any significant purchases. #41, Osprey I OM, Harlow Decl. Ex. 5 at § 6.06(c)(i)(describing consent rights of Certificateholders for acquisitions of $40 million or greater).[33]

_____

[32] Plaintiffs fail to allege that the tax transactions affected Enron's cash flow, level of hidden debt, or credit ratios (likely causes of Enron's descent into bankruptcy) or that they had any direct effect on Whitewing or Osprey.

[33] Plaintiffs do not allege that the Marlin transactions played any part in their Osprey losses.

- 55 -

Claiming that it was only a passive investor[34] that provided $10 million out of approximately $40 million (2.5% of the total investment) invested in LJM2, an insubstantial sum, Deutsche Bank insists it did not as a matter of law provide substantial assistance to LJM2 or any fraud involving LJM2.

Finally, Deutsche Bank maintains that Plaintiffs, while complaining that Deutsche Bank assisted in the concealment of Enron's fraud by failing to issue a downgrade or a warning about the company, do not allege that its analyst reports caused Plaintiffs' injuries. Not preventing loss is different from causing it. There was no fiduciary or contractual relationship between Deutsche Bank and Plaintiffs and therefore no affirmative duty of Deutsche Bank to disclose. *In re Sharp Int'l Corp.*, 403 F.3d 43, 52 (2d Cir. 2005); *Kaufman v. Cohen*, 760 N.Y.S. 2d 157, 170 (N.Y. App. Div. 2003)("[I]nstead of an affirmative misrepresentation, a fraud cause of action may be predicated on acts of concealment where the defendant had a duty to disclose material information."). Plaintiffs do not even plead that they saw or read a Deutsche Bank analyst report. Nor did one of Deutsche Bank's analysts address, no less recommend, the Osprey Certificates.

*Civil Conspiracy*

---

[34] Deutsche Bank insists that Plaintiffs do not allege any role of the bank in LJM2's operations or in LJM2's transactions with Enron (nor, it maintains, did it have any), nor any facts to demonstrate any link between the bank's passive investment in LJM2 and Plaintiffs' losses on the Osprey Certificates.

Deutsche Bank contends that Plaintiffs' civil conspiracy claims fail because Plaintiffs have not alleged facts demonstrating a knowing agreement by each alleged co-conspirator to commit fraud.[35] *Snyder v. Puente De Brooklyn Realty Corp.*, 746 N.Y.S. 2d 517, 521-22 (N.Y. App. Div. 2002), *appeal denied*, 99 N.Y. 2d 506 (N.Y. 2993)(plaintiff must plead facts supporting "'an inference that defendants knowingly agreed to cooperate in a fraudulent scheme or shared a perfidious purpose'"); *Ins. Co. of N. America v. Morris*, 981 S.W. 2d 667, 675 (Tex. 1998)(plaintiff must establish a "meeting of the minds," "an agreement or understanding between the conspirators to inflict a wrong against, or an injury on, another," "a meeting of minds on the object or course of action, and some mutual mental action coupled with an intent to commit the act which results in injury; in short, there must be a preconceived plan and unity of design and purpose, for the common design is of the essence of the conspiracy."). Plaintiffs have failed to plead that Deutsche Bank knowingly conspired with Enron to defraud investors with the specificity required by Fed. R. Civ. P. 9(b). Instead they have

---

[35] While Plaintiffs have asserted a "concerted action" theory under New York law, Deutsche Bank contends that any differences between conspiracy and concerted action are irrelevant, because Plaintiffs fail to establish an indispensable element of both, i.e., a knowing agreement to injure investors.

This Court notes that it is questionable whether Texas recognizes a theory of concert of action. *Juhl v. Airington*, 936 S.W. 2d 640, 643 (Tex. 1996)("Whether such a theory is recognized in Texas is still an open question."), *citing Gaulding v. Celotex Corp.*, 772 S.W. 2d 66, 69 (Tex. 1989)(refusing to apply concert of action theory and expressly declining to approve it).

pleaded that Deutsche Bank participated in certain tax, investment, or structured finance transactions that Enron may have used to defraud investors. Plaintiffs have also failed to plead that as an alleged conspirator, Deutsche Bank knew the wrongful nature of the conduct of primary actor Enron.

### Plaintiffs' Response (#47)

Plaintiffs first complain that Deutsche Bank has attached over 400 pages of documents to its motion, some of which were never referenced in their complaint, others that are both repetitious and only tangentially related to their claims. *Collins*, 224 F.3d at 498–99, (approving view that "'documents that a defendant attaches to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to her claim.' In so attaching, the defendant merely assists the plaintiff in establishing the basis of the suit, and the court in making the elementary determination of whether a claim has been stated."). While Plaintiffs insist that they do not view the motion to dismiss as one for summary judgment, they submit a "few rebuttal exhibits" and ask that if the Court does not consider them, that it strike those submitted by Deutsche Bank. #46 at 3.

Plaintiffs also ask the Court to consider an adverse-inference spoliation instruction because of "Deutsche Bank's purposeful destruction of documents" related to this action, in which the bank's primary relationship banker, Paul Cambridge, testified that he knowingly engaged. #46 at 4; Ex. A (Deposition

of Cambridge).  The Court finds this request premature, as will be discussed.

Plaintiffs challenge Deutsche Bank's primary defense, that it did not know its statements were false and deceptive. Plaintiffs quote from an email with an attached Powerpoint presentation, entitled "Whitewing Investment Proposal--Sarlux and Trakya Projects," from the sellers of the Osprey Notes and Certificates, including Deutsche Bank, received by Doug Stark immediately before the closing of the Osprey Trust; it purports to weigh numerous risks and benefits in the Sarlux and Trakya projects to be invested in by Whitewing. #47 at 5-7 and Ex. B at DBN 181426 and 181436.  They maintain that the bank furthermore knew that there were significant prohibitions on equity transfer and changes in control of these assets which the bank did not disclose to Plaintiffs.  #33 at ¶¶ 67, 75, 133, 135, 137, 145. [36] They assert that Deutsche Bank had learned this concealed information more than one month before, around August 9, 1999, from due diligence that it had performed for a transaction known as Margaux (Ex. C).  Margaux was never completed, but some of the same assets involved in it were shortly afterward sold to Plaintiffs in the Whitewing transaction.  #33 at ¶ 106. Plaintiffs argue that comparing what Deutsche Bank knew about Sarlux and Trakya (evidenced in their marketing materials) with

---

[36] The Court observes that none of the cited paragraphs even mentions Sarlux or Trakya, while all of them are vague and conclusory.

what it told Plaintiffs exposes a consistent pattern of fraudulent omissions.  #33 at ¶ 106.  Referencing Ex. C at DBK 0066905-6, DBK 0066906, and DBK 66905 and the Complaint (#33) at ¶¶ 111, 81, 112-14, Plaintiffs argue that Deutsche Bank knew, but did not disclose, that its transfer of economic interest in Sarlux would require Sarlux board approval, that the Whitewing transaction would be prohibited because Enron could not reduce its shareholding below 25% during the first five years, and that the equity agreement, itself, stated that one "may not assign, transfer, novate or dispose of any of--or any interest in, their rights and/or obligations under the Equity Agreement."  Regarding Trakya, the bank's statements were again contrary to what it knew at the time, i.e., that the Shareholders Agreement stated that "No shareholder shall make a Transfer of Its Shares to a third party without the unanimous consent of all Shareholders . . ." (Ex. C at DBK 0066897), that as a result Enron "could not without the consent of other Shareholders pledge its ownership in Trakya to the bond holders" (*id.* at DBK 66898), that the shareholder agreements placed substantial restrictions on the transfer of subordinated debt (Ex. B at DBK 0066900), and that Trakya's risk insurance on equity required Enron to "remain at all times the beneficial owner of the insured investments" so that selling the assets to Plaintiffs would give the insurer rights to terminate the insurance (Ex. C at DBN 181428 and DBK 0066901).

Arguing first for the application of Texas law to their claims, Plaintiffs reiterate that Houston, Texas was the hub of

the alleged conspiracy to enable Enron to cook its books and perpetrate fraud upon Plaintiffs for the following reasons.  It is where the scheme to defraud was hatched and executed.  Deutsche Bank worked with Enron in its Houston headquarters in creating the Osprey/Whitewing structure and in devising numerous other transactions and SPEs for the conspiracy to defraud.  The agreement, memorialized in a contract (Letter Agreement, Ex. E), between Enron and Deutsche Bank to enter into the Osprey/Whitewing, which designated the bank and any of its affiliates ("DBSI") and DLJ to be Enron's "exclusive agents" in addition to being an underwriter for the transaction, was conceived, planned, and consummated (signed) in Texas, as evidenced by the testimony of Mike Jakubik (Ex. E at 296-98). Therefore as an agent that makes fraudulent representations, uses duress, or knowingly assists in a tortious fraud or in duress by its principal or by others, Deutsche Bank is liable in tort to Plaintiffs even though the fraud occurs in a transaction on behalf of the principal.  *Paxton v. Weaver*, 553 F.2d 936, 939 (5th Cir. 1977), *citing Restatement (Second) of Agency*, § 348 (1958)("An agent who fraudulently makes representations, uses duress, or knowingly assists in the commission of tortious fraud or duress by his principal or by others is subject to liability in tort to the injured person although the fraud or duress occurs in a transaction on behalf of the principal.").  Plaintiffs argue that they suffered injury when Enron, in Houston, executed its transfer

of assets at far below fair value to the Osprey/Whitewing structure and later collapsed.

Plaintiffs ask the Court to defer ruling on the choice-of-law issue because the law of different states may apply to the various claims, and Deutsche Bank does not consider the possibility. *See LaBelle v. Brown & Williamson Tobacco Co. Ltd.*, 1999 U.S. Dist. LEXIS 21629, *45 (D.S.C. Mar. 18, 1999)(opining where the court faced a motion to dismiss, "As the choice of law question remains unresolved for the time being, the court will reserve a ruling on this matter until such time as that question is resolved and the issue can be briefed more fully by the parties."). The Court denies that request, noting that a plaintiff could not comply with *Twombly* pleading standards unless it identifies the applicable law and the essential elements under that law. *LaBelle* was decided long before *Twombly* and has no precedential value in the Fifth Circuit, as is true of many cases cited by Plaintiffs regarding pleading sufficiency for the various causes of action they assert. Moreover, the Court observes that Plaintiffs have had seven years, since 2003, to consider the question and by now should be prepared to support their claims regarding the applicable state law. So far the only state laws contemplated by the parties are either Texas or New York, so the Court will address the pleadings under them.[37]

_____

[37] Plaintiffs argue that this Court, in an Enron-related action with claims similar to those asserted in this case, applied the *Restatement (Second) of Conflicts of Laws* § 6(2) (1971) and concluded that Texas law should apply in part because (a) "the

Plaintiffs assert that the TSA is a broad remedial statute intended to protect both Texas residents and non-residents from fraudulent securities practices emanating from Texas. *In re Enron Corp. Sec., Derivative & "ERISA" Litig.*, 235 F. Supp. 2d 549, 691-92 (S.D. Tex. 2002). *See also Rio Grande Oil Co. v. State*, 539 S.W. 2d 917, 921 (Tex. Civ. App.--Houston [1st Dist.] 1976, writ ref'd n.r.e.)(TSA applies if any act in the selling process of securities covered by the Act occurs in Texas); *Texas Cap. Sec., Inc. v. Sandefer*, 58 S.W. 3d 760, 776 (Tex. App.--Houston [1st Dist.] 2001, pet. ref'd). The TSA claims are in accord with Texas' public policy for comprehensive security regulation. Plaintiffs urge that their TSA claims against Deutsche Bank should be allowed to proceed because of Texas' strong public policy interests.

Plaintiffs also contend that because there is no significant difference between New York and Texas law for simple

---

needs of interstate and international systems, of which there is no evidence in the record, are not important"; (b) "Texas has a strong policy interest in regulating businesses that voluntarily chose to do business within its borders"; (c) "because Texas has the most significant contacts here, the policies of other interested states are not important here, nor is there any evidence of conflict"; (d) the defendant "should have expected the application of Texas law while doing business in Texas"; (e)-(f) Texas has an interest in seeing the injuries caused by the tort remedied and "the Court is clearly capable of applying Texas law." *In re Enron Corp. Sec., Derivative and "ERISA" Litig.*, Nos. MDL-1446, H-01-3624, G-02-0299, 2007 U.S. Dist. LEXIS 17374 *8 (S.D. Tex. Mar. 12, 2007). As pointed out by Deutsche Bank, the facts and context were very different in the Enron case: plaintiffs were based in and suffered their harm in Texas, the misrepresentations occurred in Texas, the plaintiffs purchased securities from Houston-based Enron, and the parties agreed that Texas substantive law applied.

fraud and conspiracy to defraud claims, there is no conflict-of-law decision required.

While Deutsche Bank wants the Court to focus on each transaction separately, Plaintiffs emphasize that the transactions involving Osprey Trust were extremely complicated and were documented to conceal the fraud.   The fraud involved two SPEs, Osprey Trust, which collected money from investors, and Whitewing, which purchased assets from Enron to aid Enron in cooking its books.   Plaintiffs urge the Court to consider the totality of the documentation evidencing the whole scheme, which they claim makes evident that Texas has the most significant relationship with Plaintiffs' claims.

All the claims brought under Texas law except for primary violation of the TSA have analogues in New York common law.   Plaintiffs argue that Deutsche Bank "tacitly concedes" that if Texas law applies to the state-law claims, their TSA claims survive.   They note that Deutsche Bank did not object to the sufficiency of their allegation that Deutsche Bank was a primary violator under the statute (a person who sells securities "by means of an untrue statement of material fact or an omission to state a material fact"), but only argued that New York law applied instead.   Tex. Rev. Civ. Stat. Art. 581-33A.   The TSA does not require a buyer to prove reliance on the sellers's misrepresentation or omission, nor does it require proof of scienter or have a causation requirement.   *Weatherly v. Deloitte & Touche*, 905 S.W. 2d 642, 648-49 (Tex. App.--Houston [14th Dist.]

1995, writ dism'd w.o.j.), *abrogated on other grounds, Tracker Marine LP v. Ogle*, 108 S.W. 3d 349 (Tex. App.--Houston [14th Dist. 2003, no pet.); *Wood v. Combustion Engineering, Inc.*, 643 F.2d 339, 345 (5th Cir. 1981); *Busse v. Pacific Cattle Feeding Fund #1 Ltd.*, 896 S.W. 2d 807, 815 (Tex. App.--Texarkana 1995, writ denied); *Geodyne Energy Income Production Partnership v. The Newton Corp.*, 97 S.W. 3d 779, 783-85 (Tex. App.--Dallas 2003), *rev'd on other grounds*, 161 S.W. 3d 482 (Tex. 2005). Plaintiffs maintain that they have adequately pleaded a primary violation of the TSA by Deutsche Bank: that Deutsche Bank was an underwriter and Enron's agent for Osprey, that it allowed Enron to remove non-performing or poorly performing assets from its consolidated balance sheet, that it knew that Osprey was designed for such manipulation, and that Plaintiffs relied on Enron's financial statements made false by Deutsche Bank's aid to Enron's fraud in deciding to purchase the Certificates. More specifically Plaintiffs have discussed the pamphlets authored and used by Deutsche Bank in offering and selling the Osprey Certificates, described communications with Deutsche Bank's Seth Rubin, material misrepresentations by Deutsche Bank promising arm's length negotiations and fair market value for the assets, and material omissions by Deutsche Bank.

Alternatively, if the Court finds that Deutsche Bank did not sell the Certificates, Plaintiffs assert that they have adequately alleged that in violation of article 581-33F(2) Deutsche Bank is secondarily liable for aiding Enron, which was

the true offeror or issuer under the sham front of the Osprey/Whitewing structure. The only challenge raised by Deutsche Bank on this claim is that there was no primary violation by Enron. Plaintiffs maintain that in essence Enron was the issuer or seller of the Osprey securities because it created and controlled the Osprey/Whitewing structure as part of its scheme to defraud and that Enron made material false statements and omissions, as evidenced in guilty pleas and cooperation agreements of its former officers Richard Causey, Andrew Fastow, and Mark Koenig.

Alternatively, Plaintiffs insist they have adequately pleaded that Deutsche Bank was an aider and abettor under New York common law. *See, e.g., Unicredito Italiano SPA v. JPMorgan Chase Bank*, 288 F. Supp. 2d 485, 502 (S.D.N.Y. 2003)(to state a claim for aiding and abetting fraud under New York common law a plaintiff must allege (1) the existence of an underlying fraud, (2) knowledge of this fraud on the part of the aider and abettor, and (3) substantial assistance by the aider and abettor in achieving the fraud). Substantial assistance exists when a defendant affirmatively assists, helps conceal, or enables the fraud to proceed by failing to act when required to do so, and the aider's actions proximately cause the harm on which the primary liability is predicated. *Id.* Plaintiff argue they have met the requirements, citing #33 at ¶ 165-67, 169-72, 175-76, 409-549. They claim they have raised a strong inference of scienter by alleging facts showing motive (high fees and commissions) and a

clear opportunity to participate in Enron's fraudulent scheme and by identifying specific circumstances indicating conscious misbehavior (tax transactions, Marlin, Osprey, LJM2, and Deutsche Bank's failure to disclose Enron's misstated financials).  They maintain they do not need to allege scienter as to a particular analyst because Deutsche Bank used its analysts as conduits[38] through which the fraudulent scheme could be continued.  They have alleged that Deutsche Bank affirmatively aided Enron's fraud by assistance in a wide array of detailed transactions with Enron-related entities that proximately caused Plaintiffs' injuries, and that Deutsche Bank clearly knew of the fraud.  Even Plaintiffs' allegations of scienter demonstrate the bank's aid to Enron.  *ABF*

---

[38] Regarding the "conduit" allegation, the Court notes that in *In re Kidder Peabody Sec. Litig.*, 10 F. Supp. 2d 398, 407 (S.D.N.Y. 1998), the district court wrote,

> [T]hat the defendant must make a misrepresentation does not mean that the defendant must communicate that misrepresentation directly to the plaintiff. Rather, where the defendant has made a misstatement but used another actor to deliver the message, the defendant still may be liable as a primary violator.  In such circumstances, it was the defendant's original statement which misled investors--the person who communicated the statement to investors served as a mere conduit for the defendant's statement.  Thus, if plaintiffs can show that defendants were the original and knowing source of a misrepresentation and that defendants knew or should have known that misrepresentation would be communicated to investors, primary liability should attach. [internal quotations and citations omitted]

As discussed in *Gabriel Capital, LP v. NatWest Finance, Inc.*, 94 F. Supp. 2d 491, 509 (S.D.N.Y. 2000).

*Cap. Management v. Askin Capital Management, LP*, 957 F. Supp. 1308, 1330 (S.D.N.Y. 1997)("[E]ven silence or inaction that is designed to aid a primary fraud particularly where there is heightened economic motivation to do so may constitute substantial assistance."). Plaintiffs contend they have satisfied the element of proximate cause by alleging that the injury was a foreseeable consequence of Deutsche Bank's misrepresentations or omissions.[39] Plaintiffs purchased their Osprey Certificates based on information that Deutsche Bank knew was false. Because of these falsified financials, the excessively priced assets to be purchased with Osprey Trust funds, and Deutsche Bank's knowledge of Enron's actual financial condition, Deutsche Bank could reasonably foresee that Plaintiffs would be harmed. Furthermore causation can be adequately pleaded by affirmation that no investment would have been made if the Plaintiffs had known the investment was based on fraudulent financials. *Fidelity Funding*

---

[39] Deutsche Bank contends that this aiding and abetting claim based on omission fails because inaction in the face of a third party's fraud is not actionable unless the defendant directly owed a fiduciary duty to the plaintiff, a circumstance not the case here. *Kaufman v. Cohen*, 760 N.Y.S. 2d 157, 170 (N.Y. Sup. Ct. 2003)("[M]ere inaction of an alleged aider and abettor constitutes substantial assistance only if the defendant owes a fiduciary duty directly to the plaintiff."); *see also In re Sharp Int'l Corp.*, 403 F.3d 42, 52 (2d Cir. 2005)(rejecting claim that mere inaction constituted aiding and abetting). This Court agrees that New York law does not recognize an aiding and abetting cause of action based on inaction or silence where there is no confidential or fiduciary relationship or duty to disclose. *Jabran v. La Salle Bus. Credit, LLC*, 33 A.D. 3d 424, 424, 824 N.Y.S. 2d 224, 225 (N.Y.A.D. 1 Dept. 2006); *Stanfield Offshore Leveraged Assets, Ltd.*, 64 A.D. 3d 472, 476, 883 N.Y.S. 3d 486, 489 (N.Y.A.D. 1 Dept. 2009).

*of Cal., Inc. v. Reinhold*, 79 F. Supp. 2d 110, 122 (E.D.N.Y. 1997).[40]

Plaintiffs urge the Court that since they have settled with all the other Defendants, the Court should consider all references to "Defendants" to refer specifically to Deutsche Bank, or grant them leave to amend to specify that party.

*Common-Law Fraud*

In response to Deutsche Bank's contention that Plaintiffs failed to plead common law fraud[41] under the nearly identical standards of Texas and New York common law (misstatements, scienter, reliance, and a duty to disclose), Plaintiffs argue that allegations of direct and circumstantial evidence meet the pleading requirements. Under New York law, for the element of a material misrepresentation, "some statements, although literally accurate, can become, through their context and manner of presentation, devices which mislead investors." *McMahan & Co. v. Wherehouse Entertainment, Inc.*, 900 F.2d 576, 579 (2d

---

[40] This Court would point out that this case was decided long before *Twombly* and *Iqbal* required the pleading of sufficient facts for each element to assert a plausible claim.

[41] Under Texas law the elements of a claim for fraudulent inducement are (1) a material misrepresentation, (2) which was false, (3) which was known to be false when made or made recklessly as a positive assertion without knowledge of its truth, (4) which was intended to be acted upon, (5) which was relied upon, and (6) which caused injury. *Ins. Co. of N. Am. v. Morris*, 981 S.W. 2d 667, 674 (Tex. 1998). Under New York law the elements are (1) a misrepresentation of a material fact, (2) scienter, 93) justifiable reliance, and (4) injury or damages. *Gouldsbury v. Dan's Supreme Supermarket, Inc.*, 154 A.D. 509, 511, 546 N.Y.S. 2d 379, 381 (N.Y. App. Div. 1989).

Cir. 1990).   The real question is does the statement mislead investors or potential investors? *Fogarazzo v. Lehman Bros.*, 341 F. Supp. 2d 274, 294 (S.D.N.Y. 2004)(technically accurate statement can be actionable when material omission renders it a "half-truth").   Under Texas law, a duty to disclose may occur outside of a confidential or fiduciary relationship "in at least three other contexts.   When one voluntarily discloses information, he has a duty to disclose the whole truth.   When one makes a representation, he has a duty to disclose new information when he is aware the new information makes the earlier representation misleading or untrue.   Finally, when one makes a partial disclosure and conveys a false impression." *Hendricks v. Grant Thornton*, 973 S.W. 2d 348, 363 (Tex. App.--Beaumont 1998, pet. denied)(citations omitted).   *See also Jana L. v. West 129th St. Realty Corp.*, 22 A.D. 3d 274, 277 (N.Y.A.D. 1 Dept. 2005)(where the complaint is based on fraudulent concealment, "[a]bsent a fiduciary relationship between the parties, a duty to disclose arises only under the 'special facts doctrine, where one party's superior knowledge of the essential facts renders a transaction without disclosure inherently unfair.").   Thus under both New York and Texas common law fraud, deceptive half-truths or technically correct partial disclosures that convey a false impression are actionable.

Plaintiffs insist that as lead underwriter for the Osprey offerings, Deutsche Bank had an obligation to perform due diligence and assure that representations about the offering were

accurate, maintain Plaintiffs.  Plaintiffs claim they relied upon
the OM and the presentation pamphlet listing Deutsche Bank as an
author of these documents and on statements made by Deutsche Bank
and CSFB representatives in the OM about how the Osprey Trust-
Whitewing SPE would function.  Although Deutsche Bank argues that
the OM expressly related only to the Notes and not to the
Certificates, Plaintiffs assert that the OM was used by Deutsche
Bank as a sales tool to sell the Certificates, that the OM was
given to them as the only information available about how the
Osprey Trust would operate, and that Plaintiffs were expressly
assured by Deutsche Bank that the description was accurate.
Plaintiffs claim that instead of a blind pool as promised, several
of the Osprey/Whitewing transactions had been planned long before
the offering closed and that Deutsche Bank knew all about them.
"[A] statement concerning a future act which is made with the
knowledge or intention that the act would not occur . . . is
deemed a statement of 'a material existing fact sufficient to
support a fraud action.'"  *Chase Manhattan Bank, N.A. v. Perla*,
65 A.D. 2d 207, 210, 411 N.Y.S. 2d 66, 68 (N.Y. App. Div.
1978)(citations omitted).  Plaintiffs have alleged that the
promotional pamphlet and the OM, drafted by Deutsche Bank when it
knew the representation was false, promised the negotiations
between Whitewing and Enron to purchase Enron's assets would be
similar to a third-party, arm's length purchase and sale, while
Plaintiffs' representative, Doug Stark, made clear that the value
of the Whitewing collateral was material to Plaintiffs when he

spoke to Seth Rubin.  The OM falsely characterized the Osprey investment as a blind pool when two significant investments had been identified for purchase and it failed to describe the planned purchases in reasonable detail, including financial data.  For example, the terms of the purchases of Sarlux and Trakya by Whitewing, which were excessive given the severe transfer restrictions and call-rights on and known non-marketability (because of Enron's Margaux transaction) of these assets, were known to Deutsche Bank, but not disclosed by Seth Rubin to Doug Stark, before the closing of the Osprey offering, but the bank intentionally failed to "correct" its partial disclosures and thereby altered the total mix of information needed for investors to make an informed decision whether to invest.  Deutsche Bank also knew that Whitewing paid more than $30 million over the market value for Promigas, which closed shortly after the Osprey I closing.  All these transfers, about which Deutsche Bank withheld critical information, were designed to allow Enron to fake earnings on its financial reports.  Deutsche Bank also misrepresented that the Osprey Indentured Trustee had the ability to sell and liquidate the Whitewing assets upon occurrence of certain trigger events, that $578 million of the Trust proceeds would be used "to redeem an equity interest of an unaffiliated equity investor in Whitewing," i.e., underwriter Citigroup, but whose identity Deutsche Bank failed to disclose even though it knew of Citigroup's plan to use the Osprey/Whitewing structure to reduce its own exposure to Enron.  While Enron made the

- 72 -

misrepresentations in its financial statements, Deutsche Bank's knowledge that they were falsified makes its silence actionable.

As for Deutsche Bank's scienter, Plaintiffs argue that the only explanation for its numerous false statements, half truths, and material omissions is fraudulent intent to induce Plaintiffs into purchasing Osprey Trust Certificates. Furthermore, the larger scheme and conspiracy between Deutsche Bank and Enron also supports an inference of scienter.   The tremendous fees paid to Deutsche Bank for its actions on behalf of Enron were an incentive to do whatever was necessary to keep Enron happy.

As for reasonable reliance, Plaintiffs argue that Deutsche Bank's opposition is largely based on the Complaint's use of "Defendants," instead of naming Deutsche Bank.  They again ask the Court to either consider the generic term to refer to Deutsche Bank or to let them replead.  Furthermore, they argue that at minimum they have raised a fact issue as to whether Plaintiffs' reliance was reasonable.  Despite the OM's statement that it is not offering the Osprey Certificates, as noted earlier, the OM was used by Deutsche Bank as a sales tool to sell the Certificates, and that (1) the OM was given to them as the only information available about how the Osprey Trust would operate, and (2) Plaintiffs were expressly assured by Deutsche Bank that the description was accurate.  The OM was one of two documents provided by Deutsche Bank to Plaintiffs about the investment, and Deutsche Bank does not claim that their reliance on the

presentation pamphlets was unreasonable.  Deutsche Bank also notes
that the representation that prices and other terms would be
conducted in arm's length negotiations was qualified by the
statement, "but there can be no assurance that such prices and
other terms will reflect those that would be agreed upon by
unaffiliated third parties."  Motion at 28.  Plaintiffs complain
that Deutsche Bank is taking the phrase out of context, that it
knew from the beginning that there would be no arm's length deals
and that all of the terms and prices would be fraudulently set.
Although Deutsche Bank urges that Plaintiffs could have obtained
more information and better terms, Plaintiffs argue that the
securities were offered and sold on a 'take-it-or-leave-it" basis,
the terms of placement were not and could not be negotiated, and
the only information available at the time was in the OM, the
pamphlets, and the email from CSFB and Deutsche Bank (documents
authored or sponsored by Deutsche Bank after purportedly
performing due diligence).

### *Conspiracy to Defraud*

Deutsche Bank has argued that the conspiracy-to-defraud
claim under either Texas or New York law[42] fails because Plaintiffs

---

[42] Under both New York and Texas law, civil conspiracy must be
based on an underlying tort, with both adequately pled to state a
claim.  *Romano v. Romano*, 2 A.D. 3d 430, 432 (2003); *Ernst & Young,
LLP v. Pac. Mutual Life Ins. Co.*, 51 S.W. 3d 573, 583 (Tex. 2001).

did not adequately plead Deutsche Bank's knowledge of the fraud and/or an agreement between Deutsche Bank and Enron.  The former has been discussed previously.  Plaintiffs assert the agreement or meeting of the minds between Deutsche Bank and Enron was to falsify Enron's financial records and illegally file these statements with the SEC, as well as to withhold material information about the Osprey Trust/Whitewing assets from potential investors to whom Deutsche Bank, as Enron's agent, was marketing the Certificates.  The object of the co-conspirators was to help each other make a lot of money by allowing and approving improper transactions and disseminating false financial information in filings with the SEC in violation of securities laws.  Plaintiffs contend that Deutsche Bank worked hard to conceal its agreement to conspire with Enron by downplaying its involvement in Enron's fraudulent transactions and failing to disclose its knowledge of

---

Thus to plead conspiracy to defraud, a plaintiff must allege both a claim for conspiracy and a claim for fraud. *See supra* for the elements of fraud under each state's common law.

Under New York law, to state a claim for conspiracy a plaintiff must allege facts demonstrating (1) an agreement between two or more parties, (2) an overt act in furtherance of the agreement, (3) the parties' intentional participation in furtherance of a plan or purpose, and (4) resulting damage or injury.  *World Wrestling Fedn. Entertainment v. Bozell*, 142 F. Supp. 2d 514, 532 (S.D.N.Y. 2005).  Under Texas law the elements of conspiracy are essentially the same:  (1) two or more persons; (2) an objective to be accomplished; (3) a meeting of the minds on the object or course of action; (4) one or more overt acts; and (5) damages.  *Massey v. Armco Steel Co.*, 652 S.W. 2d 932, 934 (Tex. 1983).  A party that joins in a conspiracy is jointly and severally liable "for all acts done by any of the conspirators in furtherance of the unlawful combination."  *Carroll v. Timmers Chevrolet, Inc.*, 592 S.W. 2d 922, 926 (Tex. 1979); *in accord Litras v. Litras,* 254 A.D. 395, 396, 681 N.Y.S. 2d 545, 546 (N.Y.A.D. 2 Dept. 1998).

Enron's true financial condition.  They reiterate that they are entitled to an instruction on spoliation because of Deutsche Bank's practice of destroying documentation demonstrating or relating to the agreement between Deutsche Bank and Enron to conspire.  Ex. C., Deposition of Paul Cambridge at 388-89; *Trevino v. Ortega*, 969 S.W. 2d 950, 953 (Tex. 1998).  Plaintiffs have described overt acts, such as devising and implementing a number of tax transactions and identifying the significant financial impact they had on Enron's books, the collusion of Enron and Deutsche Bank in the tax accommodation transactions, and the fraud accomplished through the Marlin transactions and participation in LJM2.  Deutsche Bank's intent to mislead investors can be inferred from its efforts to reduce its exposure to Enron at the same time its analysts were disseminating untrue reports and buy recommendations for Enron, which it failed to disclose.  *Barrie v. Intervoice-Brite, Inc.*, 397 F.3d 249, *modified and reh'g denied*, 409 F.3d 653 (5th Cir. 2005)(where one defendant knew that the statement of another was false, but the first defendant remained silent, both defendants were liable).[43]  Where particular agent-analysts do not have scienter for misrepresentations, but

_____

[43] Deutsche Bank correctly points out why *Barrie* does not involve similar circumstances and is inapposite to the facts of the instant case.  *Barrie* dealt with two employees **of the same corporate defendant** who were involved in the same conference call and it was unclear which one had made the alleged affirmative misrepresentation.  Just because Seth Rubin attended a meeting with Plaintiffs and representatives does not mean that any specific misstatement made at the meeting (and Plaintiffs do not identify one) should be attributed to Rubin, no less to Deutsche Bank.

the defendant knowingly allows its analysts to use fraudulent
financial information as the basis of analyst reports as part of
a larger fraudulent scheme, the defendant, who has a duty to
disclose, is liable to the investor who relied on those
misrepresentations. *Quaak v. Dexia, S.A.*, 445 F. Supp. 2d 130 (D.
Mass. 2006).[44]

***Concerted Action***

---

[44] The Fifth Circuit in *Southland Security*, 365 F.3d at 373-74,
relying in part on *Elkind v. Liggett & Myers, Inc.*, 635 F.2d 156,
163 (2d Cir. 1980), required more than the *Quaak* court:

> Generally, securities issuers are not liable
> for statements or forecasts disseminated by
> securities or analysts or third parties unless
> they have "sufficiently entangled [themselves]
> with the analysts' forecasts [so as] to render
> those predictions 'attributable to [the
> issuers].'" . . . In order to attribute third-
> party statements to the defendants, the
> investors must demonstrate that the statements
> were adopted by the defendants or attributable
> to the defendants in some way, such as when
> officials of a company "have, by their
> activity, made an implied representation that
> the information they have reviewed is true or
> at least in accordance with the company's
> views." . . . The investors could also allege
> that the defendants used the analysts as a
> conduit, making false and misleading
> statements to securities analysts with the
> intent that the analysts communicate those
> statements to the market . . . . ***The plaintiff
> must plead with particularity how these
> exceptions apply, including who supplied the
> information to the analyst, how the analyst
> received the information, and how the
> defendant was entangled with or manipulated
> the information and the analyst.*** [emphasis
> added by this Court]

It is clear that Plaintiffs here have not met the enhanced pleading
requirements for such a claim.

In addition, because Deutsche Bank did not address Plaintiffs' claim that Deutsche Bank and Enron engaged in concerted action to defraud Plaintiffs under New York law, Plaintiffs insist that the concerted action claim, too, survives.

*Sections 12(a)(2) and 15 of the Securities Act of 1933*

Plaintiffs insist the express words of Section 12(a)(2) create liability for a party that offers or sells a security by means of a prospectus "*or oral communication, which . . . omits to state a material fact in order to make the statements, in light of the circumstances under which they were made, not misleading (the purchaser not knowing of such untruth or omission).*" Here oral communications omitting material facts about the risks of the assets in the Osprey securities transaction were made to Plaintiffs to induce them to purchase their Certificates, including Seth Rubin's[45] communications with Douglas Stark, an employee of Plaintiffs at the time. Plaintiffs also argue that *Gustafson*, 513 U.S. at 567-68, and its progeny have been misread. The issue in *Gustafson,* which dealt with a secondary offering, was how to define the term "prospectus" in § 12(a)(2), and does not address "oral communication." The Supreme Court did not hold that "oral communication" means that the oral communication is restricted to communications relating to a prospectus, but only

---

[45] Plaintiffs assert that Rubin was an employee of Deutsche Bank or its predecessors from 1996-2003, was involved in the marketing of the Osprey certificates, and was aware of the Margaux project in which Deutsche Bank learned about the problematic assets in the Osprey transaction.

stated that the Third and Seventh Circuit Courts of Appeals have so held.[46]   513 U.S. at 567-68 (observing that the Third and Seventh Circuits "agree that the phrase 'oral communication' is restricted to oral communications that relate to a prospectus"). Plaintiffs also point out that *Gustafson* Court misstated the words of the *Ballay* panel*, 925 F.2d at 688, which actually wrote,

> We agree with both parties that the words "prospectus or oral communication" must be construed as related terms.  We are persuaded that the plain meaning of the words "prospectus or oral communication" together is that buyers may recover for material misrepresentations made in a prospectus or in an oral communication related to a prospectus ***or initial offering*** [emphasis added].

The issue before the *Ballay* panel was whether § 12(a)(2) related to a secondary market purchase and it concluded that the statute did not.   Plaintiffs emphasize that their claims relate to an initial offering, which they argue, under *Ballay*, may properly be brought under § 12(a)(2).

As for Deutsche Bank's citation to *Lewis v. Fresne*, 252 F.3d 352, 357 (5th Cir. 2001)(and progeny), Plaintiffs argue that *Fresne* overextended *Gustafson* beyond the reach of the Supreme Court's narrow holding, which did not address oral communications relating to initial offerings, but instead a "prospectus" in secondary offerings under § 12(a)(2), to conclude that section 12 does not apply to private transactions.

---

[46] The Supreme Court cited *Pacific Dunlop Holdings, Inc. v. Allen & Co.*, 993 F.2d 578, 588 (7th Cir. 1993), *abrogated by Gustafson*, 513 U.S. at 567, and *Ballay v. Legg Mason Wood Walker, Inc.*, 925 F.2d 682, 688 (3d Cir. 1991).

Alternatively, Plaintiffs contend that the Osprey integrated offering of notes and certificates does not qualify for an exemption from the registration requirements of the 1933 Act. The statute was designed to protect investors by promoting full disclosure of information thought necessary for an informed investment decision. *SEC v. Ralston Purina*, 346 U.S. 119, 124–25 (1953). In *Ralston Purina*, the Supreme Court held that the issuer, here Deutsche Bank, bears the burden of proving that the exemption from registration requirements applies. *Id.* at 119. That protection is based more on access to information than a party's sophistication and wealth. Where a party has no ability to obtain the vital, material information about the investment, the exemption should not apply. *Carroll v. First Nat'l Bank*, 413 F.2d 353, 357 (7th Cir. 1969); *Banca Cremi v. Alex. Brown*, 955 F. supp. 499, 516 (D.C. Md. 1997)("[T]he Securities Exchange Act is not intended to provide protection only for uninformed or unsophisticated investors . . . as 'fraud may also be perpetrated upon the powerful and sophisticated."). "But once it is seen that the exemption question turns on the knowledge of the offerees, the issuer's motives, laudable though they may be, fade into irrelevance." *Ralston Purina*, 346 U.S. at 119.[47] Deutsche Bank's

---

[47] But as Deutsche Bank correctly points out, Plaintiffs first bear the burden of pleading a § 12(a)(2) claim, including the elements that a prospectus exists and that they purchased their Certificates in a public offering, which they cannot do. *See Waltree*, 97 F. Supp. 2d at 420 (dismissing complaint where allegations of a public offering were conclusory and plaintiff failed to allege a prospectus or oral communication relating to a prospectus); *Dietrich v. Bauer*, 76 F. Supp. 2d 312, 331 (S.D.N.Y.

success in getting Plaintiffs to sign acknowledgments that they are sophisticated, accredited investors does not mean that such status gave them access to the material information that Deutsche Bank intentionally concealed from them.[48]  Deutsche Bank is liable for material omissions it made in its oral communications to Plaintiffs, they contend.

### *Statute of Limitations*

Finally to Deutsche Bank's argument that Plaintiffs' first purchase of the Osprey Certificates in 1999 is barred by limitations, Plaintiffs respond that this Court has not decided whether the Sarbanes-Oxley Act, 28 U.S.C.§ 1658(b), extends the applicable limitations period to § 12(a)(2) claims grounded in fraud.  *Cf. In re Enron Corp. Sec., Derivative & "ERISA" Litig*., 465 F. Supp. 2d 687, 711 n.33 (S.D. Tex. 2006)("Thus the new Sarbanes Oxley statute of limitations does not apply to non-fraud-

---

1999)(dismissing § 12(a)(2) claim where plaintiff failed to allege the existence of a prospectus or oral statements by Defendants that relate to a prospectus).

[48] Deutsche Bank correctly observes that this allegation that it fraudulently induced Plaintiffs to sign statements that they were sophisticated investors and had the status of accredited investors was not contained in their complaint, nor is it supported by pleading any facts.
     The bank also contends that Plaintiffs are estopped from disavowing their own previous representations that they are sophisticated and accredited investors.  *Faye L. Roth Revocable Trust v. UBS PaineWebber, Inc*., 323 F. Supp. 2d 1279, 1301 (S.D. Fla. 2004)("Plaintiffs cannot disavow their representations that they were accredited investors."); *Goodwin Props. v. Acadia Group, Inc*., Civ. No. 01-49-P-C, 2001 WL 800064, *7 (D. Me. July 17, 2001)(holding that where plaintiffs represented in writing at the time of the sale that they were accredited investors, they "cannot now disavow those representations in order to support their claims against the defendants.").

based actions under § 11 and 12(a)(2) of the 1933 Act."). Regardless, they maintain that they state a timely and cognizable claim under the § 12(a)(2) for their second purchase in 2000, and Deutsche Bank agrees.

**Deutsche Bank's Reply (#48)**

***Generic "Defendants"***

Regarding their use of the general term "Defendants," Plaintiffs request that the Court consider each generic reference to be to Deutsche Bank since all other Defendants have settled. Deutsche Bank objects that Plaintiffs must present only factual allegations that have evidentiary support and must link Deutsche Bank to each individual act or statement.

*Exhibits*

Second, argues Deutsche Bank, Plaintiffs pretend that the documents attached to their response are for "rebuttal" of the Osprey transaction documents that Deutsche Bank offered with its motion. Deutsche Bank maintains that these attachments cannot be used to amend their poorly pleaded complaint nor do they rebut or even relate to any of the transaction documents that are central allegations or provide support for any of Plaintiffs' claims. The bank points to Exs. B and C to the Response, which Plaintiffs claim show that the bank misrepresented the nature of the risks associated with Whitewing investment in Sarlux and Trakya. The bank argues that these documents were available to Plaintiffs long before they filed their Second amended Complaint, but more importantly they are irrelevant: they do not identify any

misrepresentations by Deutsche Bank nor support elements of Plaintiffs's claims.  The same is true of the other "rebuttal" exhibits.  Those exhibits that were provided by Deutsche Bank, in contrast, are documents that are relied on, referred to, or quoted from in the Second Amended Complaint and all but the tax opinion letters govern or provide restrictions about the Osprey Certificate purchases.

After examining these documents, the Court agrees with Deutsche Bank's arguments.

### New Allegations of Fraudulent Inducement

Objecting to Plaintiffs' new contention that Deutsche Bank fraudulently induced them to sign an acknowledgment in their Certificate Purchase Agreements that they are sophisticated accredited investors, Plaintiffs provide no support for this claim.  Plaintiffs have not challenged their own express representations in the same transaction documents that they had access to necessary information in making their investment decisions and that the Osprey documents were all to their and their attorneys' satisfaction at the time of the closing.

### Amendment Futile

In summary, instead of addressing the pleading defects raised by Deutsche Bank, Plaintiffs avoid or try to redraft the complaint's allegations and misstate the controlling law on various points.  Their pleading defects cannot be cured by further amendment, insists the bank.

### Section 12(a)(2) Claims

The bank reiterates that the § 12(a)(2) claims must be dismissed because Plaintiffs do not allege that they purchased their Certificates pursuant to a "prospectus." *Gustafson*, 513 U.S. 561; *see also Waltree Ltd. v. ING Furman Selz LLC*, 97 F. Supp. 2d 464, 470 (S.D.N.Y. 2000). Despite the statutory language regarding offers made by "oral communication," the Supreme Court has clearly held that this phrase "is restricted to oral communications that relate to a prospectus." 513 U.S. at 567-68. Numerous courts have followed this binding Supreme Court precedent. *See, e.g., Yung v. Lee*, 432 F.3d 142, 148 n.5 (2d Cir. 2005). Contrary to Plaintiffs' argument, the Third Circuit Court of Appeals in *Ballay* also narrowly interpreted § 12(a)(2): "We deduce no evidence that Congress intended an expansive meaning of oral communication unconnected to the term 'prospectus.'" 925 F.2d at 688. Furthermore the United State Supreme Court in *Gustafson* held that a "prospectus" refers to a document soliciting the public to purchase securities, and § 12(a)(2) applies only to public offerings. 513 U.S. at 574, 577-78. Because the Osprey Certificates were privately placed, the § 12(a)(2) claims fail. *Gustafson*, 513 U.S. at 582 (section 12(a)(2) does not relate to private sales or secondary offerings)[49]; *Fresne*, 252 F.3d at 357-

---

[49] This Court is aware that the decision in *Gustafson* (5-4) to construe "prospectus" so narrowly and to limit the applications of § 12(a)(2) to public offerings has received harsh criticism. *See, e.g., Gustafson*, 513 U.S. at 585 (Thomas, J., dissenting) and 596 (Ginsberg, J. dissenting); Ted J. Fiflis, *Gustafson v. Alloyd Co., Judicial v. Legislative Power*, 23 Sec. Reg. L.J. 423 (1996); Stephen M. Bainbridge, *The Securities Act Section 12(2) After the Gustafson Debacle*, 50 Bus. Law. 1231 (1995); Elliot Weiss,

58.   *See also Holland v. GEXA Corp.*, 161 Fed. Appx. 364, 366 (5th Cir. 2005); *Yung v. Lee*, 432 F.3d at 148; *Joseph v. Wiles*, 223 F.3d 1155, 1161 (10th Cir. 2000); *Maldonado v. Dominguez*, 137 F.3d 1, 8 (1st Cir. 1998).

### *Choice of Law Determination*

The bank argues that, and this Court has ruled, choice-of-law determinations can be made at a motion-to-dismiss stage of the litigation. *King v. Douglass*, 973 F. Supp. 708, 723-24 (S.D. Tex. 1996).

Deutsche Bank agrees with Plaintiffs that New York and Texas common-law for fraud and civil conspiracy do not differ significantly.  The Court finds no conflict.

Regarding Plaintiffs' TSA claims, the parties also agree that there is a conflict between New York and Texas law and that if New York applies here, the TSA claims are precluded. *Greenberg Traurig*, 161 S.W. 3d at 75-76.  Even without that determination, however, Deutsche Bank maintains that the TSA does not apply because it does not extend to misrepresentations in New York by non-Texas sellers or offerors to New York Plaintiffs where no step of the allegedly misleading sale occurred in Texas.  As argued previously, Plaintiffs have not pleaded any facts that could make

*Securities Action Section 12(2) After Gustafson v. Alloyd Co.: What Questions Remain?*, 50 Bus. Law. 1209 (1995); and Thomas Lee Hazan, *1933 Act Section 12(a)(2)--Liability for Material Misstatements or Omissions by Sellers of Securities*, 2 Law Sec. Reg. § 7.6 at § 7.6[2][A] ("this unfortunate and erroneous conclusion") and § 7.6[2][B] (Criticism of the Public Offering Limitation) (updated by July 2010 pocket part).  Nevertheless it is controlling.

Enron a party to, or a primary violator in, these TSA claims based on their purchase of Osprey Securities from the seller Osprey, a Delaware entity.   Plaintiffs concede that the primary violation conduct occurred in New York, but that they can invoke the TSA for both a primary and an aiding and abetting claim against Deutsche Bank because some unspecified aiding activity by Deutsche Bank may have occurred in Texas.   The bank argues that the idea that Texas can regulate the primary violation based on some subset of aiding activity, but not any misrepresentations in the security sale, is not plausible.   In contrast, Deutsche Bank has shown that when the test factors of the *Restatement (Second) of Conflict of Laws* § 148(1), as well as of § 145(2) for tort claims, are applied, Plaintiffs' claims based on misrepresentations relating to their Certificate purchases are governed by New York law for claims of fraud and misrepresentation.   Plaintiffs do not address either of these sections, no less analyze these factors to determine the applicable law.  Furthermore § 148(1), governing misrepresentation cases, requires the Court to apply New York law because Plaintiffs allege that the misrepresentations were made, received, and acted on in New York and Plaintiffs, who are New York-based institutional investors and/or investment managers, suffered their pecuniary losses in that state.   It is not the global scheme they assert, but the specific Osprey Certificate purchases and TSA claims that must be the focus of the analysis.   Plaintiffs attempt to obscure these facts by submitting an extra-complaint advisory services engagement letter signed in Houston (Response, Exs. D,

E) when the specific acts of misrepresentations and the injuries alleged took place in New York.  Furthermore, the documents and testimony by Mike Jakubik about the engagement letter do not involve the offerings on which Plaintiffs sue, but concern Osprey III in October 2000.  Moreover, no Texas public policy interests are involved in a case with no alleged Texas actor or Texas selling activities that are redressable under the TSA.

The secondary aider claim under the TSA fails because it depends on Enron as the primary violator, which it cannot be because (1) Enron was not the seller or offeror of the Osprey certificates, (2) there are no allegations that Enron was involved in the selling process, and (3) there are no allegations that Plaintiffs purchased their Certificates from Enron.  Osprey Trust issued the Certificates, as reflected in the sales documents. Plaintiff fails to provide factual support for its assertion that Osprey Trust was a sham front for Enron, so its existence should be disregarded and Enron should be viewed as the true offeror or issuer of the Certificates.

**Common Law Fraud**

Deutsche Bank reiterates that Plaintiffs have failed to plead common law fraud with the requisite particularity.  They fail to identify any misrepresentations or demonstrate scienter. They do not allege that Deutsche Bank drafted, directed the drafting of, or played any role in compiling Enron's financial statements.  When they argue that the bank misrepresented the ability of the Osprey Indentured Trustee to cause the sale and

- 87 -

liquidation of Whitewing upon a triggering event, they cite to ¶ 97 of the Complaint; that paragraph makes no mention of the Osprey indenture trustee and merely alleges that Douglas Stark remembered that Seth Rubin was involved in the presentation of Osprey I material, but does not identify anything he said.[50] Plaintiffs now allege (Response at 29 n.6) that they were "expressly assured by Deutsche personnel," none of whom is identified, that the description in the OM of the functioning of Osprey Trust and Whitewing was accurate and cite ¶¶ 47, 50, and 62-66 of the Complaint; none of these paragraphs refers to Deutsche Bank. *See Southland Sec. Corp. v. INSpire Ins. Sol., Inc.*, 365 F.3d 353, 365 (5th Cir. 2004)(rejecting group pleading doctrine and requiring a complaint to specify which document or portion or statement therein is attributable to each individual defendant). Moreover, insists the bank, since Plaintiffs have failed to particularize their pleadings, even if the Court allowed Plaintiffs to substitute Deutsche Bank for all the references to "Defendants," that modification would not cure all these deficiencies. The Court agrees with these objections.

Deutsche Bank further objects that Plaintiffs assert new, extra-complaint allegations that Deutsche Bank misrepresented the risks associated with Sarlux and Trakya assets, which Whitewing ultimately purchased from Enron. Deutsche Bank emphasizes that Plaintiffs cannot "amend" their complaint through

---

[50] The Court notes that paragraphs 108-116 of the Complaint, #33, do discuss the issue.

responsive pleading.  In addition, these new arguments rely on a falsehood that Deutsche Bank and other sellers sent Plaintiffs' representative Douglas Stark an email with a Powerpoint presentation entitled "Whitewing Investment Proposal–Sarlux and Trakya Projects."  Response at 5 and 31 & Ex. B.  Deutsche Bank contends that the document on its face indicates that it did not come from anyone at Deutsche Bank, but from someone at DLJ, now Credit Suisse, to various people including Stark and Deutsche Bank.  Furthermore it is a Whitewing investment proposal; Enron and Whitewing were the parties to these asset purchases, with the Osprey Certificateholders having a right of consent, and Deutsche Bank was not a "seller" in any of the transactions.  Nor do Plaintiffs provide any factual support demonstrating that Deutsche Bank possessed the information that would make the information in the email misleading.  Although Plaintiffs' Response at 7-9 points to Exhibit C as a document indicating that Deutsche Bank knew of risks regarding Sarlux and Trakya because of the due diligence it performed for the Margaux transaction, Deutsche Bank insists Exhibit C reflects that it was not authored by or sent to anyone at Deutsche Bank.  Plaintiffs appear to claim that the bank knew of the information in Exhibit C because Mike Jakubik, who at other times worked at BT/Deutsche Bank, is listed as copied on the document, but Jakubik was at Enron in August 1991 and did not join Deutsche Bank until August 2000.  Ex. 1 to #48, Jakubik Dep. Tr. at 287:9-16.

Regarding scienter, Plaintiffs also fail to allege the necessary factual detail to support an inference of scienter. *Giant Group, Ltd. v. Arthur Andersen, LLP*, 770 N.Y.S. 2d 291, 292 (N.Y. App. Div. 2003); *Johnson & Higgins of Texas, Inc. v. Kenneco Energy, Inc.*, 962 S.W. 2d 507, 526-27 (Tex. 1998).  Where the fraud is alleged against a corporate defendant, the plaintiff must allege that the individual corporate officer making the statement had the requisite level of knowledge and intent.  *Southland Security*, 365 F.3d at 366.  Instead of meeting this requirement, Plaintiffs improperly urge the Court to infer scienter on the grounds there can be no other plausible explanation for the bank's false statements, half truths and material omissions.  Their other suggestion based on the fees earned by Deutsche Bank fails in light of the overwhelming authority discounting such a motive because every rational economic actor desires to earn more. *Ellison v. Am. Image Motor Co.*, 36 F. Supp. 2d 628, 639-40 (S.D.N.Y. 1999); *THC Holdings Corp. v. Chinn*, No. 95 Civ. 4422 (KMW), 1998 WL 50202, at *9 (S.D.N.Y. Feb. 6, 1998).

Plaintiffs also fail to plead specific facts demonstrating reasonable reliance on specific misrepresentations. *In re Enron Corp. Sec., Derivative & "ERISA" Litig.*, 284 F. Supp. 2d 511, 644 (S.D. Tex. 2004); *Hernandez v. Ciba-Geigy Corp. USA*, 200 F.R.D. 285, 293 (S.D. Tex. 2001)(dismissing complaint pursuant to Rule 9(b) where plaintiffs failed to allege that the misstatements were read).  Deutsche Bank points out that Plaintiffs were separately represented by counsel and approved the

terms of, and all transaction documents for, the Osprey financing, and their Certificate purchases were expressly conditioned on their representations that they (1) had access to and (2) received sufficient information to make their purchase decisions and that (3) the transaction documentation was reasonably satisfactory to them.  *See* Certificate Purchase Agreements, Harlow Decl. Exs. 1 and 2 at 2.  They cannot now reasonably argue that the information they received was artificially limited and inadequate.  *DynCorp c. GTE Corp.*, 215 F. Supp. 2d 308, 322 (S.D.N.Y. 2002)("Sophisticated parties to major transaction cannot avoid their disclaimers by complaining that they received less than all information, for they could have negotiated for fuller information or more complete warranties."); *Stuart Silver Assocs. v. Baco Dev. Corp.*, 665 N.Y.S. 2d 415, 417 (N.Y. App. Div. 1997)(a party who fails to make use of available means "to discover the true nature of the transaction . . . cannot claim justifiable reliance on defendant's misrepresentations").  Nor could they, as none of the Plaintiffs purchased their Certificates from Deutsche Bank or otherwise consummated any business transaction with Deutsche Bank. *Williams v. Bank Leumi Trust Co. of New York*, No. 96 Civ. 6695 (LMM), 1998 WL 397887, *8 (S.D.N.Y. July 15, 1998)(dismissing fraud claim based on nondisclosure where plaintiff failed to show that plaintiff and defendant "stood on opposite sides of the same transaction.").

           To the extent that Plaintiffs are contending they relied on material omissions by Deutsche Bank, their claims fail because

Plaintiffs do not allege any relationship (fiduciary, confidential or contractual) that would give rise to a duty to disclose under either New York or Texas law.

**_Aiding and Abetting_**

Deutsche Bank further argues that the complaint fails to state with the requisite factual particularity an aiding and abetting claim under New York law.[51] _Inzerilla v. Am. Tobacco Co._, No. 11754/96, 2000 WL 34016364, *3 (N.Y. Sup. Ct. Oct. 27, 2000)(plaintiff asserting aiding and abetting must plead with specific facts consistent with Rule 9(b) heightened requirements (1) the existence of a fraud; (2) defendant's actual knowledge of the fraud; and (3) substantial assistance in advancing the fraud's commission.).  For substantial assistance, the plaintiff must allege facts not only showing that the defendant significantly aided the primary wrongdoer's fraud, but also that the aiding

---

[51] Plaintiffs do not assert a claim for aiding and abetting fraud under Texas common law.  It is questionable whether Texas recognizes such a claim separate from conspiracy or separate from the underlying wrongful act.  _Ernst & Young, LLP v. Pacific Mutual Life Ins. Co._, 51 S.W. 3d 573, 583 n.7 (Tex. 2001).  _See also Newby v. Enron Corp. (In re Enron Crop. Sec., Derivative & "ERISA" Litig.)_, 2006 WL 3716669, *8 & n.7 (S.D. Tex. 2006)(agreeing that the Texas Supreme Court has not recognized a separate tort of aiding and abetting, and finding that because plaintiffs also plead conspiracy to defraud, the aiding and abetting claim was redundant and unnecessary), _citing Prospect High Income Fund v. Grant Thornton, LLP_, 203 S.W. 3d 602, 616 (Tex. App.--Dallas 2006); _Highland Crusader Offshore Partners, LP v. LifeCare Holdings, Inc._, No. Civ. A. 3:08CV0102B), 2008 WL 3925272, *14 (N.D. Tex. Aug. 27, 2008), _aff'd_, No. 09-10554, 2010 WL 1849293 (5th Cir. May 10, 2010)(dismissal of aiding and abetting fraud claim was not appealed and therefore not considered); _Hill v. Hunt_, No. CIV A 307-CV-2020-0, 2010 WL 54756, *3 n.2 (N.D. Tex. Jan. 4, 2010).  Thus the Court does not address the aiding and abetting under Texas law.

defendant's actions proximately caused the plaintiff's injuries.
*Cromer Fin. Ltd. v. Berger*, 137 F. Supp. 2d 452, 470 (S.D.N.Y.
2001).  Plaintiffs have failed to allege facts demonstrating that
Deutsche Bank had actual knowledge of the underlying fraud,
instead asserting conclusory statements that the bank knew.
Receipt of professional fees is not a sufficient basis to
establish scienter. *Ellison*, 36 F. Supp. 2d at 640; *THC Holding
Corp.*, 1998 WL 50202 at *9; *ABF Capital Management v. Askin
Capital Management, LP*, 957 F. Supp. 1308, 1327 (S.D.N.Y.
1997)("Although the desire to enhance income may motivate a person
to commit fraud, allegations that a defendant stands to gain
economically from fraud do not satisfy the heightened pleading
requirements of Rule 9(b)").  Nor do Plaintiffs' conclusory
statements and references to the tax transactions, Marlin, Osprey,
and Deutsche Bank's passive investment in LJM2 show actual
knowledge of any fraud.  Plaintiffs' argument that Deutsche Bank
used its analysts as conduits has no basis in the complaint and
cannot circumvent the requirement of scienter.  Even if there were
a basis in the complaint, under *Southland* Plaintiffs must show
that a particular individual at Deutsche Bank directed or made
sure that the analysts would issue false statements and knew that
those statements would be used by Enron to defraud investors.  365
F.3d at 366.

        Deutsche Bank also challenges Plaintiffs' assertion that
it is reasonable to infer knowledge and intent from allegations
of substantial assistance.  Actual knowledge and substantial

assistance are separate elements that must be independently alleged with particularity. *Inzerilla*, 2000 WL 34016364 at *3. Plaintiffs have not alleged facts establishing knowledge, substantial assistance or proximate cause. Deutsche Bank argues that Plaintiffs conflate proximate cause with reliance or transaction causation ("but for") in wrongly arguing that proximate causation can be adequately pleaded by a simple affirmation that no investment would have been made had Plaintiff known the investment was based on fraudulent financials. Instead, for proximate cause Plaintiffs must allege facts with particularity showing that Deutsche Bank's conduct directly and proximately caused their injuries or loss. *Cromer Fin. Ltd.*, 137 F. Supp. 2d at 470 ("'But-for' causation is insufficient; aider and abettor liability requires the injury to be a direct or reasonably foreseeable result of the conduct."). *Cf. Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 343-46 (2005)(recognizing general common law rule that proximate causation, not merely transaction causation, must be alleged). Plaintiffs also erroneously collapse the elements of reliance and causation, which must be independently and specifically alleged as separate prerequisites for aiding and abetting. *Dura*, 544 U.S. at 343-44 ("the common law has long insisted that a plaintiff in [a misrepresentation] case show not only that had he known the truth he would not have acted but also that he suffered actual economic loss" caused by the misrepresentation). That Plaintiffs may have relied on certain information in the course of their purchase says nothing

about whether their later losses were proximately caused by a misrepresentation in that information.  At most Plaintiffs allege that Enron may have used the tax transactions to inflate Enron's accounting income, but do not allege any causal connection between this inflated accounting income and their injuries, i.e., that their Osprey Certificates became worthless.  While Plaintiffs complain they were harmed by the asset transfers at inflated values from Enron to Whitewing, they do not and cannot allege that Deutsche Bank had anything to do with Enron's subsequent abuse of the Osprey/Whitewing structure or that the Marlin transactions played any role in their Osprey losses.

### Civil Conspiracy and Concerted Action Claims

Deutsche Bank also charges that Plaintiffs fail to plead adequately their civil conspiracy and concerted action claims. They must provide particularized facts establish a knowing agreement by each alleged co-conspirator to commit the fraud alleged. *Snyder v. Puente De Brooklyn Realty Corp.*, 746 N.Y.S. 2d 517, 521-22 (N.Y. App. Div. 2002), *appeal denied*, 99 N.Y.2d 506 (N.Y. 2003); *Ciba-Geigy*, 2000 WL 33187524 at *5.  A meeting of the minds cannot be inferred from Deutsche Bank's receipt of professional fees.  Plaintiffs must show that there is "a preconceived plan" and agreement to defraud investors and that from the beginning of the agreement Deutsche Bank intended to cause Plaintiffs injury.  *Schlumberger Well Surveying Corp. v. Nortex Oil & Gas Corp.*, 435 S.W. 2d 854, 856-57 (Tex. 1968);

*Triplex Communications, Inc. v. Riley*, 900 S.W. 2d 716, 719-20 (Tex. 1995).

As for Deutsche Bank's involvement in certain tax, investment, or structured finance transactions purportedly demonstrating the existence of an agreement to conspire between Enron and Deutsche Bank, these allegations do not show that Deutsche Bank knew how Enron ultimately used the transactions to defraud investors. *Snyder*, 746 N.Y.S. 2d at 521-22 (holding that "the mere fact that a defendant's otherwise lawful activities may have assisted another in pursuit of guileful objectives is not a sufficient basis for a finding that he or she conspired to defraud"); *Pittman v. Grayson*, 149 F.3d 111, 122-23 (2d Cir. 1998)(to be liable for civil conspiracy "the defendant must know the wrongful nature of the primary actor's conduct"); *Firestone Steel Prods. Co. v. Barajas*, 927 S.W. 2d 608, 617 (Tex. 1996)(holding that "[f]or a civil conspiracy to arise, the parties must be aware of the harm or wrongful conduct at the beginning of the agreement" and that "[o]ne cannot agree expressly or tacitly, to commit a wrong about which he has no knowledge.").

As Deutsche Bank pointed out in its motion, to the extent that there are any differences between conspiracy and concerted action claims, Plaintiffs fail to establish an element indispensable to both: a knowing agreement to injure investors. *Pittman*, 149 F.3d at 122-23. In addition, concerted action claims require an allegation that each defendant committed a tortious act in furtherance of the overall wrongful conduct. *Id.* The bank

contends that Plaintiffs fail to allege that the bank committed any such tortious act.

### *Spoliation Instruction*

Deutsche Bank asserts that Plaintiffs have misrepresented the testimony of its employee, Paul Cambridge, who testified that he did retain or destroy documents according to the firm's general retention/destruction policy. Response, Ex. A at 389:10-15, 17-18. Furthermore, Plaintiff have failed to satisfy the elements for an adverse inference on spoliation by showing (1) there was a duty to preserve by the alleged wrongdoer; (2) evidence relevant to the litigation was actually destroyed; (3) with a culpable state of mind. *Smith v. Am. Founders Fin. Corp.*, No. Civ. A. H-05-1779, 2007 WL 781949, *28 (S.D. Tex. Mar. 10, 2007); *Zubulake v. UBS Warburg LLC*, 229 F.R.D. 422, 430-31 (S.D. Tex. 2004). Finally, spoliation is an evidentiary doctrine having no application to this motion to dismiss. *King v. Ill. Cent. RR.*, 337 F.3d 550, 555 (5th Cir. 2001).

### Plaintiffs' Surreply (#50)

### *TSA*

Plaintiffs argue that Deutsche Bank cannot avoid liability for aiding and abetting by arguing that Osprey Trust issued the securities, not Enron, because Osprey was merely a shell. Tex. Admin. Code § 109.13(k)(13)(Vernon 2007)("[Exemptions from the Act are not available] to any issuer with respect to any transaction which, although in technical compliance with this subsection [limited offering exemptions], is part of a plan or

scheme to evade registration or the conditions or limitations explicitly stated in this subsection."). To further the antifraud statutory scheme, the definition of "issuer" extends to "any of the issuer's predecessors or any affiliated issuer" as well as "any person who, acting alone or in conjunction with one or more other persons, directly or indirectly takes initiative in founding and organizing  the business or enterprise of an issuer." Tex. Admin. Code § 139.16(c)(2)(A) and (c)(2)(C)(i). As one factor in determining whether an issuer was formed in furtherance of a scheme to defraud the statute lists a shell corporation (one that has no substantive operations or assets). Tex. Admin. Code § 109.7(f).[52]

Plaintiffs maintain that the TSA applies to securities violations emanating from Texas even if non-Texas residents are injured. *In re Enron Corp. Sec., Derivative & "ERISA" Litig.*, 235 F. Supp. 2d 549, 691-92 (S.D. Tex. 2002); *Citizens Ins. Co. of Am. v. Daccach*, 217 S.W. 3d 430, 444 (Tex. 2007).[53] They insist that

---

[52] Plaintiffs claim the evidence shows that Osprey was devised with Deutsche Bank's assistance and was funded and controlled by Enron; the entire Whitewing/Osprey structure was controlled by Enron; and the Osprey Trust never had any employees.

[53] Plaintiffs point to an action filed by the SEC against Deutsche Bank in 2004 for inappropriate influence by its Americas Equity Research Department over its research analysts in New York. Ex. A to #50, *SEC v. Deutsche Bank Sec. Inc.*, Cause No⌐ 04-CV-06909, *3 (S.D.N.Y. 2004. In May 2006 the Texas State Securities Board ("TxSSB") fined Deutsche Bank $1,847,656 for the same conduct occurring in New York, i.e. inappropriate influence by investment banking over Deutsche Bank's research analysts. *In the Matter of Dealer Registration of Deutsche Bank Sec., Inc.*, Order No⌐ IC06-CDO-07, 2006 Tex. Sec. LEXIS 31, *1 (Tex. State Sec. Bd. May 31, 2006), a copy attached as Ex. A to #50. Under Findings of Fact is

- 98 -

the fraudulent scheme alleged here emanated from Texas from Enron. Enron, based in Houston, controlled the shell Osprey Trust entity. Enron engaged Deutsche Bank and others to devise, underwrite and promote the Osprey offerings. The co-lead underwriters marketed the scheme to potential investors through a roadshow, attended by Enron Treasurer Ben Glissan, and written materials, and the underwriters, including Deutsche Bank, were responsible for completing the Osprey Trust due diligence in Houston through Enron contacts. #50, Capolongo Dep., Ex B. Furthermore, claim Plaintiffs, Enron's SEC-filed financial statements, from Enron in Texas, were presented as part of the roadshow materials upon which Plaintiffs relied in making their investment Decision. Complaint, #33, ¶¶ 68, 137, 138, 150-54, 465, 500, 549, 581, 591. Plaintiffs argue that all of the misrepresentations were Enron's made from Texas. Enron's SEC-filed financial statements were from Enron in Texas and were among the roadshow materials on which Plaintiffs relied in deciding to buy the certificates. Therefore, they conclude, Deutsche Bank's conduct falls within the reach of the TSA. *In re Enron*, 235 F. Supp. 2d at 691-92. The jurisdictional reach of the TSA extends to any part of the selling process that occurred in Texas.

Thus Plaintiffs insist they have pleaded a primary violation of the statute by Deutsche Bank. In sum, Deutsche Bank

the statement "Deutsche Bank admits to the jurisdiction of the Texas Securities Act . . . ." The TxSSB also found that the analysts published exaggerated, unwarranted or unreasonable research reports.

knew Enron's financial statements were false because it helped to make them so through six specific tax transactions and two tax accommodation transactions.   Plaintiffs have pleaded Deutsche Bank's knowledge, participation and purposeful concealment from the public of the transactions and have alleged statements by the bank's employees and attorneys showing that the bank knew what the transactions were designed for, i.e., solely to manipulate Enron's balance sheet to allow Enron to recognize improperly accounting income to manipulate its reported financial results.   Enron's accounting for the transactions did not comply with GAAP and was misleading to anyone reviewing the financial statements.   The banks's conduct in devising, underwriting, and promoting the tax transactions and then using the resulting false financial statements to sell Osprey Trust certificates to Plaintiffs both establishes direct fraud and creates a strong inference of a conspiracy between Deutsche Bank and Enron, maintain Plaintiffs.

Plaintiffs insist they have pleaded adequately their common law fraudulent misrepresentation claims under Texas and New York law despite Deutsche Bank's "frivolous" contention that it made no deceptive statements or misleading omissions to Plaintiffs, that no evidence raises an inference of scienter, and that Plaintiffs fail to allege reasonable reliance.   Instead of singling out certain paragraphs and ignoring others that specify facts supporting Plaintiffs' claims as Deutsche Bank has done, they contend the complaint must be read as a whole.

Plaintiffs insist that Deutsche Bank knowingly helped to make Enron's financial statements false through tax transactions and tax accommodation transactions and to conceal that fact. The bank knew that the marketing materials for Osprey, which it helped to draft, were misleading, but did not disclose their misrepresentations. Deutsche Bank also knew from its Margaux dealings that the documents related to risky Sarlux and Trakya had material misrepresentations and omissions to Plaintiffs regarding the assets sold to Osprey. It had a duty to disclose where partial disclosures were misleading or where their superior knowledge rendered a transaction without disclosure inherently unfair; instead it actively concealed the truth.

Plaintiffs contend that scienter need only "be averred generally." Fed. R. Civ. P. 9(b). *Southland*'s pleading requirements for federal statutory claims do not apply to common law fraud claims, object Plaintiffs.[54] Even if they did, they would not apply where a defendant, here Deutsche Bank's Seth Rubin, remained silent while material falsehoods and omissions were made during the roadshow and in materials provided to investors. Under both Texas and New York law, principles of agency make an employer vicariously liable for the torts of its servants upon a showing of scienter by either. *In re Enron Corp.*

---

[54] Deutsche Bank correctly points out that the *Southland* panel expressly stated that its scienter standard "is consistent with the general common law rule that . . . the required state of mind must actually exist in the individual making (or being the cause of the making of) the misrepresentation." 365 F.3d at 366.

(*American Nat'l Ins. Co. v. J.P.Morgan Chase & Co.*), G-02-299 at
18-20 (S.D. Tex. Apr. 19, 2007); *African Metals Corp. v. Bullowa*,
288 N.Y. 78, 85 (N.Y. App. 1942)("Where there are a number of
promoters, all these coadventurers are liable in damages for the
fraud of an agent employed by them to effect the sale of the
property owned, without reference to the moral guilt or innocence
of those not directly involved in the misrepresentations").

        Moreover the Second Circuit opined that there are four
primary ways a plaintiff can demonstrate a strong inference of
scienter:  where a defendant (1) benefits in a concrete and
personal way from the fraud; (2) engaged in deliberately illegal
behavior; (3) knew facts or had access to information suggesting
that public statements were inaccurate; or (4) failed to check
information that it had a duty to monitor. *Novak v. Kasaks*, 216
F.3d 300, 311 (2d Cir. 2000), *cert. denied*, 531 U.S. 1012 (2000).[55]
Plaintiffs claim they have satisfied these elements.  Deutsche
Bank personally benefitted by making money, generating additional
business with Enron, and tax accommodation transactions that
helped it evade taxes.  They have pleaded what Deutsche Bank knew
that contradicted the information provided to investors (Sarlux
and Trakya risks, the bank's analysts' public recommendations to
buy Enron securities while trying to lower its own exposure to
Enron, and after providing half truths about Enron in analyst

---

[55] *Novak* was discussing the statutory requirement under the
PSLRA, which is not applicable here.

reports, the bank had a duty to monitor and correct untrue statements).

Plaintiffs further insist they have pleaded reasonable reliance on Deutsche Bank's misrepresentations and omissions in the Osprey OM and pamphlets with the bank's name on their covers and which the bank helped prepare at working group drafting sessions. They also relied on Deutsche Bank and CSFB, as leaders of the sale syndicate, for completing due diligence about Osprey Trust. They contend that reasonable reliance in a fraud action is not an issue to be resolved on a motion to dismiss or summary judgment.

Plaintiffs also maintain that they have adequately pleaded conspiracy of Deutsche Bank with Enron to help Enron falsify its financial statements and defraud Osprey Trust certificate purchasers. Although the bank argues that receipt of professional fees cannot be used to demonstrate conspiracy, that is true only where the fees are customary; large, out-of-the-ordinary fees, especially where other facts indicate fraudulent intent, may raise an inference of fraud. *In re Enron Corp. Sec., Derivative & "ERISA" Litig.*, 2005 U.S. Dist. LEXIS 39927, *40 n.41 (S.D. Tex. Dec. 5, 2005), *citing inter alia In re Complete Management Sec. Litig.* They assert that for conspiring to help Enron cook its books and co-manage the Osprey Trust offering, Deutsche Bank received huge fees and other favors totaling

millions of dollars, as summarized *supra*, substantially greater than customary fees for transactions.[56]

As for Deutsche Bank's wrongful intent, Plaintiffs argue that for conspiracy claims, if the party either intends the consequences of his act or believes the consequences are substantially certain to follow, then he acts with the requisite intent. *State Farm Ins. Co. v. S.S.*, 858 S.W. 2d 374, 378 (Tex. 1993), *quoting Restatement (Second) of Torts* § 8A (1965). Plaintiffs have alleged that Enron and Deutsche Bank conspired to "add accounting income" through transactions with no legitimate business purpose that aided in the manipulation of Enron's SEC-filed financial statements, and would thus injure investors in Enron Corp. and Enron-related entities.

Inferences of agreement to conspire may be drawn from Deutsche Bank's actions as a participant in Enron-related transactions. *Brandt v. Sebek*, 14 S.W. 3d 756, 766 (Tex. App.--Houston [1st Dist.] 2000, pet. denied)("undisputed" that "an

---

[56] Deutsche Bank, citing an earlier opinion by this Court, notes that the complaint fails to allege facts showing that the fees it earned in the transactions in dispute were non-customary or excessive as compared with fees it charged its other clients for similar services to support his conclusory allegation. *See In re Enron Corp. Sec., Derivative, & "ERISA" Litig.*, Civ. A. H-01-3624, 2005 WL 3704688, *7 n.41 (S.D. Tex. Dec. 5, 2005)(finding allegations insufficient where plaintiffs "fail[ed] to show with any specific allegations that those fees were not the usual fees charged by [defendant,]" failed to "provide figures for [defendant's] various financial institution clients" and failed to "demonstrate that the fees were excessive"). Even if they had pleaded such supporting facts, without additional facts demonstrating fraudulent intent the pleading would not sufficiently show scienter. *Id.* at *6-7 & n.41.

agreement may be informal and tacit and that a civil conspiracy can be established by circumstantial evidence"), *citing International Bankers Life Ins. Co. v. Holloway*, 368 S.W. 2d 567, 581-82 (Tex. 1963).  The court examines the complaint as a whole to determine if there was a "meeting of them minds." *In re Complete Management*, 153 F. Supp. 2d at 334-35.  They point, in addition to exorbitant fees, to the bank's collusion with Enron in the sham tax transactions to create improper "accounting income" for Enron to manipulate its financial statements, lacking legitimate business purpose and economic substance because no reasonable possibility of a profit existed. *Compaq Computer Corp. v. Comm'r*, 277 F.3d 778, 781 (5th Cir. 2001)(two prongs of economic substance doctrine).  The structures of the tax transactions had no economic effect because the transactions simply involved moving assets around among entities owned and controlled by Deutsche Bank and Enron.  "Transactions that have no economic effect other than the creation of income tax losses are shams for tax purposes and will not be recognized." *Boynton v. Comm'r*, 649 F.2d 1168, 1172 (5th Cir. 1981), *citing Knetsch v. United States*, 346 U.S. 361 (1960).[57]  Deutsche Bank was also rewarded for its participation in the conspiracy by being allowed to invest in LJM2 with guaranteed high returns and by Enron's $1.95 billion loan to

_____

[57] Deutsche Bank objects that Plaintiffs fail to provide any facts in the complaint to support the argument that the tax transactions did not satisfy the economic substance doctrine, no less to show that the tax transactions were in any way relevant to investment in Osprey equity or later caused losses in that equity.

- 105 -

Deutsche Bank that netted it $40 million per annum in tax benefits.  Complaint at ¶ 680-738, 554-58.  Deutsche Bank's analyst reports about Enron further support an inference of an agreement to conspire.  The gap between what Deutsche Bank knew about the assets to be purchased with Osprey Trust proceeds and what it told Osprey Trust investors constituted at least recklessness in not knowing, sufficient to establish scienter.

Plaintiffs also contend that they have adequately pleaded concerted action because, as just argued, they have alleged facts supporting a meeting of the minds and they have alleged that Deutsche Bank committed a tortious act, fraudulent misrepresentation and aiding and abetting under New York law, in furtherance of the overall wrongful conduct.  *Pitman v. Grayson*, 149 F.3d 111, 122-23 (2d Cir. 1998).

Regarding aiding and abetting under New York common law, Plaintiffs assert that they have alleged facts showing Deutsche Bank's actual knowledge of the fraud perpetrated by Enron and the sale of the Osprey certificates.  They have asserted that Deutsche Bank knew about the Sarlux and Trakya asset purchase with Osprey Trust funds (including the transfer restrictions, limited liquidity, and ineffectiveness of the insurance) and that the information given to Plaintiffs about these particular assets was contrary to that information.  The tax transactions were designed to mislead investors, as Deutsche Bank knew from designing them.  It also participated in LJM2 and knew from reviewing Enron's financial statements and other information that LJM2 was being

used to doctor Enron's books.  Because Osprey note holders would be paid before certificate holders on unwinding the structure, Plaintiffs relied reasonably on Enron's financial statements at the roadshow and attached to promotional materials as an accurate depiction of  Enron's financial condition; thus Deutsche Bank's actions in making those statements false proximately caused Plaintiffs' injury.  Loss causation refers to a direct causal link between the misstatement and the claimant's economic loss. *Schlick v. Penn-Dixie Cement Corp.*, 507 F.2d 374, 380 (2d Cir. 1975), *cert. denied*, 421 U.S. 976 (1975); *Huddleston v. Herman & MacLean*, 640 F.2d 534, 549 (5th Cir. 1981).  For loss causation, "substantial assistance in aiding and abetting claims exists where a defendant "affirmatively assists, helps conceal, or by virtue of failing to act when required to do so enables the fraud to proceed." *Cromer Fin. Ltd.,* 137 F.2d at 471.  The injury must be a direct result or reasonably foreseeable result of the conduct. *Id.*  The judge in *Cromer, id.* at 472, described examples of substantial assistance in *In re Gas Reclamation, Inc. Sec. Litig.*, 659 F. Supp. 493, 504 (S.D.N.Y. 1987):  "[T]he brokers participated in the creation of the documents which contained the false statements.  Others substantially assisted the fraud by reviewing and approving that document, devising the marketing and financial scheme for the fraud, and engaging in 'atypical' financing transactions."  Plaintiffs argue such is the conduct Deutsche Bank engaged in here.  Another relevant factor is the bank's "access to confidential, non-public information" and

knowledge of the primary violator's financial condition, liquidity, and net capital position." *McDaniel v. Bear Stearns & Co.*, 196 F. Supp. 2d, 343, 354 (S.D.N.Y. 2002).

**Deutsche Bank's Opposition and Response to Surreply (#51)**

Objecting that Plaintiffs' Surreply (1) barely addresses any of Deutsche Bank's earlier arguments, (2) asserts new, inapposite arguments to obscure their failure to plead adequately, (3) relies on deposition testimony not referenced in their complaint, and (4) is late, unnecessary and irrelevant, Deutsche Bank asks the Court to disregard it, or, if it does not, to consider the instant response.

The bank first contends that the Texas State Securities Board settlement with Deutsche Bank relied upon by Plaintiffs in their Surreply is a distinct proceeding unrelated to the Osprey Certificate sales and brought under different provisions of the TSA. Nor do the incomplete definitions of "issuer" or "shell corporation" in the Texas Administrative Code apply to TSA Article 581-22 and the instant case, and they cannot transform Enron into a primary violator of the TSA. Both the alleged facts and the transaction documents on which Plaintiffs rely show that the TSA does not apply to their alleged harms in New York from alleged transactions and misrepresentations in New York, involving non-Texas entities.

After Plaintiffs conceded in their Surreply at 1 n.1 that a change in the law would be necessary for them to proceed on their Section 12 claim, Deutsche Bank argues that they attempt

to transform their purported common-law fraud claim into a strict liability federal Section 11 or 12 claim by pretending that Deutsche Bank served as an underwriter or co-lead underwriter on the Osprey certificate sales, with due diligence obligations to Plaintiffs, and by ignoring necessary elements of common-law fraud (material misrepresentation(s), reliance on it (them), causation by the misrepresentation(s), and scienter). Deutsche Bank proclaims that it did not underwrite or even serve as an initial purchaser on Plaintiffs' certificate purchases and had no obligation to do due diligence for them. The certificates were purchased by the certificate holders in direct transactions and negotiations with Osprey. The Osprey Certificate offering, unlike the Notes offering, involved only a few institutional purchasers in a personal, direct private placement from Osprey.[58] Plaintiffs were equity purchasers who specifically undertook to perform their own due diligence, and who retained independent counsel to assist them. The sales, as evidenced by the transaction documents, were expressly conditioned on the certificate purchasers' acknowledging that they had received adequate information about their investment and about transaction documents that they and their counsel approved. Plaintiffs try to obscure these facts, but they do not and cannot contest them.

---

[58] Deutsche Bank insists neither an underwriter nor an initial purchaser is obligated to perform due diligence, which instead serves as a defense to liability under certain securities laws, but there is no cognizable claim for failure to perform and no obligation to perform due diligence.

Deutsche Bank also accuses Plaintiffs of using the tax transactions at issue as a "smoke screen for Plaintiffs' pleading failures."  Plaintiffs have failed to allege facts showing any misrepresentation(s) by the bank to Plaintiffs about the tax transactions, and/or reliance on specific misrepresentations related to the tax transactions in their decision to purchase the Osprey certificates, and/or that any individual at Deutsche Bank has scienter while allegedly aiding the deception of the purchasers, and/or any misstatement of Enron's accounting income derived from the tax transactions that proximately caused Plaintiffs' losses as Osprey equity holders (who did not have any recourse to or guarantee by Enron and who were betting--with their own direct access to information and their own control over Whitewing investments--on Whitewing's assets).  The bank urges the Court to reject Plaintiffs' latest attempt to manufacture a TSA claim by arguing that Enron was the primary violator when Osprey, a distinct legal entity, issued and sold the certificates to Plaintiffs.

Insisting that Plaintiffs, not Enron, controlled the Osprey Trust, Deutsche Bank points out that the certificate purchasers, as clearly expressed in the Osprey Trust Agreement, "shall have the exclusive right and obligation to determine the matters referenced in" the Trust Agreement and "shall direct the management of the business and affairs of the Trust."  Harlow Decl. Ex. 4, § 7.01.  Plaintiffs had control over asset purchases by Whitewing because they directed 51% of the Osprey voting

rights.   Certificate Purchase Agreement, Harlow Decl. Ex. 1, at Osprey Associates/Westboro signature pages & Schedule I; Osprey I OM, Harlow Decl. Ex. 6 at 13; Whitewing Management LLC Agreement, Harlow Decl. Ex. 5 at § 6.06(c)(i).

Nor, insists Deutsche Bank, have Plaintiffs' irrelevant arguments shown that the TSA rather than New York law should apply here.   The consent order between Deutsche Bank and the Texas regulators cited by Plaintiffs is unrelated to Enron; it was the result of a global settlement with federal regulators and regulators from all fifty states.   A term of that settlement in Texas provided that Deutsche Bank would pay an administrative fine and consent to TSA jurisdiction for purposes of that resolution only; jurisdiction was never litigated and the limited consent cannot be used to support TSA jurisdiction in a wholly unrelated proceeding.   Moreover the TSA violations stipulated in that order were of Article 581-14, relating to dealer registration, and had nothing to do with Article 581-33 misrepresentations in a particular securities transaction.   The claims giving rise to the settlement arose out of allegedly wrongful conduct identified by the SEC as potentially affecting a nationwide class, including Texas investors.   In contrast, argues Deutsche Bank, here the TSA claims are being brought by two New York Plaintiffs who purchased securities issued by a Delaware Trust and who allege that Deutsche Bank made or assisted with unspecified misrepresentations to Plaintiffs in New York, that Plaintiffs acted on those misrepresentations in New York, and that they were injured in New

York.  Similarly Plaintiffs' citation to *In re Enron Corp. Sec.,*
*Derivative & "ERISA" Litig.*, 235 F. Supp. 2d at 691-92, is
inapposite because it dealt with allegedly false representations
made by Enron from Texas in Washington State Investment Board
Plaintiffs' notes' registration statement.  There was also no
conflict between Texas law and that of other possible states in
that case, whereas here New York law would bar Plaintiffs' TSA
claims.

Deutsche Bank also asserts that Plaintiffs
mischaracterize the deposition testimony of Dominic Capolongo of
DLJ (now Credit Suisse), which is also nowhere mentioned in the
complaint and therefore should not be considered in a Rule
12(b)(6) review.  That testimony states that two DLJ employees
(not Deutsche Bank employees) were based in Houston and worked
there on certain due diligence investigations.  As noted there
were no underwriters or "co-lead" underwriters on the Osprey
certificate offering, so any bank's due diligence for other
purposes is irrelevant to whether there is jurisdiction over
alleged misrepresentations in the sales directly between Osprey
and the certificate purchasers, which were expressly dependent on
the purchasers' own due diligence.

Plaintiffs' state common-law claims must also be
dismissed, Deutsche Bank maintains.  As noted the "co-lead"
underwriter allegations fail because the designation does not
apply to the Osprey offering, both certificates and notes, and
because Plaintiffs fail to identify any specific statement made

- 112 -

by Deutsche Bank to Plaintiffs.  The vague allegations that the bank took part is "drafting sessions" for the Osprey notes OM is similarly vague.  Although Plaintiffs mention Sarlux and Trakya documents contain misrepresentations, they no longer claim that Deutsche Bank authored or sent the documents, but only that the documents show the bank had knowledge.  They do not argue that anyone at Deutsche Bank ever made a false statement about those assets.

        With respect to a duty to disclose alleged material omission, Plaintiffs do not dispute that there is no relationship of confidence nor business transaction that gives rise to a duty to disclose here.  While Plaintiffs argue omission, because Deutsche Bank was not an underwriter in their certificate purchases, it had no obligation to disclose or perform due diligence.  As noted, Plaintiffs expressly undertook to perform their own due diligence, and their certificate purchases were explicitly conditioned on their having received investment information and full transaction documentation that was satisfactory to them and their counsel.

        Regarding the civil conspiracy cause of action, Deutsche Bank argues that Plaintiffs must allege facts demonstrating that Deutsche Bank intended to do more that engage in conduct that resulted in harm to them; it must provide facts showing that it intended to injure them and that it had that intent at the commencement of an agreement to act with another toward that goal.  *Triplex Communications, Inc. v. Riley*, 900 S.W. 2d 716, 719-20

- 113 -

(Tex. 1995).  Moreover "severe recklessness" is not sufficient to constitute scienter for conspiracy:  conspiracy requires two, specific state-of-mind elements, intent to injure and agreement to work with others to accomplish a goal.

Furthermore Plaintiffs fail to allege facts showing actual and reasonable reliance on any specific misrepresentation, argues Deutsche Bank.  Nor have they disputed Deutsche Bank's contentions that they, as certificate purchasers, agreed that they had direct access to information, a critical role in approving Whitewing investments, and that they had their own independent counsel.  Their claim to have relied on the bank's obligation to do due diligence, as discussed, fails.

Finally, maintains Deutsche Bank, Plaintiffs do not allege that their losses were proximately caused by Deutsche Bank.  They have not pleaded facts showing that it made, conspired or substantially assisted in the making of specific misrepresentations to them about Sarlux and Trakya.  Anything they learned they obtained on their own from Whitewing and Enron.  Nor do Plaintiffs allege any direct causal connection between the "accounting income" from the tax transactions allegedly inflating its financial statements and their injuries.

### Court's Decision

As a threshold matter, this Court would point out that it is irrelevant what this Court or any other authority said in another suit or a report about the collapse of Enron.  At issue is whether Plaintiffs in the instant suit in their Second Amended

- 114 -

Complaint (#33) have adequately pleaded their claims under Federal Rules of Civil Procedure 9(b) and 12(b) and the applicable state law.   For this reason the Court has not addressed Plaintiffs' Objection to Deutsche Bank's mischaracterization of facts and the law (#55), charging Deutsche Bank with incorrectly claiming that it has been adjudicated not liable in other cases in the Enron litigation.

Furthermore, "it is axiomatic that a complaint cannot be amended by briefs in opposition to a motion to dismiss."  *In re Baker Hughes Sec. Litig.*, 136 F. Supp. 2d 630, 646 (S.D. Tex. 2001), *citing O'Brien v. Nat'l Prop. Analysts Partners*, 719 F. Supp. 222, 229 (S.D.N.Y. 1989).   Therefore the Court does not consider new arguments raised by Plaintiffs in opposition to Deutsche Bank's motion to dismiss as part of their pleadings and pointed out by Deutsche Bank.

***Attached Documents***

As noted, on a Rule 12(b)(6) review, although generally the court may not look beyond the pleadings, the Court may examine not only the complaint, but documents attached to the complaint and documents attached to the motion to dismiss to which the complaint refers and which are central to Plaintiffs' claim(s), as well as matters of public record.  *Lone Star Fund V. (U.S.), L.P. v. Barclays Bank PLC,* 594 F.3d 383 (5th Cir. 2010), *citing Collins*, 224 F.3d at 498-99; *Cinel v. Connick*, 15 F.3d 1338, 1341,

1343 n.6 (5th Cir. 1994).[59]  Therefore the Court has not considered those submitted that fall outside this restriction.  It does find central to the complaint those documents attached to Deutsche Bank's motion to dismiss.  All others fall outside the parameters of reviewable documents.

### Spoliation Instruction

For the following reasons, the Court finds that Plaintiffs' petition for a spoliation instruction is premature and cannot be used to state a claim under Rule 12(b)(6) and denies the request at this time.

"Spoliation" is "the destruction of evidence . . . . The significant and meaningful alteration of a document or instrument." *Andrade Garcia v. Columbia Med. Ctr.*, 996 F. Supp. 605, 615 (E.D. Tex. 1998)(citations omitted).  "If a party with a duty to preserve evidence fails to do so and acts with culpability, a court may impose appropriate sanctions. . . . The obligation to preserve evidence arises when the party has notice that the evidence is relevant to litigation or when a party should have known that the evidence may be relevant to future litigation.'" *Smith v. American Founders Financial Corp.*, 365 B.R. 647, 681 (S.D. Tex. 2007)(and cases quoted and cited therein).  "A court may . . . assume facts against a party that

---

[59] The Second Circuit similarly permits the court to review under Rule 12(b)(6) "the facts as asserted within the four corners of the complaint" and "the documents attached to the complaint as exhibits and any documents incorporated in the complaint by reference." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007).

destroys or loses evidence subject to a preservation obligation." *Id., citing FDIC v. Hurwitz*, 384 F. Supp. 2d 1039, 1099 (S.D. Tex. 2005). Under the doctrine of spoliation, a jury may draw an adverse inference "'that a party who intentionally destroys important evidence in bad faith did so because the contents of those documents were unfavorable to that party.'" *Whit v. Stephens County*, 529 F.3d 278, 284-85 (5th Cir. 2008), *quoting and citing Russell v. Univ. of Texas*, 234 Fed. Appx. 195, 207 (5th Cir. 2007); *Vick v. Texas Employment Commission*, 514 F.2d 734, 737 (5th Cir. 1975)("The adverse inference to be drawn from the destruction of records is predicated on bad conduct of the defendant. . . . The circumstances of the act must manifest bad faith."); *in accord, Wal-Mart Sores, Inc. v. Johnson*, 106 S.W.3d 718, 721 (Tex. 2003)("a party who has deliberately destroyed evidence is presumed to have done so because the evidence was unfavorable to its case").

The Fifth Circuit has concluded that "[e]videntiary 'presumptions' which merely permit an adverse inference based on unproduced evidence are . . . controlled by federal law." *King v. Ill. Cent. R.R.*, 337 F.3d 550, 556 (5th Cir. 2003); *in accord, Adkins v. Wolever*, 554 F.3d 650, 652 (6th Cir. 2009)(joining the Fourth, Second and Ninth Circuit Courts of Appeals in holding that federal law controls a federal court's imposition of sanctions as relief for spoliated evidence because "a federal court's inherent powers include broad discretion to craft proper sanctions for spoliated evidence").

- 117 -

Nevertheless, because there are so few Fifth Circuit cases addressing imposition of spoliation sanctions and because this case before the Court involves Texas state law claims, the court "may supplement its analysis by applying elements from Texas case law" where they are not contrary to established Fifth Circuit law.[60] *In re Advanced Modular Power Systems, Inc.*, No. 07-34646-H4-7, 2009 WL 2762477, *9 (Bkrtcy. S.D. Tex. Aug. 31, 2009), *citing Silvestri v. Gen. Motors Corp.*, 271 F.3d 583, 590 (4th Cir.) (recognizing that federal law governs, but nevertheless examining New York law); *Flury v. Daimler Chrysler Corp.*, 427 F.3d 939, 944 (11th Cir. 2005)(noting that although federal law governs spoliation, the court applied Georgia law); *Schmid v. Milwaukee Elec. Tool Corp.*, 13 F.3d 76, 78 (3d Cir. 1994)(noting disagreement on whether spoliation is an issue of substantive state law or federal evidence law, but not reaching the choice of law issue because the panel concluded that the district court's decision exceeded the court's bounds of discretion under both).

In *Trevino v. Ortega*, 969 S.W. 2d 950, 953-561 (Tex. 1998), Justice Baker wrote an influential concurrence describing

---

[60] The Court notes that unlike many other jurisdictions, Texas does not recognize spoliation as an independent tort cause of action. *Trevino v. Ortega*, 969 S.W. 2d 950, 952-53 (Tex. 1998); *Adobe Land Corp. v. Griffin*, 236 S.W. 3d 351, 356 (Tex. App.--Fort Worth 2007)(citing *Trevino* and stating, "Rather, spoliation is an evidentiary concept that is best remedied by the trial court within the context of the core lawsuit in which such allegations arise."). New York does recognize an independent action for spoliation against a party, but not against a third-party. *See, e.g., Ortega v. City of New York*, 11 Misc. 3d 848, 851, 852-53, 809 N.Y.S. 2d 884, 889, 890 (N.Y. Sup. 2006).

- 118 -

the procedure and remedies available to Texas courts to protect parties prejudiced by spoliation.  Justice Baker first noted the three purposes served by remedies for spoliation (1) to punish the spoliator for destroying relevant evidence; (2) to deter future spoliators; and (3) perhaps most important, to serve an evidentiary function by allowing courts to use sanctions or submit a "presumption that levels the evidentiary playing field and compensates the nonspoliating party." *Id.* at 954 (Baker, J., concurring).

Texas courts have followed a procedure set out in Justice Baker's concurrence in *Trevino*.  "[T]he inquiry as to whether a spoliation presumption is justified requires a court to consider (1) whether there was a duty to preserve evidence; (2) whether the alleged spoliator breached that duty; and (3) whether the spoliation prejudiced the non-spoliator's ability to present its case or defense." *Adobe Land Corp.*, 236 S.W. 3d at 358, *citing Trevino*, 969 S.W. 2d at 954-55 (Baker, J. concurring); *Offshore Pipelines,* 984 S.W. 2d at 666.

As a threshold matter, before the court determines whether discovery abuse has occurred, the opposing party must demonstrate that the destroying party had a duty to preserve the evidence at issue. *Adobe Land Corp.*, 236 S.W. 3d at 358, *citing Wal-Mart Stores, Inc.*, 106 S.W. 3d at 722.  A duty to preserve the evidence arises "only when a party knows or reasonably should know that there is a substantial chance that a claim will be filed and that the evidence in its possession or control will be potentially

- 119 -

relevant to that claim." *Id., citing id., citing* 1 Weinstein & Berger, *Weinstein's Federal Evidence* § 302.06[4] at 301-28.3 (2d ed. 2003)("[T]here must be a sufficient foundational showing that the party who destroyed the evidence had notice both of the potential claim and of the evidence's potential relevance" before a duty to preserve arises).  Emphasizing that "[a] party should not be able to subvert the discovery process and the fair administration of justice simply by destroying evidence before a claim is actually filed," in *Trevino* Justice Baker opined about at what point during prelitigation does the duty [to preserve evidence] arise and what kind of "notice" is required:

> In [*National Tank Co. v. Brotherton*, 851 S.W. 2d 193, 204 (Tex. 1993)] the Court defined "anticipation of litigation" in the context of whether a party should be allowed to assert an investigative privilege.  The Court focused on how to determine when a party reasonably foresees or anticipates litigation.  Importantly, we did not require actual notice of the potential litigation for a party to anticipate litigation.  Instead we recognized that "*common sense* dictates that a party may reasonably anticipate suit being filed . . . before the plaintiff manifests an intent to sue." . . .  Consequently, the Court held that to determine when a party reasonably anticipates or foresees litigation, trial courts must look at the totality of the circumstances and decide whether a reasonable person in the party's position would have anticipated litigation and whether the party actually did anticipate litigation.  *See National Tank*, 851 S.W. 2d at 207.

*Trevino*, 969 S.W. 2d at 956 (emphasis in original)(Baker, J., concurring).

Once a duty to preserve has been established, the court must determine whether the party breached its duty. *Adobe Land Corp.*, 236 S.W. 3d at 359, *citing Trevino*, 969 S.W. 2d at 957 (Baker, J., concurring).[61]  While the possessor of potential evidence need not retain every document, it must "preserve what it knows, or reasonably should know is relevant in the action, is reasonably calculated to lead to the discovery of admissible evidence, is reasonably likely to be requested during discovery, or is the subject of a pending discovery sanction." *Adobe Land Corp.*, 236 S.W. 3d at 358-59, *citing Tex. Elec. Coop. v. Dillard*, 171 S.W. 3d 201, 209 (Tex. App.--Tyler 2005, no pet.).  Under Texas law, while a spoliator may raise a defense of destruction of evidence pursuant to a corporate retention policy, "when a party's duty to preserve evidence arises before the destruction or when a policy is at odds with a duty to maintain records, the policy will not excuse the obligation to preserve." *Id.* at 360, *citing id.*

Last, the court must ask whether the other side's ability to present its case was prejudiced by the spoliation. *Adobe Land Corp.*, 236 S.W. 3d at 360, *citing Offshore Pipelines*, 984 S.W.2d at 66 (*citing Trevino*, 969 S.W.2d at 954-55 (Baker, J., concurring)).  To do so, the court considers various factors, such

---

[61] The Texas Supreme Court departs from the Fifth Circuit's requirement of bad faith by the spoliator in holding parties accountable for negligent as well as intentional destruction of evidence. *Trevino*, 969 S.W. 2d at 957 (Baker, J., concurring); *Adobe Land Corp.*, 236 S.W. 3d at 359.

as the relevancy of the missing evidence and the availability of other evidence to take the place of the missing information. *Adobe Land Corp.*, 236 S.W. 3d at 360, *citing Trevino*, 969 S.W.2d at 958 (Baker, J. concurring).

If the court determines that the spoliating party had a duty to preserve the evidence, that it breached that duty, and that the other side was accordingly prejudiced, the court has broad discretion in choosing an appropriate remedy, such as a suitable sanction or a spoliation instruction. *Offshore Pipelines*, 984 S.W. 2d at 666.

In the Fifth Circuit, the sanction of an adverse inference instruction may be imposed only after a showing of bad faith by the party being sanctioned, to be determined by an independent investigation by the court to decide whether it has been a victim of fraud.[62] *Smith v. American Founders Financial Corp.*, 365 B.R. 647, 681 (S.D. Tex. 2007), *citing Chambers v. NASCO, Inc.*, 501 U.S. 32, 43-44 (1991)(holding that federal courts have the inherent power to manage their affairs to achieve orderly and expeditious disposition of cases, but this power must be exercised with restraint and discretion, especially in fashioning an appropriate sanction for conduct that abuses the judicial process), and *King v. Illinois Cent. R.R.*, 337 F.3d 550, 556 (5th Cir. 2003), *citing United States v. Wise*, 221 F.3d 140, 156 (5th

---

[62] The court may make credibility determinations during this examination to determine whether misconduct has occurred. *Smith v. American Founders Financial Corp.*, 365 B.R. at 681.

Cir. 2000).  *See also Vick*, 514 F.2d at 737 ("The adverse inference to be drawn from destruction of records is predicated on bad conduct of the defendant"; "[m]oreover the circumstances of the act must manifest bad fath.").  The adverse inference is not automatic where documents are destroyed under a routine policy or "'simply because documents are destroyed after the initiation of litigation.'"  *St. Tammany Parish Hospital Serv, District No. 1 v. Travelers Property Casualty Co. of America*, 250 F.R.D. 275, 276 (E.D. La. 2008), *quoting Russell v. Univ. of Tex. of Permian Basin*, 234 Fed. Appx. 195, 208 (5th Cir. 2007).  A showing of bad faith or bad conduct is essential.

    Thus it is premature to even address Plaintiffs' request for a spoliation instruction at this stage of the litigation.

### General Reference to "Defendants"

    Regarding the generic references to "Defendants" and suggested substitution of "Deutsche Bank," the Court agrees with Deutsche Bank that such a modification would fail to cure the pleading deficiency.  Even before Plaintiffs settled with the other financial institution Defendants, the general reference failed to state a claim under Rule 9(b) against any of them.  It is impermissible under Rule 9(b) to make general allegations that lump all defendants together; instead, a complaint must segregate the alleged wrongdoing of one from another.  *Patel v. Holiday Hospitality Franchising, Inc.*, 172 F. Supp. 2d 821, 824 (N.D. Tex. 2001).  In *Luce v. Edelstein*, 802 F.2d 49, 54 (2d Cir. 1986), the Second Circuit addressed a complaint attributing a number of

representations to "Defendants" and concluded that they failed to meet the requirement of particularity under Rule 9(b) because they did not connect particular representations to particular defendants and therefore necessarily also failed to specify the time, place, often the content of the alleged misrepresentations. *See also DiVittorio v. Equidyne Extractive Industries, Inc.*, 822 F.2d 1242, 1249 (2d Cir. 1987)(dismissing under Rule 9(b) because no allegations in the amended complaint linked any of the defendants in any specific way to any alleged fraudulent misrepresentation or omissions); *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir. 1993). As noted this principle is long established and basic. Plaintiffs have previously amended twice. The Court finds that given Plaintiffs' failure to cure the deficiency in two earlier amendments, justice does not require permitting additional amendments.

**Claims under Sections 12(a)(2) and 15 of the Securities Act of 1933**

*Limitations*

Plaintiffs' claims against Deutsche Bank based on their Osprey I Certificate purchases are time-barred under § 12(a)(2). Plaintiffs' Osprey Certificate purchases occurred in September 1999 (Osprey I) and September 2000 (Osprey III). Enron issued a press release and filed an SEC Form 8K on November 8, 2001, announcing that it would restate its financial statements for years ending December 31, 1997-2000 and the quarters ending March 31 and June 30, 2001 and then declared bankruptcy on December 2,

2001, "red-flag" events giving notice of facts that should have alerted Plaintiffs with the exercise of reasonable due diligence to discovery of the alleged fraud.  The Securities Act of 1933's one-year statute of limitations/three-year statute of repose, 15 U.S.C. § 77m,[63] applied to Section 12(a)(2) claims before Section 804 of the Sarbanes-Oxley Act, 28 U.S.C. § 1658(b), extended that limitations period for "private right[s] of action that involve[] a claim of fraud, deceit, or contrivance in contravention of a regulatory requirement concerning the securities laws," to a two-year statute of limitations/five-year statute of repose, which became effective on July 30, 2002.  This action was filed on April 17, 2003, after the Sarbanes-Oxley's effective date.  Because the limitations/repose period under § 77m would have expired before the effective date of Sarbanes-Oxley, § 12(a)(2) claims based upon Plaintiffs' purchase of Osprey I certificates were already time-barred.  Sarbanes-Oxley's extended limitations/repose periods cannot revive a previously extinguished cause of action. *Margolies v. Deason*, 464 F.3d 547, 551 (5th Cir. 2006); *In re*

---

[63] Section 13, 15 U.S.C. § 77m provides in relevant part,

> No action shall be maintained to enforce any liability created under [§ 12(a)(2)] . . . unless brought within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence. . . . In no event shall any such action be brought to enforce a liability created under . . . [§12(a)(2)] . . . more than three years after the sale.

*Enter. Mortgage Acceptance Co. Sec. Litig.*, 391 F.3d 401, 403-04 (2d Cir. 2004).

For the second purchase, while there is an issue here whether § 77m or § 1658(b), retroactively, applies to fraud-based claims under § 12(a)(2), because the claims arising out of the Osprey III purchase would survive under either, this Court does not need to resolve that question. Thus only the § 12(a)(2) claims based on the Osprey III offering are timely filed.

*Prospectus and Public/Private Offerings*

Even the Osprey III claims fail, nevertheless, because there was no prospectus involved and because the offering was private. Although Plaintiffs argue that the Osprey I and II OMs were provided to them in the sale of the Osprey Certificates as the only material available about the Osprey Trust, that fact, accepted as true for purposes of Rule 12(b)(6) review, does not transform the OMs into prospectuses for the certificates in a private offering.[64] The Supreme Court has defined "prospectus" as "a term of art referring to a document that describes a public offering of securities by an issuer or controlling shareholder" and "must include the 'information contained in a registration statement.'" *Gustafson*, 513 U.S. at 584, 569. Because *Gustafson*

---

[64] As noted earlier, the Osprey Purchase Agreements expressly state that the certificates were sold without being registered and required the purchasers to be accredited investors, exemption them from registration requirement. #41, Harlow Decl., Ex. 1 and 2 at 1,4. Even the Osprey I OM for the Notes states that the Notes were not registered, but offered pursuant to Rule 144A and Regulations S, and the transactions were private. #41, Harlow Decl., Ex. 6.

addressed a private *secondary* sale of securities, it did not specifically address a private *primary* sale of securities from an issuer.  Four Circuit Courts of Appeals have specifically held that no § 12 claim can be brought in any private offering.  *Lewis v. Fresne*, 252 F.3d 352, 357 (5th Cir. 2001); *Maldonado v. Dominguez*, 137 F.3d 1, 8 (1st Cir. 1998); *Joseph v. Wiles*, 223 F.3d 1155, 1161 (10th Cir. 2000); *Yung v. Lee*, 432 F.3d 142, 148 (2d Cir. 2005).  The Fifth Circuit's holding in *Lewis v. Fresne* is binding on this Court.

*Underwriter's Duty of Due Diligence*

Although the parties dispute whether Deutsche Bank was an underwriter for the Osprey offering, Plaintiffs frequently and vaguely state that they relied on Deutsche Bank's duty as an underwriter to perform a due diligence investigation, but they offer no explanation and cite no authority for such an obligation.

There is no statutory requirement that an underwriter conduct a due diligence investigation into a proposed public or private offering.  William M. Prifti, *Underwriter Due Diligence,* §. 5.30, 24 Securities Pub. & Priv. Offerings, (Database updated June 2010).  The term "due diligence" does not occur in any federal securities statutes.

Section 11 of the Securities Act of 1933 "prohibits false statements or omissions of material fact in registration statements" and "identifies various categories of defendants subject to liability for a violation," including underwriters.  *Central Bank of Denver, N.A. v. First Interstate Bank of America,*

- 127 -

*N.A.*, 511 U.S. 164, 179 (1994); 15 U.S.C. § 77k(a)(5).  "Due diligence" is used in case law to describe two affirmative defenses, collectively known as the "due diligence defense," available under § 11(b) of the 1933 Securities Act.  *In re WorldCom, Inc. Sec. Litig.*, 346 F. Supp. 2d 628, 662 (S.D.N.Y. 2004).  The first of the two, employing a negligence standard, recites that "as regards any part of the registration statement not purporting to be made on the authority of an expert," the § 11 defendant will not be liable if he demonstrates that "he had, after reasonable investigation, reasonable ground to believe and did believe, at the time such part of the registration statement became effective, that the statements therein were true and that there was no omission to state a material fact required to be stated therein or necessary to make the statements therein not misleading."  *Id., citing* 15 U.S.C. § 77k(b)(3)(A), and *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 208 (1976).  Second, where the § 11 defendant relies on the opinion of an expert regarding the registration statement, the defense is known as the "reliance defense":  the defendant will not be liable if he shows that "he had no reasonable ground to believe and did not believe, at the time such part of the registration became effective, that the statements therein were untrue or that there was an omission to state a material fact required to be stated therein or necessary to make the statements therein not misleading.  *Id.* at 663*, citing* 15 U.S.C. § 77k(b)(3)(C).  Section 11(c) defines the standard for a reasonable investigation relating to the registration statement:

"The standard of reasonableness shall be that of a prudent man in the management of his own property." *Id.*, *citing* 15 U.S.C. § 77k(c).[65]  The instant case involves a private offering with no registration statement, so there is no § 11 claim for failure to perform a reasonable investigation  against Deutsche Bank.

Section 12 "prohibits the sale of unregistered, nonexempt securities as well as the sale of securities by means of a material misstatement or omission, and it limits liability to those who offer or sell the security."[66]  *Central Bank*, 511 U.S. at 179; 15 U.S.C. § 77l(a).  Under § 12(a)(2) of the Securities Act of 1933, there is a defense of "reasonable care" that is less

---

[65] The SEC explained the duty imposed on an underwriter to conduct a reasonable investigation in *In re the Richmond Corp.*, Exchange Act Release No. 4585, 41 SEC 398 [1961-64 Transfer Binder], Fed. L. Sec. Rep. (CCB) ¶ 76,904, 1963 WL 63647, at *7 (Feb,. 27, 1963), *quoted in part in In re WorldCom*, 346 F. Supp. 2d at 662-63:

> By associating himself with a proposed offering an underwriter impliedly represents that he has made such an investigation in accordance with professional standards. Investors properly rely on this added protection which has a direct bearing on their appraisal of the reliability of the representations in the prospectus. The underwriter who does not make a reasonable investigation is derelict in his responsibilities to deal fairly with the investing public. Such dereliction, moreover, does not serve the statutory objective of achieving a prospectus for the sale of securities which, in all material respects, contains the information necessary for an informed evaluation of the securities offered.

[66] Section 12(a)(2) states that the seller is liable to "the person purchasing such security from him."  In the instant action, Osprey Trust is the seller of the certificates to Plaintiffs.

stringent than that for a "reasonable investigation" under § 11: it provides that a defendant will not be liable if he satisfies "the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of such untruth or omission" that is "necessary in order to make the statements [in a prospectus], in light of the circumstances under which they were made, not misleading." *Id*. at 663*, citing* 15 U.S.C. § 77l(a)(2). There is no prospectus involved in this action either because the offering of the Osprey Certificates was a private offering.

Thus the duties of "reasonable investigation" and "reasonable care" under these statutes would not apply to Deutsche Bank here.

Section 4(2) of the 1933 Act addresses exemptions of "all transactions by an issuer not involving any public offering" from the registration requirement for public offerings. It permits an issuer to make a discrete sale of securities to a specific person or group of persons. Michael K. Wolensky and Nannette L. Wesley, *Due Diligence in Private Placements*, 1995S PLI/Corp 23, 26 (December 1995). The Supreme Court and the SEC view § 4(2) to apply to persons with the same access to information about proposed investments as the issuer could provide through registration and therefore concluded that they do not need the protections of purchasers in a public offering. *Id., citing SEC v. Ralston Purina Co.*, 346 U.S. 119 (1953). The issuer must comply with Regulation D, comprised of a set of rules establishing specific things that must be met by the issuer to obtain a § 4(2)

exemption from registration. (Generally the issuer bears the burden of proving an exemption from registration. *Ralston Purina*, 346 U.S. at 126. The record in this case is devoid of information about if and how Osprey obtained such an exemption and Plaintiffs do not allege that Osprey improperly registered for an exemption.) Moreover, according to Wolensky and Wesley, "Despite the vast case law in securities law as a whole, there are surprisingly few precedents in the context of due diligence in private placements." 1995S PLI/Corp at 26. They conclude their article, "The growing litigation attendant to private placements will eventually force the courts to address the surprising lack of dispositive case law in this area." *Id.* at 38.

This Court has found no authority addressing an underwriter's due diligence duty under the TSA.

For these reasons the Court concludes that Plaintiffs' vague references have not stated a claim against Deutsche Bank for failure to satisfy an seemingly undefined duty of due diligence/reasonable care, especially since the offering of the Osprey Certificates was private and there was no registration statement or prospectus involved.

*Control Person Liability*

Because Plaintiffs fail to state a claim for a primary violation under § 12(a)(2), their derivative control person claim under § 15 also fails. *Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 863 (5th Cir. 2003).

Accordingly the Court grants the motion to dismiss as to Plaintiffs' federal § 12(a)(2) and § 15 claims against Deutsche Bank.

**Applicable state law**

As noted, federal courts apply the forum state's conflict-of-laws rules to determine what law governs state-law claims. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941); *Bailey v. Shell Western E&P, Inc.*, 609 F.3d 710, 722 (5th Cir. 2010). Texas courts first determine whether there is a conflict between Texas law other potentially applicable law. *Bailey*, 609 F.3d at 722, *citing SAVA geumarska in kemijska industria dd. v. Advanced Polymer Sciences, Inc.*, 128 S.W. 3d 304, 314 (Tex. App.--Dallas 2004, no pet.)("if the result would be the same under the laws of either jurisdiction, there is no need to resolve the choice of law question.").

As indicated, common law claims for fraud and civil conspiracy are essentially the same under Texas and New York law, so there is no conflict and therefore no need to determine which governs.

It is clear, however, that because New York's Blue Sky Law, the Martin Act, does not permit private causes of action for securities fraud, it conflicts with the TSA, Texas' Blue Sky Law. *Kerusa Co., LLC v. W10Z/515 Real Estate Ltd. Partnership*, 12 N.Y. 3d 236, 244, 906 N.E. 2d 1049, 1054, 879 N.Y.S. 2d 17, 22 (N.Y. 2009)("'the Attorney General bears sole responsibility for implementing and enforcing the Martin Act'; there is no private

right of action under the statute"), *quoting Kralik v. 239 E. 79th St. Owners Corp.*, 5 N.Y. 3d 54, 58, 799 N.Y.S. 433, 832 N.E. 2d 707 (N.Y. 2005), and *citing CPC Intl. v. McKesson Corp.*, 70 N.Y. 2d 268, 276-77, 519 N.Y.S. 2d 804, 514 N.E. 2d 116 (N.Y. 1987). Thus there is a clear conflict between the TSA and the Martin Act.

As noted, it is unclear whether Texas recognizes a common law claim for aiding and abetting, but Plaintiffs have not asserted one under Texas law, the Court addresses the claim under New York law.

It is also questionable whether Texas recognizes a theory of concert of action. *In re Enron Corp. Sec., Deriv. & "ERISA" Litig.*, 388 F. Supp. 2d 780, 785 (S.D. Tex. 2005); *Juhl v. Airington*, 936 S.W. 2d 640, 643 (Tex. 1996)("Whether such a theory is recognized in Texas is still an open question."), *citing Gaulding v. Celotex Corp.*, 772 S.W. 2d 66, 69 (Tex. 1989)(refusing to apply concert of action theory and expressly declining to approve it); *Okane v. Coleman*, 2008 WL 2579832, *5 (Houston [14th Dist.] July 1, 2008). The *Juhl* court did state that concert of action "requires at least a tacit agreement to participate in some tortious act, done in furtherance of a common goal or plan and which causes injury. . . . This has common elements with common law civil conspiracy, long ago a recognized tort in this state." 936 S.W. 2d at 643-44. Thus the Court examines whether Plaintiffs' complaint satisfies the elements it shares with civil conspiracy.

Therefore for the state statutory securities fraud claim the Court determines which state has the most significant relationship to the issue in dispute.  The Court agrees with Deutsche Bank that under the facts alleged in this action, New York is the state with the most significant relationship to the substantive issues regarding fraudulent inducement of Plaintiffs' purchase of Osprey certificates, the gravamen of Plaintiffs' complaint, and therefore the Martin Act controls.  The factors under *Restatement (Second) of Conflict of Laws* § 148 for fraud and misrepresentation claims relating to Plaintiffs' purchase of the Osprey certificates favor application of New York's law where it conflicts with Texas law:  Plaintiffs are residents of New York, their alleged relationship with Deutsche Bank was centered in New York, they received Deutsche Bank's alleged misrepresentations in New York, they relied on them in New  York, and they suffered injury in New York.  No Texas entity was a party to the purchase transaction.  Osprey Trust, the issuer and seller, is a Delaware statutory business Trust, not a Texas Trust.  While Plaintiffs conclusorily assert that Osprey is a mere shell for Enron, they fail to allege any facts to support that claim or the argument that therefore misrepresentations purportedly made by it or Deutsche Bank on its behalf emanated from Texas.  The factors listed in *Restatement (Second) Conflict of Laws* ¶ 145 for tort claims similarly favor application of New York law where it conflicts with Texas law:  Plaintiffs' injury occurred in New York, they received the alleged misrepresentations and omissions

- 134 -

in New York and relied on them in New York, they reside in New York, and their relationship with Deutsche Bank is centered in New York.  New York clearly has a strong interest in protecting its citizens and their justified expectations from fraud.  Moreover the substantive law of New York that would apply is not complex or difficult to apply.

Therefore claims under the Texas Blue Sky Law, the TSA, must be dismissed,[67] and Plaintiffs have not and cannot state a cause of action under the Martin Act.

### *Fraud:  Material Misrepresentations and Omissions*

*Affirmative Misrepresentations*

The Court agrees with Deutsche Bank that Plaintiffs have failed to specify any affirmative misrepresentations made by a named representative of Deutsche Bank in any documents, identifying the who, what, when, and where required by Rule 9(b); therefore they also have not and cannot plead with particularity either scienter on the part of a Deutsche Bank speaker or writer or reasonable reliance by Plaintiffs on a claimed misrepresentation by Plaintiffs.

Accepting as true for purposes of Rule 12(b)(6) review Plaintiffs' allegation that Deutsche Bank distributed the Osprey

---

[67] For this reason the Court did not discuss the TSA's statute of limitations, which states that a cause of action expires after the earlier of "(a) more than three years after discovery of the untruth or omission, or after discovery should have been made by the exercise of reasonable diligence; or (b) more than five years after the sale."  Tex. Rev. Civ. Stat. Ann. art. 581, § 33(H)(2).  Under this statute, Plaintiffs' claims appear to have been timely filed.

OMs to potential investors in the certificates to provide them with information about the Osprey Trust, despite the fact that the OMs expressly state that they relate only to the Osprey Notes, the Court observes that the OMs also clearly state that all information was provided by Enron and Osprey Trust. #41, Ex. 6 at ii ("THE INFORMATION CONTAINED AND INCORPORATED BY REFERENCE IN THIS OFFERING MEMORANDUM HAS BEEN FURNISHED BY THE ISSUERS [Osprey Trust] AND ENRON.").  Plaintiffs have not alleged facts showing otherwise.

Furthermore Plaintiffs have not identified a specific misrepresentation in Enron's SEC-filed documents, nor alleged facts showing that Deutsche Bank drafted or directed Enron to include specific misrepresentations or make material omissions in either the OMs or in Enron's SEC-filed financial statements.

Plaintiffs assert that they were given and relied upon the August 1999 and June 2000 pamphlets for potential Osprey certificate investors.  They claim there are affirmative misrepresentations in them stating that the Sarlux and Trakya assets were drawn from a blind pool, when they were actually pre-selected, or that the purchase negotiations would be at arm's length and assets sold to Osprey Trust at fair market value when the opposite was true.  Plaintiffs fail to allege facts showing that a particular Deutsche Bank representative knew these statements were misrepresentations, including the nature of and restrictions on Sarlux and Trakya assets, and with scienter created, drafted or directed the drafting of either of these

- 136 -

pamphlets; instead Plaintiffs only retreat to the conclusory assertion that Deutsche Bank worked on or was involved in the Margaux project.  Plaintiffs are required to allege facts showing a Deutsche Bank representative's knowing misrepresentation, or its severe recklessness in not knowing, e.g., that the assets sold to Osprey were exorbitantly priced or that in the event of trigger event, such as a downgrade in Enron's credit or a drop in its stock price, investors would not be protected by the trustee's power to sell and liquidate the assets, in addition to the requisite factual particularity in publishing these false statements (who, what, where, when, how) to support them,.

Plaintiffs do name three Deutsche Bank employees that they claim made material misrepresentations.  For none of them do Plaintiffs adequately plead facts showing material misrepresentations or fraudulent intent (by either showing motive and opportunity to commit fraud or circumstances indicating conscious misrepresentation or behavior).  First, Plaintiffs allege they relied on face-to-face meetings with Deutsche Bank representative Seth Rubin, along with representatives of other Defendant financial institutions, but they do not identify a single representation made by him.  They only allege that Plaintiffs' Doug Stark remembered that Rubin was present along with representatives of other financial institution Defendants when they discussed the offering documents for Osprey I.  #33, ¶ 61.  While the complaint states that Stark claimed that Rubin failed to tell the truth about the assets purchased by Osprey, the

- 137 -

complaint nowhere provides specific facts showing that Rubin knew anything about such matters as the nature of the assets to be purchased by Osprey or Citigroup's use of Osprey to offload $40 million of its risky exposure to Enron.   The only motive identified by Plaintiff for any of the claimed fraudulent conduct by Deutsche Bank generally is high fees, or greed, clearly inadequate because it is universal to virtually all banks and corporations. *See, e.g., Melder v. Morris*, 27 F.3d 1097, 1104 (5th Cir. 1994)(holding that the allegation that the underwriters' motive for committing securities fraud was to obtain substantial fees fails because it would make a mockery of Rule 9(b) by effectively eliminating the scienter requirements, since all securities underwriters are fee seekers).   Plaintiffs fail to allege facts showing that the fees collected were exorbitant or out of line with those collected by other banks for similar services.

Plaintiffs also claim that Deutsche Bank concealed a statement in an email by its employee Paul Cambridge, i.e., "The Osprey transaction was a highly tailored structured finance designed to meet certain balance sheet and income statement goals of Enron." #33, ¶ 97.  By itself this statement does not expose wrongful or illegal conduct nor support an inference of scienter.

About Deutsche Bank's third employee, Mike Jakubik, the complaint tries to suggest knowledge of the alleged fraud by stating generally that Jakubik worked as a member of Enron's Osprey team before he became Deutsche Bank's Enron-liaison person

- 138 -

and was one of the people responsible for marketing Osprey I to potential investors. #33, ¶¶ 101, 103.  The lack of specificity, including the dates when he worked for each entity and what he did in each job or in marketing Osprey I, fails to sustain scienter by a knowing misrepresentation or alleging circumstances indicating conscious misrepresentation or fraudulent behavior under Rule 9(b).  As noted earlier, according to an uncontroverted statement by Deutsche Bank, Jakubik joined Enron in August 1991 and did not move to Deutsche Bank until August 2000, after both of Plaintiffs' purchases of Osprey Certificates.  The complaint conclusorily asserts that Jakubik "knew the Osprey offerings were intended to create a vehicle for dumping [Enron's] problem assets to avoid dramatic write-downs and receiv[e] cash well in excess of the fair market value of these assets," while the Osprey Trust was "a mechanism for funding these overpriced acquisitions with Plaintiffs' funds."  *Id.* at ¶ 102.  It alleges no facts showing how, where, when or from what he supposedly learned these things to support an inference of scienter.  The complaint similarly charges without supporting facts that Jakubik "knew" that there were no arm's length negotiations between Enron and Whitewing because the executives representing each side were Enron employees with incentive to promote Enron's interests or and that Whitewing would pay inflated prices for the assets.  *Id.* at ¶ 103.  The complaint also does not indicate how he learned that the entire Osprey/Whitewing structure was purportedly controlled by Enron. Also lacking the specificity required by Rule 9(b) is the

conclusory allegation that Jakubik helped Deutsche Bank structure and promote the Osprey III offering of Notes and Certificates. *Id.* at ¶ 104.

As another source of fraudulent misrepresentation, Plaintiffs charge Deutsche Bank's analyst reports with misrepresentations. Plaintiffs do not assert that they saw or read a specific Deutsche Bank analyst's report, fail to point to any particular statement(s) within such a report, and do not allege facts demonstrating the analyst's scienter or knowledge of underlying fraud, and therefore cannot demonstrate reliance on such a misrepresentation by Plaintiffs. Deutsche Bank asserts that none of its analysts even addressed the Osprey certificates, and Plaintiffs fail to show otherwise. If the analysts were serving merely as conduits, Plaintiffs fail to attribute any misrepresentations by specific Deutsche Bank officers with scienter that were distributed to the public, and specifically to Plaintiffs, through these analysts.

The only other allegations that might constitute affirmative misrepresentations relate to the tax transactions. But these were never published to Plaintiffs, so they cannot claim to have relied on them or that they proximately caused Plaintiffs' injury. Instead Plaintiffs purportedly relied on Enron's SEC-filed financial statements, which Plaintiffs vaguely indicate must have been distorted by the tax manipulations. But Plaintiffs have not identified any particular misrepresentations by Enron in those financial statements, and thus have not pleaded a claim for fraud

- 140 -

against Enron.   At best, it might be argued that the tax transactions constituted substantial assistance for an aiding and abetting claim against Deutsche Bank or overt acts in a civil conspiracy to defraud, but without adequate pleading of fraud, the aiding and abetting claim and the civil conspiracy claims fail, too.

*Material Omissions*

When particular circumstances impose a duty to speak on a party, silence may constitute a false representation.  *World Help v. Leisure Lifestyles, Inc.*, 977 S.W. 2d 662, 670 (Tex. App.--Fort Worth 1998, pet. denied).   Therefore, where a fraud claim is based on material omissions or non-disclosure, Plaintiffs must allege that Deutsche Bank had an affirmative duty to disclose. Such a duty may arise in four circumstances under Texas law:  (1) where there is a fiduciary or confidential relationship between the parties; (2) where a person voluntarily discloses information, he must disclose the whole truth; (3) when a person makes a representation and new information makes that earlier misrepresentation misleading or untrue; and (4) when a person makes a partial disclosure and conveys a false impression. *Hoggett v. Brown*, 971 S.W. 2d 472, 487 (Tex. App.--Houston [14th Dist.] 1997, pet. denied).   A plaintiff must allege facts demonstrating that the defendant had such a duty to disclose under Rule 9(b).   *Carroll v. Fort James Corp.*, 470 F.3d 1171, 1174 (5th Cir. 2006).   "'In cases concerning fraudulent misrepresentation and omission of facts, Rule 9(b) typically requires the claimant

- 141 -

to plead the type of facts omitted, the place in which the omissions should have appeared, and the way in which the omitted facts made the representations misleading.'" *Id, quoting United States ex rel. Riley*, 355 F.3d at 381.

Because there are no identified misrepresentations by Jakubik in the complaint, perhaps Plaintiffs mean to imply that he, and through him the bank, are liable for material omissions. Even if Plaintiffs had adequately alleged Jakubik knew that Osprey Trust was a dumping ground for Enron's undesirable assets, the complaint does not plead facts showing that he had any duty to disclose that information to Plaintiffs.  No one argues that there was a confidential or fiduciary relationship between Plaintiffs and Deutsche Bank here.  Nor have Plaintiffs identified any specific disclosure by Jakubik or any other person at Deutsche Bank of partial information or information that needed to be supplemented or that a subsequent circumstance made misleading, that would give rise to a duty to disclose to Plaintiffs.

Texas also imposes a duty to disclose "when one party knows that the other party is ignorant of the true facts and does not have an equal opportunity to discover the truth." *Miller v. Kennedy & Minshew, Prof'l Corp.*, 142 S.W. 3d 325, 345 (Tex. App.--Fort Worth 2003, pet. denied); *see also Hoggett*, 91 S.W. 2d at 487.  *In accord Jana L. v. West 129th St. Realty Corp.*, 22 A.D. 3d 274, 277 (N.Y.A.D. 1 Dept. 2005)(where the complaint is based on fraudulent concealment, "[a]bsent a fiduciary relationship between the parties, a duty to disclose arises only under the 'special

- 142 -

facts doctrine, where one party's superior knowledge of the essential facts renders a transaction without disclosure inherently unfair."). While Plaintiffs claim they were ignorant of the fraud and lacking an opportunity to discover the truth, because Plaintiffs have failed to allege facts showing a named official of Deutsche Bank knew about the fraud or was reckless in not knowing, there can be no imposition of a duty to disclose information about which it has not been shown to have known.

*Fraudulent Intent or Scienter*

Finally the Court observes that the identified motive for Deutsche Bank's alleged fraud was the desire for high fees and tax benefits, an incentive nearly universal to financial institutions, corporations, and their officers, and inadequate under both Texas and New York law to state a claim for fraud. *Melder*, 27 F.3d at 1104 (holding that the allegation that the underwriters' motive for committing securities fraud was to obtain substantial fees fails because it would make a mockery of Rule 9(b) by effectively eliminating the scienter requirements since all securities underwriters are fee seekers); *Ellison*, 36 F. Supp. 2d at 639-40 (Where the complaint fails to allege that a defendant obtained anything other than its customary fees for professional services rendered, the receipt of fees is insufficient to raise a strong inference of fraudulent intent). As pointed out by Deutsche Bank, nowhere in the complaint have Plaintiffs alleged facts demonstrating that the fees earned by Deutsche Bank were exorbitant or excessive.

**Aiding and Abetting**

Common law aiding and abetting of a fraud under New York law, to which Rule 9(b)'s heightened pleading standards apply, requires pleading facts showing (1) the existence of a fraud; (2) defendant's actual knowledge of the fraud; and (3) that defendant provided substantial assistance to advance the fraud's commission. *Anzerilla v. Am. Tobacco Co.*, No. 11754/96, 2000 WL 34016364, *3 (N.Y. Sup. Ct. Oct. 27, 2000).  Because Plaintiffs have also failed to plead a fraud claim against Enron with the requisite detail, the aiding and abetting claim against Deutsche Bank fails, too.   Plaintiffs have also not pleaded with the requisite specificity Deutsche Bank's actual knowledge of the primary violator's fraud.

Finally, with regard to Deutsche Bank's alleged material omissions, as noted earlier, New York law does not recognize an aiding and abetting cause of action based on inaction or silence where there is no confidential or fiduciary relationship or duty to disclose.  *Jabran v. La Salle Bus. Credit, LLC*, 33 A.D. 3d 424, 424, 824 N.Y.S. 2d 224, 225 (N.Y.A.D. 1 Dept. 2006); *Stanfield Offshore Leveraged Assets, Ltd.,* 64 A.D. 3d 472, 476, 883 N.Y.S. 3d 486, 489 (N.Y.A.D. 1 Dept. 2009).

**Civil Conspiracy/Concerted Action**

Because conspiracy is not an independent cause of action under either Texas or New York law, Plaintiffs' failure to plead sufficiently an underlying fraud claim against either Deutsche Bank or Enron requires dismissal of the conspiracy claim.  *Zarzana*

*v. Ashley*, 218 S.W. 3d 152, 162 (Tex. App.--Houston [14th Dist.] 2007)("conspiracy is not an independent cause of action but requires an underlying tort, which may include fraud," and if the fraud claim is dismissed, it is proper to dismiss the conspiracy claim); *Filler v. Hanvik Bank*, 156 Fed. Appx. 413, 417-18 (2d Cir. 2005).

Furthermore, both civil conspiracy and concerted action claims require facts demonstrating an agreement among, a meeting of the minds of, the conspirators regarding the object or course of action with an intent to commit the act which results in injury *Morris*, 981 S.W. 2d at 675. Plaintiffs' complaint fails to allege facts showing such an agreement between Enron and Deutsche Bank to defraud investors in the Osprey Certificates.

Accordingly, for the reasons stated above, the Court finds that Plaintiffs have failed to adequately state any of their causes of action against Deutsche Bank and therefore

ORDERS that Deutsche Bank's motion to dismiss under Federal Rules of Civil Procedure 12(b)(6) and 9(b) is GRANTED. Therefore this case is CLOSED.

**SIGNED** at Houston, Texas, this 6th day of January, 2011.

_____
MELINDA HARMON
UNITED STATES DISTRICT JUDGE